UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHILDREN'S NATIONAL MEDICAL CENTER<br><br>&<br><br>BRSI, L.P. d/b/a BENEFIT RECOVERY SPECIALISTS<br><br>Plaintiffs,<br><br>v.<br><br>TODD HICKS, INDIVIDUALLY, AND ON BEHALF OF TODD HICKS, JR., DECEASED,<br><br>&<br><br>LOCAL UNION NO. 639, BUILDING, INC. d/b/a INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 639 and d/b/a LOCAL 639<br><br>&<br><br>LOCAL UNION NO. 639, BUILDING, INC. d/b/a INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 639 d/b/a Teamster's Local 639 - Employer's Health Trust Fund<br><br>Defendants. | No. 06-0317RJL |



EXHIBIT C

## DECLARATION OF LESTER PORIS

I, Lester Poris, do hereby declare as follows:

1. "I am employed by Children's National Medical Center as its Manager of Credit & Collections. I have held this position since March 1999. My job duties include being responsible for the collection of all "self-pay" accounts, co-payments, deductibles, and supervise

and manage these collections in the department. I am in charge of the administration of these claims in my department and I have been working on this account for several years along with others under my direction and supervision.

2. On January 12, 2003, Todd Hicks, Jr., a minor, was admitted to Children's National Medical as a result of a serious automobile-pedestrian accident. The hospital received Mr. Hicks in the emergency room. While physicians and hospital staff were working on Mr. Hicks to stabilize him, our admitting department contacted the managed care company that we were told handled care and payments relating to Mr. Hicks' health insurance. The company is called Alliance/MAMSI. The hospital has a contract with Alliance/MAMSI regarding payments owed to the hospital.

3. On or about January 12, 2003, Alliance/MAMSI told us that on behalf of Teamster's Local 639, which we were told represented his father, Children's National Medical Center was authorized to provide care for Mr. Hicks and that Local 639 would pay the charges that we had agreed to with our contract with Alliance/MAMSI. Alliance/MAMSI told us that Mr. Hick's coverage started on about January 1, 2002, that charges would be paid at 100% of the rate in the hospital's contract with Alliance/MAMSI, that there were no deductibles or co-payments due, and that the lifetime maximum was $1 Million dollars. Relying on the promised payments, we did not request payment up front, did not request any deductibles or co-pays, and provided care to Mr. Hicks over the next several days until his death, which occurred on or about January 14, 2003. Throughout the time that Mr. Hicks was our patient, at the request of his parents and Alliance/MAMSI (on behalf of Local 639), the hospital provided the necessary medical care, services, and goods that Mr. Hicks needed until his death.

4. The hospital prepared a bill for the services provided on or about January 20, 2003. Since Children's National Medical Center had a contract with Alliance/MAMSI that set some prices for the care provided at a reduced rate, the total amount of the hospital's portion of the initial bill was $75,306.56. Pursuant to the hospital's contract with Alliance/MAMSI, we submitted the bill to Alliance/MAMSI on or about February 11, 2003. Alliance/MAMSI informed us that all payments would be made by Local 639, which I understood to be a local unit of the Teamsters Union, which represented Todd Hicks, Sr. A true and correct selection from the billing section of the hospital's contract with Alliance/MAMSI is attached to this Declaration as Exhibit 1.

5. On about February 11, 2003, we called Local 639 to follow up on the bill and request for payment. The Local 639 representative told us that Local 639 needed additional detailed information about the bill, which they acknowledged receiving. The Union indicated that once they received the detailed billing information, the Union would pay the bill. On or about February 19, 2003, we sent Local 639 a bill with additional details as requested. We periodically followed up with Local 639 to check on the status of payment, offering to provide any additional information needed to help Local 639 process and make the payment required under the hospital's agreement with Alliance/MAMSI, which I understood had a contract with Local 639 which bound Local 639 to follow the terms of the hospital's contract with Alliance/MAMSI. A copy of the Alliance/MAMSI's contract with Local 639 is attached to this Declaration as Exhibit 2.

6. On or about August 13, 2003, the hospital received an "Explanation of Benefits" from Local 639, which indicated that Local 639 wanted a "subrogation form" signed by the patient. A true and correct copy of the Explanation of Benefits, often called an "EOB" is attached to this Declaration as Exhibit 3. This was the first correspondence that the hospital received from Local 639. Based on the Union's request, we called Local 639 to find out what they wanted in order to process and pay the claim. The Local 639 representative told us that they needed a subrogation form signed by Mr. Hicks, Sr. We called Mr. Hicks, Sr. to ask about the subrogation. Mr. Hicks referred us to his attorney, Mr. Lawrence Thrower. Mr. Thrower told us that Mr. Hicks had already signed a subrogation form and sent it to Local 639 but that he would send another signed subrogation form to Local 639.

7. In spite of Local 639's initial promises that payment was authorized, that the payment would be made, that it was being processed, by March 2004, the hospital had not received any payment. On March 11, 2004, we called Local 639 to follow up on Local 639's payment, which was already long overdue under our agreement with Alliance/MAMSI. The Local 639 representative told us that they were still working with Mr. Hicks to get a subrogation. We informed Local 639 that further delays were unacceptable. Local 639's non-payment was a breach of the hospital's contract with Alliance/MAMSI. In response, the Local 639's representative told us that she would call the hospital back. Local 639 did not return the call.

8. On May 21, 2004, a Local 639 representative called the hospital. She told us that Local 639 had received the subrogation form that they needed, that they were in the process of "keying it in" and that the hospital's claim would be processed and paid.

9. On July 2, 2004, I spoke with Local 639 and told them that payment had still not been received. Contrary to our earlier discussions with Local 639, the representative told us that they still needed a signed subrogation form. I told them that they already told me that they had a signed subrogation form but that, in spite of that, Local 639's obligation under the Alliance/MAMSI agreement to pay the hospital's bills was not dependent upon any subrogation form. The representative told me that they would call me back. Local 639 did not return the call.

10. On December 3, 2004, I called Local 639 again to check on payment. The Local 639 representative acknowledged that they received the signed subrogation form, but, for the first time, told me that they wanted Mr. Hicks' attorney to sign it. This was the first time we were notified that Local 639 wanted Mr. Hick's attorney to sign the subrogation. The hospital never received any written notice of Local 639's request for Mr. Hick's attorney to sign a subrogation form. The Local 639 representative told me that Local 639 had turned the question over to "legal", that he would research it, and that he would call me back. The Local 639 representative did not tell me that the claim was being denied or that it had been denied. I continued to follow up Local 639 on the payment and status, but Local 639 indicated that it was reviewing the issue -- without giving the hospital any denial of the claim.

11. On May 31, 2005, I spoke with an attorney who represented himself to be the attorney for Local 639. He told me that the Union wanted a subrogation letter signed by Mr. Hicks and his

attorney, Lawrence Thrower. For the first time, Local 639 -- through this attorney -- told me that the Union would not pay the hospital's claim until it received another signed subrogation form, this time from Mr. Hicks' attorney, and that the Union was denying the claim until it was received. I spoke with Mr. Hicks' attorney and asked him to sign the subrogation form. While he was very pleasant, he informed me that he could not sign the form and that the hospital could not get him to sign the form.

12.    As of the date of this Declaration, neither Local 639 nor any person or company affiliated with Local 639 has given the hospital a written denial of the hospital's claim. Furthermore, the hospital has not received: (1) any written notification of a denial stating the basis of the denial (Mr. Thrower not signing a subrogation); (2) any notice of any "plan", "appeal", or alleged rights or obligations under any policy, contract, or plan operated by Local 639, or (3) or any other information stating any basis for a denial or what the hospital could do about it with respect to Local 639 or any other party. I have reviewed the hospital's file and have been unable to find any assignment signed by Mr. Todd Hicks, Sr.

13.    As of the date of this Declaration, the hospital is owed approximately $88,595.95 and $12,777.00 in physician charges for an approximate total of $101,372.95. Since Local 639 has not paid as agreed under the Alliance/MAMSI contract with the hospital, or Local 639's agreement with Alliance/MAMSI, no credits, prompt payment reductions, or other credits are owed to Local 639. Local 639 has not made any payment to the hospital on its claims."

14.    I declare that under penalty of perjury this declaration is true and correct and to the best of my knowledge and/or belief.

Executed on: ___3/13/06___                    _____
                                               Lester Poris

## Alliance and MAPSI Claims

*Alliance/MAPSI is not the claims payor. Alliance/MAPSI only processes the claim for completeness, accuracy, and repricing and forwards the claim to the appropriate claims payor for payment.*

Alliance/MAPSI practitioners must mark all claims "Alliance PPO, LLC" or "MAPSI" and send to the Alliance/MAPSI address identified on the participant's identification card.

*Remember to have the participant assign the claim. This is essential if you are to be reimbursed properly.*

The participant will provide you with:
- Participant name, address, date of birth and Social Security number
- Employee (Insured's) name, address and Social Security number
- Insured's group name and group number from their insurance card

You fill out:
- Individual practitioner or group practice name(s)
- Address
- Federal tax identification number or practitioner Social Security number
- Group name and payor name
- Appropriate CPT and ICD-9 codes and charges
- Alliance/MAPSI practitioner number (Same as M.D. IPA/OCI/MAMSI Life and Health Insurance Company practitioner number).

Your claim cannot be paid or processed if any of the following information is omitted:
- Participant's name, address and Social Security number
- Insured's Social Security Number
- Insured's complete name and address
- Insured's Group Number and/or Group Name (Please include both if that information is available)
- Your Practitioner Name and Number
- Your Tax Identification Number
- CPT Code(s)
- Date(s) of Service
- Diagnosis
- Description of Service
- Requested amount/charges
- Bill with HCFA-1500 claims form

*Incomplete or inaccurately completed claim forms will be returned to your office, which delays processing and payment.* Completed claim forms will be processed and the appropriate fee maximums will be applied. Once processed by Alliance/MAPSI, the claim will be forwarded to the appropriate claims payor.

You will receive appropriate reimbursement from the claims payor, which may be the participant's group, third party administrator, insurance carrier or union fund. Preferred practitioner services are reimbursed according to your contract. Practitioner claims are paid according to current CPT and ICD-9 codes; use of incorrect codes may affect your reimbursement.

In some instances, the physician's/practitioner's established charge may exceed Alliance's/MAPSI's maximum allowable reimbursement. The claims payor will compensate the physician/practitioner according to the contracted amount, minus the insured's co-payment or any deductible (if applicable).

Chapter 14 - 3

*Physicians Health Plan of Maryland, Inc., Physicians and Health Care Practitioners Manual for MAMSI Health Plans,*
*11/20/00*

EXHIBIT

Some participants do not have office visit co-payments; reimbursement is then at a percentage rate of your contracted amount. For all eligible covered services, the participant is responsible for the difference between the Alliance/MAPSI contracted amount and the amount reimbursed by the claims payor. *Practitioners are not permitted to balance bill the participant for amounts in excess of the Alliance/MAPSI contracted amount for covered services.*

The claims payor will send you an Explanation of Benefits (EOB) with itemized explanations of reimbursement amounts for services. It will state the billed amount, the Alliance/MAPSI maximum allowable reimbursement amount and the amount which was adjusted based on contract or benefit policies. Once payment has been received, participants may be billed for the difference between the Alliance/MAPSI maximum allowable and the amount paid by the payor. According to your practitioner contract, billing the participant for reimbursement in excess of the contracted amount for covered services is prohibited.

If you have any questions regarding reimbursement, call our Professional Services Department.

Chapter 14 - 4

*Physicians Health Plan of Maryland, Inc., Physicians and Health Care Practitioners Manual for MAMSI Health Plans, 11/20/00*

### Claim Inquiries

We can verify the receipt, pricing and mail date of a claim, but inquiries regarding payment of Alliance/MAPSI claims should be directed to the payors. To do so, provide social security and group number of Alliance/MAPSI participants.

### Mail Inquiries

Please mail claim inquiries using the Claim Information Request Form. These forms may be obtained by calling the Professional Services Department.

The 3-part form was designed to give the physician/practitioner an efficient means of inquiring about a claim. The physician/practitioner or his/her staff should complete the unshaded portion of the form, retain the pink physician/practitioner copy, and return remaining copies to the Health Plan. A claims analyst will research each inquiry, respond in the gray shaded area, and return the original copy to the physician/practitioner. A response is provided within 30 days of receipt. The form includes complete instructions.

### Phone Inquiries

All physician/practitioner telephone inquiries regarding the status of a claim should be directed to our Professional Services Department (See Appendix 2). Be prepared to provide the following information:

- Participant name and identification number
- Practitioner name and identification number
- Date(s) of service for the claim

Alliance/MAPSI participants with claim inquiries or questions should be instructed to contact a Member Services representative at the number printed on their identification card.

### Web Page Inquiries

Practitioners may find out a claim's status on our Web site, www.mamsi.com. The site gives a ninety (90) day history. Please contact our Professional Services Department to set up your specific user name and password.

### Practitioner Claims Appeals Procedures

If a payor denies a claim, the practitioner will be notified by the payor's EOB. *A practitioner may appeal or resubmit additional information by the date referred to by the payor on the EOB.*

When resubmitting additional information based on a denial or to correct a payment, *always include a copy of the remittance and forward it to the address on the remittance.*

Send all appeals regarding repricing or discount amounts in writing to:

*MAMSI Health Plans-Alliance Appeals*
*P. O. Box 934*
*Frederick, MD 21705-0934*
*Attention: Control Desk*

Chapter 14 - 5

Physicians Health Plan of Maryland, Inc., Physicians and Health Care Practitioners Manual for MAMSI Health Plans, 11/20/00

annexed to this Agreement as Attachment A and incorporated by reference herein.

Subject to Section VI below, for all bills received by Health Plan in substantially complete form that are not paid within forty-five (45) days, Health Plan shall pay Hospital the amount due in accordance with the compensation schedule plus interest in the amount of one and a quarter (1.25) percent per month on the balance owed; provided, however, this provision shall not entitle the Health Plan to delay payment beyond the 45 day period. Time is of the essence with respect to the payment period. Notwithstanding this provision, in the event Health Plan does not receive a bill from Hospital within ninety (90) days of the date of discharge of the Member or the date of Service(s), as applicable, Health Plan shall pay Hospital the amount due in accordance with the compensation schedule within ninety (90) days from the date the bill is received and, if Health Plan fails to pay within this period, Health Plan shall pay an interest rate of one and a quarter (1.25) percent per month.

Hospital shall submit bills to Health Plan in batches by certified mail. In an effort to ensure verification of Health Plan's receipt of all bills, Health Plan shall provide Hospital with written verification of each bill in batches received from Hospital within seven working days of receipt of such bills. Such verification shall take the form of an itemized list of each bill received including the following items from the UB-82 billing form:

Patient name,
Patient control number,
Total charges, and
Date(s) of service.

All verification lists shall be sent by certified mail to:

HMO Billing Manager
Children's Hospital National Medical Center
8737 Colesville Road, 6th Floor
Silver Spring, Maryland  20910

VI.  **BILLINGS**

The Hospital shall bill the Health Plan for all Hospital Services rendered to Members. Billings shall include identifying patient information and an itemized record of services and charges in customary bill form (UB-82). All bills shall be sent to:

M.D. Individual Practice Association, Inc.
451 Hungerford Drive, Suite 700
Rockville, Maryland  20850-4168

6

Case 1:06-cv-00317-RJL    Document 13-4    Filed 03/14/2006    Page 9 of 13

Hospital agrees and warrants that in no event, including, but not limited to, non-payment by Health Plan, Health Plan insolvency or breach of this Agreement, shall Hospital bill, charge, or collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or subscriber for Covered Services provided under this Agreement. This provision shall not prohibit Hospital from billing and collecting from the Member or subscriber for applicable copayments and deductibles and non-Covered Services. Hospital further agrees that this provision and warranty herein shall survive termination of this Agreement, regardless of the cause giving rise to termination, shall be construed to be for the benefit of the Member or subscriber, and shall supersede any oral or written contrary agreement now existing or hereafter entered into between Hospital and any Member or subscriber or any person acting on a Member's or subscriber's behalf. Any modification, addition, or deletion to this paragraph shall become effective on a date no earlier than fifteen (15) days after the Virginia State Corporation Commission or appropriate state regulatory agencies have received written notice of such proposed change.

Except for circumstances which are beyond the control of Hospital, Hospital shall make reasonable efforts to submit all bills within ninety (90) days of the date of discharge of the Member or date of Service(s), as applicable. No payment shall be made unless the bill for Hospital Services is received within one (1) calender year after the date of discharge of the Member or date of Service(s), as applicable; provided, however, for a Member who is hospitalized continuously, Hospital may, at its option, submit a bill every thirty (30) days. Hospital shall appeal all Health Plan denials of payment within one hundred and fifty (150) days from the date Hospital receives written notice of a denied claim. All billings by Hospital may be considered final by Health Plan unless adjustments are requested in writing by Hospital within sixty (60) days after receipt of such billing by Health Plan.

Health Plan shall pay the Hospital 90% of the amount due as set forth in this Agreement on all disputed claims pending resolution of the dispute; provided, Hospital responds in writing within 30 days to written inquiries received from Health Plan regarding disputed amounts. If Health Plan disagrees with the charges on any bill, it shall notify Hospital in writing of the disputed charges within thirty (30) days after receipt of the bill. The above provision for 90% payment on disputed claims does not apply to claims which have been denied for reasons other than disputes related to the amount of charges for services rendered by Hospital.

7

## ALLIANCE/MAPSI
## Participation Agreement

This Participation Agreement is entered into this 1st day of June, 1993, between the Health Care Cost Containment Corporation of Mid-Atlantic Region, Inc. ("HCCCC"), Teamsters Local 639 Employers Health Trust ("the Fund"), and Alliance PPO, Inc. and MAPSI (collectively referred to as "Alliance").

WHEREAS, the Health Care Cost Containment Corporation of Mid-Atlantic Region, Inc. has entered into two Purchaser Service Agreements dated, January 1, 1992, one with Alliance PPO Inc., and the other with MAPSI ("the Agreements"), a copy of which is attached and incorporated herein, which permit those Health and Welfare Trust Funds which are members of the HCCCC to become Member Funds in the Alliance PPO network, utilization review services and MAPSI mental health and substance abuse services; and

WHEREAS, the Fund has elected to become a Member Fund pursuant to one or both of the Agreements.

NOW THEREFORE, in consideration of the mutual covenants contained herein, it is hereby agreed as follows:

1. The Fund shall be a Member Fund pursuant to one or both of the Agreements, and be entitled to all the rights, privileges and obligations of Member Funds in accordance with the terms of such Agreements and such terms as incorporated herein by reference until such time as the Agreements shall terminate in accordance with its terms, or until such time as the Fund may earlier elect to terminate its participation under the terms of this agreement.

2. The Fund hereby elects to participate in the following portions of the Agreements:

    ☒ PPO      ☒ UR      ☐ MAPSI

3. Alliance agrees to provide to the Fund such services and obligations as are established for Member Funds under the Agreements, with respect to the services elected hereunder.

4. The Fund agrees to pay to Alliance on or before the fifth day of each month a monthly contribution obligation in accordance with the schedule set forth in the Agreements.

-1-

EXHIBIT 2

The Fund agrees to pay Health Care Cost Containment Corporation of Mid-Atlantic Region, Inc. an administrative fee per participant per month in accordance with the fee schedule attached to the Agreements for tasks performed by "HCCCC" in behalf of and as agreed to by the Fund and HCCCC. The Fund recognizes that the monthly payment hereunder includes this administrative charge which will be paid from Alliance to HCCCC only after receipt by Alliance.

5. The Fund agrees to provide to Alliance its Summary Plan Description and any modifications to its plan of benefits which shall occur from time to time.

6. This Participation Agreement shall continue in full force and effect until the earlier of a) the termination of the Agreements, or b) the date upon which the Fund shall set to terminate its participation, provided, however that the Fund shall have provided no less than 60 days written notice to HCCCC and Alliance that it will terminate its participation, or c) at the option of Alliance, if the fund fails materially to pay, or provide sufficient funds to pay, claims for Covered Services and for other expenses of the Fund in accordance with the terms of this Participation Agreement and pursuant to the schedule of benefits of the Fund, or shall fail to pay to Alliance the compensation due hereunder.

_____
Alliance

_____
HCCCC

_____
Union Trustee
Phillip Feaster

_____
Employer Trustee
Roger Olson

-2-

## MEMBERSHIP AGREEMENT

The TEAMSTERS LOCAL 639 - EMPLOYERS HEALTH TRUST (hereafter "Trust Fund") hereby agrees to participate on behalf of its eligible participants in the Health Care Cost Containment Corporation of The Mid-Atlantic Region (hereafter "Corporation") under the following terms and conditions:

1. It is understood that the Corporation is a non-profit corporation established to assist Health and Welfare Trust Funds in Maryland, Washington, D.C., and Virginia in matters of health cost containment.

2. The Trust Fund hereby agrees to participate in the Corporation, and to appoint one representative from Labor and one from Management to serve as Directors of the Corporation and to comply with the terms of the By-Laws of the Corporation as they may be amended from time to time. A copy of the By-Laws in existence as of September 6, 1990, is attached and the By-Laws are hereby incorporated into this agreement.

3. The Trust Fund agrees to contribute $.50 per eligible participant for each participant eligible for health benefits in its plan as of the date of participation. The contribution will be made no later than ninety (90) days following such date. It is the purpose of this contribution to provide initial funding for the efforts of the Corporation. It is contemplated that periodic assessments or contributions may be required from participating Trust Funds to provide the necessary funding for operations of the corporation. By the execution of this Membership Agreement, the Trust Fund does not agree to make any contribution beyond the initial contribution set forth above.

4. The Trust Fund may cancel its participation in the Corporation at any time by delivery of a written Statement of Cancellation.

5. In the event the Corporation shall determine to cease operations, it shall refund any remaining balance of its assets to the then participating Trust Funds on a *pro rata* basis in accordance with the contributions made.

Dated 5/25/93

_____
Secretary
PHILIP A. FEASTER

_____
Health Care Cost Containment
Corporation of The Mid-Atlantic
Region
By: President

_____
Chairman
Roger D. Olson

```
                    TEAMSTER  LOC  639-EMPLOYERS*H1
                              HEALTH TRUST
                         3130 AMES PLACE, N.E.
                         WASHINGTON, DC 20018

                      EXPLANATION   OF   BENEFITS

                   UNITED   PARCEL   SERVICE  --  UP44


EMPLOYEE:  TODD HICK                         SSN: 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
           1011 RED MAPLE VIEW TERRACE       CLAIM: 639-ACQ-03-064885-860
           CHURCHTON, MD  20733


PATIENT: TODD HICKS
================================================================================
TREATMENT  PROV SERV                DEDUCT                         NOT
 DATES     CODE CODE     CHARGE     AMOUNT  PCT     PAYMENT      COVERED     NC
01/12-01/14 (1)  105    88595.95            80                   88595.95    30
                        ────────                                 ────────
                        88595.95                                 88595.95
OTHER INSURANCE CREDITS:                             .00
                                                    ────
TOTAL BENEFITS PAID:                                 .00
================================================================================
                      PAYMENT   DISTRIBUTION
  CODE    PAYEE                              CHECK NBR           AMOUNT
  (E)     TODD HICK                                                .00
  (1)     CNMC - CHILDRENS NATIONAL MEDICAL                        .00
================================================================================
     SERVICE   CODE                    |      NOT    COVERED    CODE
105 HOSPITAL ROOM & BOARD-BASIC S/P NO  |30 INFORMATION PREV. REQUESTED NOT RECE
────────────────────────────────────────────────────────────────────────────────
SUBROGATION REQUESTED HAS NOT BEEN RETURNED  PLAN CAN NOT PAY
  YOU HAVE SATISFIED $   200.00 OF YOUR TOTAL FAMILY DEDUCTIBLE.
  PPO DEDUCTIBLE: $     .00, STANDARD INDEMNITY DEDUCTIBLE: $      .00.
  YOU HAVE SATISFIED $    59.10 OF YOUR TOTAL PATIENT DEDUCTIBLE.
  PPO DEDUCTIBLE: $     .00, STANDARD INDEMNITY DEDUCTIBLE: $      .00.
================================================================================
PREPARED BY: D. HAYES              ON: 08/08/03
================================================================================
```

RECEIVED BY
AUG 1 3 2003
Business Operations

PROVIDER: CNMC - CHILDRENS NATIONAL MEDI
          P.O. BOX 37214
          BALTIMORE, MD  21297-7214

EXHIBIT 3

PRINTED BY: gvaughan  DATE: 3/9/2006