# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHILDREN'S NATIONAL MEDICAL CENTER<br><br>&<br><br>BRSI, L.P. d/b/a BENEFIT RECOVERY SPECIALISTS<br><br>Plaintiffs,<br><br>v.<br><br>TODD HICKS, INDIVIDUALLY, AND ON BEHALF OF TODD HICKS, JR., DECEASED<br><br>&<br><br>LOCAL UNION NO. 639, BUILDING, INC. d/b/a INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 639 and d/b/a LOCAL 639<br><br>&<br><br>LOCAL UNION NO. 639, BUILDING, INC. d/b/a INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 639 d/b/a Local 639 - Employer's Health Trust Fund<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     Civil Action No. 06-0317RJL |

**PLAINTIFFS' SUPPLEMENTAL AND SUR-REPLY MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Children's National Medical Center ("Children's") and Benefit Recovery Specialists, Inc.

("BRSI") (collectively "Plaintiffs") file this Supplemental and Sur-Reply Memorandum of Points

and Authorities in Opposition to Defendant Local Union No. 639, Building, Inc. d/b/a International Brotherhood of Teamsters, Local 639 and d/b/a Local 639 - Employer's Health Trust Fund's ("Health Fund") Motion to Dismiss or, in the alternative, for Summary Judgment ("Motion to Dismiss"). Plaintiffs' sur-reply is necessary because the Health Fund's reply raised issues beyond the scope of its motion or Plaintiffs' opposition, which Plaintiffs must address to complete the record.

## I.
## PROCEDURAL BACKGROUND

1.　　On January 12, 2006, Plaintiffs filed their Original Complaint against Defendants Todd Hicks, Individually, and on behalf of Todd Hicks Jr., Deceased (collectively the "Hicks Defendant" unless noted otherwise), and Local Union No. 639, Building, Inc. d/b/a International Brotherhood of Teamsters, Local 639 and d/b/a Local 639 ("Local 639") in the Superior Court for the District of Columbia. On February 3, 2006, Plaintiffs filed their First Amended Complaint and a Motion for Leave seeking to add the Health Fund as a Defendant along with an additional theory of recovery based on alter ego.

2.　　On February 23, 2006, the Health Fund then filed its Notice of Removal to this Court. Days later, on March 1, 2006, the Health Fund filed its Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. The Health Fund has not since amended or supplemented its Motion to Dismiss.

3.　　After further investigating the facts, claims, damages and the relationship between the parties, Plaintiffs then sought leave on March 13, 2006, to file their Second Amended Complaint. The Court granted Plaintiffs' leave and filed Plaintiffs' Second Amended Complaint, Subject to, and Without Waiver, of Motion to Remand on March 21, 2006. The

parties then filed, and the Court approved, two consecutive motions to stay all proceedings from approximately March 31, 2006 until August 6, 2006.

4.      Plaintiffs' Second Amended Complaint, based on further investigation, no longer alleges an assignment of benefits from a participant of an ERISA benefit plan to Plaintiffs. Plaintiffs' causes of action, as alleged in the Second Amended Complaint, instead are based on a separate contractual agreement Children's had either directly or indirectly with the Health Fund, Local 639 and/or other third parties.  In doing so, Plaintiffs have cured all of the alleged deficiencies addressed in the Health Fund's Motion to Dismiss.

## II.
## CONTRACTUAL ARRANGEMENT BETWEEN THE PARTIES

5.      For more than eighteen (18) years Children's has been a party to a Hospital Services Agreement with M.D. Individual Practice Association, Inc. ("M.D. IPA") ("Children's Service Agreement").  *See* **Exhibit A**.  As a result of Children's Service Agreement, Children's agreed to provide covered medical services to M.D. IPA's members.  *See id.*

6.      Since 1992, the Health Care Cost Containment Corporation of Mid-Atlantic Region ("HCCCC") and Alliance PPO, Inc. ("Alliance") have been parties to a Purchase Service Agreement ("HCCCC Service Agreement").  *See* **Exhibit B**.  In accordance with the HCCCC Service Agreement, Alliance agreed to arrange health care providers for HCCCC's members. *See id.*  As previously provided in the Declaration of Lester Poris, the Health Fund and/or Local 639 are members of HCCCC and Alliance.  *See* Exhibit 2 to the Declaration of Lester Poris (Plaintiffs attached to their Opposition Brief the declaration of Lester Poris as **Exhibit C** which is attached and incorporated herein).

7.      On information and belief, M.D. IPA and Alliance are subsidiaries of the Mid Atlantic Medical Services, LLC (MAMSI).

3

**III.**
**ARGUMENT**

A.    THE ISSUE AS TO WHETHER ERISA CONFLICT PREEMPTION APPLIES TO
PLAINTIFFS' CLAIMS SHOULD BE ADDRESSED BY THE STATE COURT, THUS
REMAND IS APPROPRIATE.

8.    The Health Fund's Reply argues for the first time that Plaintiffs' claims against

the fund are preempted by ERISA conflict preemption.  In the same breath, the Health Fund

concedes, and Plaintiffs generally agree, that ERISA complete preemption is a necessary

prerequisite for removal jurisdiction.  As such, even assuming ERISA conflict preemption

applies, which Plaintiffs deny, that issue should be decided by the state court and thus remand is

proper.

9.    Conflict or ordinary ERISA preemption cannot serve as the basis for removal

jurisdiction.  *McClelland v. Gronwaldt*, 155 F.3d 507, 516 (5th Cir. 1998), *citing Metropolitan

Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987).  "In contrast to

ordinary preemption, complete preemption not only displaces substantive state law, but also

'recharacterizes' preempted state law claims as 'arising under' federal law for the purposes of

determining federal question jurisdiction."  *Id.*  It is an abuse of discretion for a federal district

court to continue to exercise removal jurisdiction if the federal district court determines that only

ERISA conflict preemption applies, but complete preemption does not.  *Id.* at 521.

10.    Under the well pleaded complaint rule, the plaintiff is ordinarily entitled to

remain in state court so long as its complaint does not, on its face, affirmatively allege a federal

claim.  *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393,

398 (3d Cir. 2004), *citing, Beneficial Nat'l. Bank v. Anderson*, 539 U.S. 1, 6 (2003).  To support

removal, a right or immunity created by the Constitution or laws of the United States must be an

element, and an essential one, of the plaintiff's cause of action.  *Id.*

4

11.    In the context of complete versus conflict preemption under ERISA, the Third

Circuit further elaborated as follows:

> Pre-emption under § 514(a) of ERISA, 29 U.S.C. § 1144(a), must be
> distinguished from complete pre-emption under § 502(a) of ERISA, 29 U.S.C. §
> 1132(a). Only the latter permits removal of what would otherwise be a state law
> claim under the well-pleaded complaint rule. Under § 514(a), ERISA supersedes
> state laws that "relate to" an ERISA plan. 29 U.S.C. § 1144(a). Unlike the scope
> of § 502(a), which is jurisdictional and creates a basis for removal to federal
> court, § 514(a) merely governs the law that will apply to state law claims,
> regardless of whether the case is brought in state or federal court. *Lazorko v. Pa.
> Hosp.*, 237 F.3d 242, 248 (3d Cir. 2000). Section 514(a), therefore, does not
> permit removal of an otherwise well-pleaded complaint asserting only state law
> claims. *Pryzbowski*, 245 F.3d at 275 ("[W]hen the doctrine of complete
> preemption does not apply, but the plaintiff's state claim is arguably preempted
> under § 514(a), the district court, being without removal jurisdiction, cannot
> resolve the dispute regarding preemption)."

*See Pascack Valley*, at 398 n.4.

12.    In *Pascack*, the Court held that under the well-pleaded complaint rule, the

Hospital's complaint did not present a federal question that would support removal. *Id.* at 395.

The Court further held that the Hospital's state law breach of contract claims are not completely

preempted by ERISA's civil enforcement provision because the Hospital could not have brought

its claims under ERISA. *Id.*

13.    Since the hospital's claims in *Pascack* could not have been brought under section

502(a) of ERISA, the Court held that the claims were not completely preempted. *Id.* at 402. The

Court did leave open the possibility that conflict preemption applied, but deferred that decision

to the state court -- "It may very well be that that hospital's breach of contract claim against the

Plan will fail under state law, or that the hospital's state law claims are pre-empted under §

514(a). These matters, however, go to the merits of the hospital's breach of contract claim,

which can only be adjudicated in state court." *Id.* at 404.

5

14.     In the context of third-party health care providers asserting breach of contract claims based on their own contracts with an insurer, such as Plaintiffs' claims here, federal jurisprudence holds, as previously stated, that complete preemption does not apply. *See Pasack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393 (3d Cir. 2004); *Blue Cross of California v. Anesthesia Care Assoc. Medical Group, Inc.*, 187 F.3d 1045 (9th Cir. 1999); *Baylor University Medical Center v. Epoch Group, L.C.*, 340 F.Supp.2d 749, 760 (N.D.Tex. 2004); *Children's Hospital Corp. v. Kindercare Learning Centers, Inc.*, 360 F.Supp.2d 202, 206-07 (D.Mass. 2005). Many federal courts stop there since such a finding eliminates federal removal jurisdiction. In *Anesthesia Care*, however, the Court went one step further and held that neither complete nor conflict preemption applied to such claims. *Id.* at 1054; *see also Orthopaedic Surgery Associates of San Antonio v. Prudential Health Care Plan, Inc.*, 147 F.Supp.2d 595, 603 (W.D.Tex. 2001).

15.     Plaintiffs here are similarly asserting various breach of contract claims based on their contract with the Health Fund and Alliance/MAMSI.  The only federal jurisprudence currently before the court on this issue holds that ERISA complete preemption does not apply to such claims.  Moreover, even if the Health Fund believes ERISA conflict preemption applies, which Plaintiffs deny, that issue should be decided by the state court.  Remand of all of Plaintiffs' claims is thus appropriate.

**B.     PLAINTIFFS CLAIMS WERE FILED WITHIN THE STATUTE OF LIMITATIONS.**

**i.     Plaintiffs Opposition Brief Addresses Each of the Claims the Health Fund Asserts are Barred by the Statute of Limitations.**

16.     The Health Fund's Reply raises the new argument that Plaintiffs Opposition Brief did not address the statute of limitations claims asserted by the Health Fund with respect to Plaintiffs' breach of duty of good faith and fair dealing, quantum meruit, misrepresentation and

fraud, and alter ego claims.[1]  Plaintiffs' Opposition Brief, however, previously addressed each of these causes of action within this context.

17.    By addressing the breach of contract claims, Plaintiffs also addressed their breach of duty of good faith and fair dealing and quantum meruit claims as well.  A breach of contract and breach of duty of good faith and fair dealing arise from the same contractual relationship and underlying events. *Kyriakopoulos v. George Washington Univ.*, 866 F.2d 438, 445 (D.C. Cir. 1989).  "The doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct...." *Id.* at 445, Fn. 2 (citation omitted). *See also Beebe v. Washington Metro Area transit Authority*, 129 F.3d 1283, 1290 (D.C. Cir. 1997) (covenant of good faith and fair dealing depends upon the existence of an enforceable contract).  Similarly, Plaintiffs' quantum merit claim is a contract related claim. *See Novecon Ltd. v. Bulgarian-American Enterprise Fund*, 190 F. 3d 556, 561 (D.C. Cir. 1999) (breach of contract and quantum merit are contract related claims).  As such, Plaintiffs' Opposition Brief directly responded to each of the Health Fund's statute of limitations defenses with respect to Plaintiffs' contract related claims.

18.    With respect to Plaintiffs' cause of action for misrepresentation and fraud, Plaintiffs attached to their Opposition Brief the declaration of Lester Poris as **Exhibit C** (which is attached to Plaintiffs' Opposition Brief and incorporated herein).  Mr. Poris' declaration provides, at a minimum, a genuine issue of material fact as to when Plaintiffs' cause of action for misrepresentation and fraud accrued and thus summary judgment is equally inappropriate under F.R.C.P. 56(c) for this claim based on a limitations defense.  Specifically, Mr. Poris' declaration states that Local 639 and the Health Fund, either directly or indirectly through their agent

---

[1] Plaintiffs' alter ego claim is not an independent cause of action, but instead an alternative basis for recovery or doctrine which permits the court to disregard the corporate entity.

Alliance/MAMSI, had told Children's that Children's was authorized to provide care to Todd Hicks, Jr. and that Local 639 would pay the charges under Alliance/MAMSI contract at 100% under the contract, amongst other fraudulent representations. *See* **Exhibit C**, ¶¶s 2-3. Children's relied on these promises and did not request any up front payments or deductibles and provided care to Todd Hicks, Jr. for the next several days until his unfortunate death. *See* **Exhibit C**, ¶ 3. On at least two occasions after this, on February 11, 2003 and May 21, 2004, a Local 639 representative had informed Children's that the bill would be paid. *See* **Exhibit C**, ¶¶s 5, 8. Payment was eventually *informally* denied on May 31, 2005, subject to Children's ability to force Hicks' personal attorney to sign a subrogation (in addition to Mr. Hicks' signature). *See* **Exhibit C**, ¶ 13. These are the same allegations Plaintiffs also asserted in their Second Amended Complaint. *See* **Exhibit B** (which is attached to Plaintiffs' Opposition Brief and incorporated herein). The undisputed evidence indicates that Plaintiffs' claims for misrepresentation and fraud thus did not accrue until May 31, 2005, when Children's was informally told that their claim was denied.

> ii. **The Health Fund has Failed to Provide Any Legal Authority to Support its Contention that Children's Claims Accrued on the Last Date it Provided Care for Todd Hicks, Jr.**

19. The Health Fund in their Motion to Dismiss correctly lays out the statute of limitations for each cause of action asserted by Plaintiffs -- three years. The Health Fund, however, stops there. The Health Fund argues, without any legal authority, that the statute of limitations accrued for all claims when Todd Hicks, Jr. died and Children's stopped providing health care services. Although contrary to legal authority with respect to the accrual of Plaintiffs' claims, the Health Fund's Motion to Dismiss is also flawed as it is inconsistent with the local rules. *See* Rule 7(a), LCvR ("Each motion shall include or be accompanied by a

statement of the specific points of law and authority that support the motion…"). This rule also applies to Motions for Summary Judgment. *See* Rule 7(h), LCvR. The Health Fund neglects to refer the Court to any legal authority which sets forth when Plaintiffs' causes of action accrued. Aside from conclusory statements and baseless assertions, the Health Fund is unable to provide the Court with any legal authority to support its argument that Plaintiffs' claims accrued upon Todd Hicks, Jr.'s death. The Health Fund has failed to comply with the local rules and thus has provided no legal authority to support its Motion to Dismiss.

20.    In its reply, the Health Fund for the first time claims that Plaintiffs have conceded to the statute of limitations arguments, which clearly did not occur based on the discussion in the previous section, even when a local rule equates the failure to file a response with consent to a motion, a motion for summary judgment must still satisfy the requirements of F.R.C.P. 56. *See Rudder v. District of Columbia*, 99 F.3d 448, *2, 1996 WL 590741 (D.C. Cir. 1996); *Ramsdell v. Bowles*, 64 F.3d 5, 7 (1st Cir. 1995). Even assuming the Health Fund's argument for the moment, the Health Fund would still not be entitled to summary judgment under F.R.C.P. 56. For example, the Health Fund has failed to show that there is "no genuine issues as to any material fact." *See* F.R.C.P. 56. Furthermore, the Health Fund also fails to controvert the genuine issues of material fact that the Declaration of Lester Poris raises with respect to the statute of limitations. At the very least, Plaintiffs Second Amended Complaint and the undisputed/uncontroverted Declaration of Mr. Poris create a genuine issue of material fact as to the when the statute of limitations accrued for Plaintiffs' multiple causes of action against the Health Fund. The Health Fund's Motion to Dismiss based on statute of limitations should therefore be denied as well.

**IV.**
## CONCLUSION AND REQUESTED RELIEF

WHEREFORE, Plaintiffs, Children's National Medical Center and Benefit Recovery Specialists, Inc. request that Defendant Local Union No. 639, Building, Inc. d/b/a International Brotherhood of Teamsters, Local 639 and d/b/a Local 639 - Employer's Health Trust Fund's Motion to Dismiss, or in the alternative, Motion for Summary Judgment, be denied in its entirety. Moreover, Plaintiffs request that their Motion to Remand be granted. Alternatively, to the extent Plaintiffs' Motion for Remand is denied, Plaintiffs ask the Court to defer its ruling on the Health Fund's Motion to Dismiss or in the alternative, pursuant to Plaintiffs' Motion for Discovery under Rule 56(f) Continuance, to grant Plaintiffs additional time to conduct FED. R. CIV. P. 56(f) discovery to more fully address the issues in the Health fund's Motion. Plaintiffs additionally request for any other and further relief to which Plaintiffs may be entitled.

10

Dated this 21st day of August 2006.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _____

L. Bradley Hancock *(Admitted Pro Hac Vice)*
District of Columbia Bar No. 465746
GREENBERG TRAURIG, LLP
1000 Louisiana, Suite 1800
Houston, TX 77002
(713) 374-3500 (Telephone)
(713) 374-3505 (Facsimile)

Kenneth P. Kaplan
District of Columbia Bar No. 460614
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
(202) 331-3191 (Telephone)
(202) 261-0156 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS CHILDREN'S NATIONAL MEDICAL CENTER AND BENEFIT RECOVERY SPECIALISTS, INC.**

11

# EXHIBIT A

⟨⟩ CONFIDENTIAL

7/1/88

M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC.

HOSPITAL SERVICES AGREEMENT

THIS AGREEMENT, effective July 1, 1988, by and between the M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC., a Maryland corporation (hereinafter "Health Plan") and CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER, a private, not-for-profit corporation organized under the laws of the District of Columbia (hereinafter "Hospital").

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, the parties agree as follows:

## I. DEFINITIONS

A. "Covered Services" means those health services which are covered by Health Plan in accordance with the applicable Evidence of Coverage issued by Health Plan.

B. "Emergency" means a physical or mental condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that, in the opinion of the physician or other professional treating the person in need of care, the absence of immediate medical attention could reasonably be expected to result in (1) placing the patient's health in serious jeopardy, (2) serious impairment to bodily functions, (3) serious dysfunction of any bodily organ or part, or (4) unduly prolonging suffering. The Hospital will use reasonable efforts to contact the Health Plan within twenty-four (24) hours after treatment or admission of a Member for an Emergency to the Hospital, but in no event, later than the next business day following a weekend or holiday.

C. "Evidence of Coverage" means the agreement(s) between Health Plan and employer groups or individuals specifying the terms and conditions of Health Plan's coverage by which Health Plan is obligated to provide certain medical and hospital services to Members (and which include any copayment and/or deductible amounts to be paid by Members), which agreement(s) may be modified by Health Plan from time to time and copies of which will be made available to Hospital upon the signing of this Agreement; provided, however, Health Plan will provide Hospital with at least thirty (30) days written notice of any material change in Health Plan's coverage which would impact Hospital directly.

BRSI 000194

[ | ] CONFIDENTIAL

D.   "Hospital-based Physicians" means those physicians who practice at Hospital in the specialty areas including, but not limited to, Radiology, Pathology, Anesthesiology and Emergency Medicine; and who have satisfied the credentialling requirements of Hospital and its medical staff.

E.   "Hospital Services" means all inpatient services, emergency room, and outpatient hospital services that are ordinarily and customarily provided by Hospital; provided, however, that Hospital Services do not include the services of any Hospital-based Physicians.

F.   "Inpatient Day" means the day or days a Member is a registered bed patient at Hospital in accordance with Health Plan certification procedures.  Only those Inpatient Days described in the applicable Member Evidence of Coverage will be covered by Health Plan.

G.   "Member" means any person who is enrolled in the M.D. IPA Health Plan as defined by the Health Plan or validly eligible for Health Plan coverage or who has been admitted to Hospital or retained as an inpatient in Hospital following an admission based upon pre-admission authorization by Health Plan.  Status as a Member resulting from pre-admission authorization by Health Plan, authorization by Health Plan following Emergency admission, or Health Plan authorization of persons not otherwise qualified as a Member shall continue until notified otherwise by Health Plan, and until such time as the individual can be discharged or a transfer can be arranged.  Similarly, individuals receiving outpatient services from Hospital pursuant to authorization by Health Plan shall be deemed to be Members until Hospital is notified otherwise by Health Plan.

H.   "Plan Provider" means a physician or other appropriately licensed provider of health services with whom the Physicians Health Plan of Maryland, Inc. or Health Plan has entered into a contractual agreement for the provision of certain Covered Services to Members.

## II.   HEALTH SERVICES

The Hospital agrees to provide to Members those Hospital Services normally provided by Hospital to the general community; provided, however, the Hospital's obligation to provide such services is subject to the availability of beds, staff and other facilities and services.  If the operation of Hospital's facilities is interrupted by war, fire, insurrection, labor dispute, riot, the elements, act of God or, without limiting the foregoing, any other cause beyond the control of Hospital, Hospital shall be relieved of its obligations as to all services

2

BRSI 000195

CONFIDENTIAL

affected for the duration of such interruption.  In the event
this occurs, Hospital will cooperate with Health Plan in its
attempts to refer Members to appropriate treatment settings
within Health Plan's delivery network.  Hospital will notify
Health Plan in the event Hospital is unable to provide services
under this Agreement.

Hospital further agrees to arrange for the provision of
Covered Services by Hospital-based Physicians to support the
provision of Hospital Services.  Hospital will provide Health
Plan with evidence that Hospital's obligations with respect to
qualifications of, and provision of Covered Services by,
Hospital-based Physicians will be performed in accordance with
Hospital's standard procedures.

The Hospital and Hospital-based Physicians, in accordance
with the provisions, spirit and intent of this Agreement, shall
not differentiate or discriminate in the treatment of or in the
quality of services rendered to Members on the basis of race,
sex, age, religion, place of residence, health status or source
of payment, and shall observe, protect and promote the rights of
Members as patients.

The Health Plan shall allow Plan Providers to refer Members
to Hospital for specialty services including secondary care.  The
Health Plan administrative policies and procedures shall not
limit referrals to Hospital to only tertiary care services.

III.  HOSPITAL ADMISSIONS, OUTPATIENT SERVICES AND EMERGENCIES

A.  General

Health Plan will establish a procedure reasonably acceptable
to Hospital by which Hospital may, at its option, confirm, by
telephone (1) that a particular person is a Member and (2) that
the services rendered or to be rendered to a particular Member
are Covered Services.  If Hospital obtains oral confirmation from
Health Plan through such procedure that a particular person is a
Member and/or that particular services are Covered Services,
Health Plan shall not subsequently deny payment on the grounds
that such information was incorrect, provided, Hospital uses
reasonable efforts to obtain payment from the person before
collecting from Health Plan.  Notwithstanding the preceding
sentence, Hospital shall not be obligated to attempt to collect
from persons covered under state-sponsored assistance programs
prior to collecting from Health Plan.  Verification of Hospital
Services pursuant to this paragraph shall also be deemed to be
verification for the admitting CHFA Specialist's services.  The
Hospital shall identify an individual who, along with his
designees, shall serve as coordinator for the Hospital in
cooperating with Health Plan's authorization process (such person
is hereinafter referred to as the "Coordinator").

3

BRSI 000196

!!! CONFIDENTIAL

If it should be necessary for Hospital to transfer a Member to another facility, all costs of transferring the Member from Hospital to such other facility shall be borne by Health Plan.

B.    Hospital Admissions

Except in Emergencies, the Hospital agrees to admit Members to the Hospital subject to bed and staff availability only upon (1) the order of a Plan Provider who is also a member of the Hospital medical staff with admission privileges and who is in compliance with Hospital's policies and procedures and medical staff bylaws and (2) oral notification by the Health Plan of a pre-admission authorization certifying the coverage, services and the number of Inpatient Days authorized.  In the event a Plan Provider admits a Member for other than an Emergency and the Hospital has not been notified of a pre-admission authorization, the Hospital shall make reasonable efforts to contact the Health Plan within twenty-four (24) hours, but in no event later than the next business day following a weekend or holiday after admission of a Member to the Hospital.  Notwithstanding the outcome of the post-admission certification, the Hospital will be paid by the Health Plan for the period from date of admission to the date notice is given by Health Plan certifying length of stay, which length of stay period shall in no event be for a period shorter than the period between date of admission and receipt by Hospital of the post-admission certification determination.  However, except in Emergencies, if the Hospital fails to notify Health Plan within the required time frame set forth above, and if services are retrospectively denied by Health Plan, Hospital shall not be entitled to any compensation hereunder for services rendered after the expiration of the certified length of stay.

C.    Outpatient Services

Except in Emergencies, the Hospital agrees to treat Members on an outpatient basis subject to staff and facilities availability only upon the order of a Plan Provider.

D.    Emergencies

In Emergencies, the Hospital will use reasonable efforts to contact the Health Plan within twenty-four (24) hours after treatment or admission of a Member to the Hospital, but in no event later than the next business day following a weekend or holiday.  The Coordinator shall provide the Health Plan such information as Health Plan may reasonably request on the number and type of Emergency admissions of Members at the Hospital.  The Hospital shall permit review of such admissions by a Plan Provider or his or her designated representative for certification of the number of Inpatient Days authorized by the Health Plan.  Such certification shall in no event be for a

4

**⑪ CONFIDENTIAL**

period shorter than the period between date of admission and receipt by the Hospital of notice of certification, except that if Hospital fails to notify Health Plan within the required time frame set forth in this paragraph, and if services are retrospectively denied by Health Plan, Hospital shall not be entitled to any compensation hereunder for services rendered after the expiration of the certified length of stay.

## IV.   DISCHARGE PLANNING

The Health Plan, through Plan Providers, utilizes a system for the coordinated discharge planning of Members.  The Hospital shall cooperate in the implementation and operation of such a discharge planning system.

Hospital recognizes that Health Plan utilizes an extensive network of Plan Providers in order to provide cost efficient and appropriate health services to its Members.  Unless otherwise directed by Health Plan, or unless no Plan Provider is available to meet the Member's health need, all discharges and referrals by Hospital shall be to a Plan Provider provided Hospital, in its sole discretion, believes such Plan Provider is qualified and competent.

Health Plan shall notify Hospital in writing in those situations where discharges are to other than a Plan Provider. There shall be no penalty for the first and second transfer to other than a Plan Provider.  However, in the event Hospital receives written notification of Hospital's failure to comply with this provision a third time, Hospital shall reimburse Health Plan for the difference, if any, in costs incurred by Health Plan between compensation it pays to the non-Plan Provider and the payment that would otherwise have been made to the Plan Provider designated by Health Plan and such reimbursement will apply to all subsequent non-compliance with this provision; provided this non-compliance penalty shall not apply where the Hospital refused to transfer to a Plan Provider because of questions of the Plan Provider's qualifications or competency.

## V.   COMPENSATION

Health Plan agrees to pay Hospital for Covered Services it renders to Members, provided that such Covered Services are provided in accordance with the procedures provided herein. Hospital shall collect Health Plan authorized copayments and deductibles from the Members and the Members shall be solely responsible for the payment of such copayments and deductibles.

The Health Plan agrees to pay the Hospital for services provided to Members in accordance with the compensation schedule

5

BRSI 000198

## ⟦L⟧ CONFIDENTIAL

annexed to this Agreement as Attachment A and incorporated by reference herein.

Subject to Section VI below, for all bills received by Health Plan in substantially complete form that are not paid within forty-five (45) days, Health Plan shall pay Hospital the amount due in accordance with the compensation schedule plus interest in the amount of one and a quarter (1.25) percent per month on the balance owed; provided, however, this provision shall not entitle the Health Plan to delay payment beyond the 45 day period. Time is of the essence with respect to the payment period. Notwithstanding this provision, in the event Health Plan does not receive a bill from Hospital within ninety (90) days of the date of discharge of the Member or the date of Service(s), as applicable, Health Plan shall pay Hospital the amount due in accordance with the compensation schedule within ninety (90) days from the date the bill is received and, if Health Plan fails to pay within this period, Health Plan shall pay an interest rate of one and a quarter (1.25) percent per month.

Hospital shall submit bills to Health Plan in batches by certified mail. In an effort to ensure verification of Health Plan's receipt of all bills, Health Plan shall provide Hospital with written verification of each bill in batches received from Hospital within seven working days of receipt of such bills. Such verification shall take the form of an itemized list of each bill received including the following items from the UB-82 billing form:

> Patient name,
> Patient control number,
> Total charges, and
> Date(s) of service.

All verification lists shall be sent by certified mail to:

> HMO Billing Manager
> Children's Hospital National Medical Center
> 8737 Colesville Road, 6th Floor
> Silver Spring, Maryland  20910

## VI.  BILLINGS

The Hospital shall bill the Health Plan for all Hospital Services rendered to Members. Billings shall include identifying patient information and an itemized record of services and charges in customary bill form (UB-82). All bills shall be sent to:

> M.D. Individual Practice Association, Inc.
> 451 Hungerford Drive, Suite 700
> Rockville, Maryland  20850-4168

6

BRSI 000199

# ⟨I⟩ CONFIDENTIAL

Hospital agrees and warrants that in no event, including, but not limited to, non-payment by Health Plan, Health Plan insolvency or breach of this Agreement, shall Hospital bill, charge, or collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or subscriber for Covered Services provided under this Agreement. This provision shall not prohibit Hospital from billing and collecting from the Member or subscriber for applicable copayments and deductibles and non-Covered Services. Hospital further agrees that this provision and warranty herein shall survive termination of this Agreement, regardless of the cause giving rise to termination, shall be construed to be for the benefit of the Member or subscriber, and shall supersede any oral or written contrary agreement now existing or hereafter entered into between Hospital and any Member or subscriber or any person acting on a Member's or subscriber's behalf. Any modification, addition, or deletion to this paragraph shall become effective on a date no earlier than fifteen (15) days after the Virginia State Corporation Commission or appropriate state regulatory agencies have received written notice of such proposed change.

Except for circumstances which are beyond the control of Hospital, Hospital shall make reasonable efforts to submit all bills within ninety (90) days of the date of discharge of the Member or date of Service(s), as applicable. No payment shall be made unless the bill for Hospital Services is received within one (1) calender year after the date of discharge of the Member or date of Service(s), as applicable; provided, however, for a Member who is hospitalized continuously, Hospital may, at its option, submit a bill every thirty (30) days. Hospital shall appeal all Health Plan denials of payment within one hundred and fifty (150) days from the date Hospital receives written notice of a denied claim. All billings by Hospital may be considered final by Health Plan unless adjustments are requested in writing by Hospital within sixty (60) days after receipt of such billing by Health Plan.

Health Plan shall pay the Hospital 90% of the amount due as set forth in this Agreement on all disputed claims pending resolution of the dispute; provided, Hospital responds in writing within 30 days to written inquiries received from Health Plan regarding disputed amounts. If Health Plan disagrees with the charges on any bill, it shall notify Hospital in writing of the disputed charges within thirty (30) days after receipt of the bill. The above provision for 90% payment on disputed claims does not apply to claims which have been denied for reasons other than disputes related to the amount of charges for services rendered by Hospital.

7

BRSI 000200

[] CONFIDENTIAL

## VII.   TESTS AND PROCEDURES

Hospital agrees to accept the results of qualified and timely laboratory and radiological tests or other procedures which may have been performed on a Member prior to admission or outpatient treatment at Hospital; provided, (1) in the sole judgment of the Hospital, such tests or procedures are performed in accordance with accepted medical practice and (2) the tests or procedures are submitted at the time of admission or performance of outpatient services; and provided further, that this shall not be deemed to prevent such tests and/or procedures from being reperformed or repeated if the Hospital, in its sole judgement, determines that it is medically necessary.

## VIII.   COOPERATION

Hospital shall permit Health Plan to implement and operate Health Plan's own prospective, concurrent and retrospective quality assurance and utilization review programs through Health Plan employees and/or agents within the Hospital, attached hereto as Attachment B and incorporated by reference.  The Health Plan shall notify the Hospital at least thirty (30) days in advance of any material changes in such programs.  Material changes are defined as changes which are implemented to directly impact Hospital in a manner that Hospital determines it cannot abide by the provisions of this Agreement.  Hospital shall, upon 24 hours advance notice, make available for the Health Plan's inspection such pertinent sections of a Member's hospital medical record as may be required by Health Plan in keeping with the rules of confidentiality of Member records as set forth in Section XI of this Agreement.  Copies of such information will be provided to Health Plan or its agent at a cost of 15 cents per page.

Hospital shall cooperate with Health Plan in the coordination of benefits and other third party claims.  In cases where Health Plan is determined, under applicable industry standards regarding coordination of benefits, to be the primary payor, Hospital shall accept payment as set forth in this Agreement.  Notwithstanding the above, in cases where any third party is liable for payment of any amounts and/or services rendered to a Member, Hospital may bill the third party for the difference between Hospital's full charges and the amount due under this Agreement.  In no event shall Health Plan be responsible for any additional payment to Hospital beyond the amount due under this Agreement according to Attachment A, compensation schedule.  Additionally, Hospital will abide by the hold harmless provision listed in Section VI of this Agreement. In cases where Health Plan is not the primary payor, Hospital shall seek payment from the primary payor before seeking payment from Health Plan.  Health Plan agrees to pay any balance for Covered Services rendered by Hospital that is not paid by the

8

BRSI 000201

# CONFIDENTIAL

primary payor not to exceed the amounts listed in Attachment A, compensation schedule, within 30 days of Health Plan's receipt of a substantially complete bill from Hospital. Hospital will be responsible for obtaining from Member any necessary assignments of benefits in cases where Health Plan is not the primary payor.

Hospital agrees that Health Plan shall list its name, address, and telephone number in Health Plan's roster of participating hospitals; provided, however, that any descriptive statements other than such a listing shall be approved in advance by Hospital.

Hospital and Health Plan shall cooperate through their respective programs and procedures in the expeditious resolution of any Member grievances or complaints. In this regard, Health Plan shall bring to the attention of appropriate Hospital officials all member complaints involving Hospital or any Hospital-based Physician, and Hospital shall, in accordance with its regular procedure, investigate such complaints and use its best efforts to resolve them in a fair and equitable manner. Hospital agrees to notify Health Plan promptly of any action taken or proposed with respect to the resolution of such complaints and the avoidance of similar complaints in the future.

Both Health Plan and Hospital shall give Hospital reasonable access and opportunity to inspect and examine each others' records related to this Agreement.

At least 90 days prior to any renewal date of this Agreement (as specified in Section XIV hereof), Health Plan shall provide Hospital with a list of health care providers (hospitals, physicians and others) that have executed participation agreements with Health Plan, and such other information as may be reasonably requested by Hospital.


IX.  INSURANCE

Health Plan and Hospital, at each organization's sole cost and expense, shall provide and maintain policies of, or provide through an actuarially determined self-funded insurance plan, general liability and professional liability insurance and other necessary insurance for claims for damage arising by reason of personal injuries or death occasioned directly or indirectly in connection with the operation of each organization. Certificates of proof of insurance in force shall be made available upon request to each party to this Agreement. Any material change in either party's coverage shall be communicated to the other party in writing at least thirty (30) days prior to such change. The party receiving such notice of change in coverage may thereafter terminate this Agreement upon ten (10) days written notice, notwithstanding anything to the contrary herein. Minimum limits

9

BRSI 000202

[I] CONFIDENTIAL

of professional liability coverage shall be $5,000,000 per
occurrence and $5,000,000 aggregate. Minimum limits of general
liability coverage shall be $3,000,000 per occurrence and
$3,000,000 aggregate. If Health Plan changes insurance carriers
it shall endeavor to purchase a tail to cover occurrences back to
the effective date of Hospital's 1986 Agreement with Health Plan.
If a self-funded insurance plan is used by Health Plan, the
financial stability of the reserves shall be opined upon by the
Hospital's actuary on an annual basis.

## X.   INSPECTION OF RECORDS

Subject to the provisions of Section XI of this Agreement,
Health Plan shall have the right, upon request during normal
business hours, to inspect, and obtain copies of, at reasonable
times all books and records including business, administrative
and medical records maintained by Hospital or Hospital-based
Physicians pertaining to Covered Services rendered to Members;
provided, however, Health Plan is responsible for keeping on file
written authorization for release of such records from Member.
The Health Plan agrees to contact the Hospital's Medical Records
Department at least twenty-four (24) hours in advance to schedule
an appointment to inspect records during a Member's hospital
stay. Copies of the record during such inspection by the Health
Plan or its agent shall be at a cost of 15 cents per page. The
termination of this Agreement shall have no effect upon such
obligations.

## XI.   CONFIDENTIALITY

Health Plan, Hospital and Hospital-based Physicians shall
treat all Member medical records as confidential to comply with
all local, state and federal laws and regulations, as well as any
licensure and certification requirements, regarding the
confidentiality of Member medical records.

## XII.   REQUIRED CERTIFICATIONS

Hospital warrants that it is duly licensed by the
appropriate governmental agency of the District of Columbia to
operate a hospital and is accredited by the Joint Commission on
Accreditation of Healthcare Organizations (JCAHO). Hospital
further warrants that it is currently certified as a hospital
provider under Title XVIII (Medicare) of the Social Security Act
and that it shall maintain such certification during the term of
this Agreement.

Hospital shall maintain in good standing such license and
accreditation and shall notify Health Plan immediately should any

10

BRSI 000203

⑪ CONFIDENTIAL

action of any kind be initiated against Hospital which results in (i) the suspension or loss of such license; or (ii) the suspension or loss of such accreditation; or (iii) the imposition of any sanctions against Hospital under the Medicare program. Hospital shall furnish to Health Plan such evidence of licensure and accreditation as Health Plan may reasonably request.

Health Plan warrants that it is duly licensed by the Department of Health and Mental Hygiene of the State of Maryland to operate as a health maintenance organization and that it has been granted a Certificate of Authority to so operate by the State of Maryland.

The Health Plan further warrants and represents that it shall maintain in good standing its (1) Certificate of Authority to operate in the State of Maryland and (2) its federal qualification and that it will notify the Hospital immediately of any action of any kind initiated against it which could result in the suspension or loss of such certification or qualification or imposition of any sanctions against it by the State or Federal government.

### XIII.  MEDICAL STAFF MEMBERSHIP

Notwithstanding any provision contained in this Agreement, a Plan Provider may not admit or treat a Member in the Hospital unless he is a member in good standing of Hospital's organized medical staff with appropriate clinical privileges to admit and treat such Member and is in compliance with Hospital's policies and procedures and medical staff bylaws.

### XIV.  TERM AND TERMINATION

This Agreement shall be effective from July 1, 1988 until June 30, 1989, whereupon the terms of this Agreement will automatically be extended for one year periods unless sooner terminated.

Notwithstanding anything herein to the contrary, this Agreement may be terminated by Hospital upon giving at least thirty (30) days written notice to Health Plan.  Health Plan may terminate this Agreement upon giving at least ninety (90) days written notice to Hospital.

effective     In the event that a Member is an admitted inpatient as of the date of termination of this Agreement, Health Plan shall pay for Covered Services at the rate specified in Attachment A, compensation schedule, provided Hospital continues to honor the terms of this Agreement, through such Member's discharge.  Except as modified herein, termination shall have no effect upon the

11

## ⬚ CONFIDENTIAL

rights and obligations of the parties arising out of any transactions occurring prior to the effective date of such termination.

Notwithstanding anything herein to the contrary, Health Plan shall have the right to terminate this Agreement immediately by notice to Hospital upon the occurrence of (i) the suspension or revocation of Hospital's license; or (ii) the suspension, revocation or loss of Hospital's JCAHO accreditation; or (iii) the imposition of any sanction against Hospital under the Medicare or Medicaid program. Notwithstanding anything herein to the contrary, Hospital may terminate this Agreement immediately upon written notice to Health Plan in the event of a loss by Health Plan of any license or regulatory approval as set forth in Section XII.

Either party may terminate this Agreement for any material breach by the other of its obligations under this Agreement, provided that written notice of such breach and the intent to terminate this Agreement has been given to the breaching party and such breach has not been remedied to the satisfaction of the non-breaching party within thirty (30) days of such notice. For purposes of this Agreement, "material" breach shall include but shall not be limited to (1) Hospital's or Health Plan's failure to obtain and maintain the insurance required under Section IX and (2) Health Plan's failure to pay Hospital invoices within the times specified in Section V.

### XV.  MISCELLANEOUS

A.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

B.  Upon termination or expiration of this Agreement certain obligations shall survive, including but not limited to, all confidentiality rights and Health Plan's payment obligations as set forth in Section V.

C.  In the event any dispute shall arise with respect to the performance or interpretation of any of the terms of this Agreement (other than terminations made pursuant to Section XIV), the signatories of this Agreement, or their designees, shall communicate, in writing, the dispute. Such communication shall be reviewed by the other party and a response in writing shall be made within fifteen (15) days. Should such correspondence fail to resolve the dispute, both parties agree to meet within ten (10) days of the date that the correspondence was sent in order to resolve the dispute. In the event such dispute cannot be satisfactorily resolved by the above process, the dispute, at the request of either party, shall be submitted to a Board of

12

BRSI 000205

## ◫ CONFIDENTIAL

Arbitrators, so constituted, and shall proceed under the rules and regulations of the American Arbitration Association. Each party shall select one arbitrator and a third shall be selected by the two chosen arbitrators. Both parties expressly covenant and agree to be bound by the decision of the arbitrators as a final determination of the matter in dispute. This provision shall not require either party to pursue arbitration prior to, or in lieu of, exercise of termination rights under Section XIV above. Each party to this Agreement agrees to pay half the arbitration costs.

D.  Any notice required to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, or by personal hand delivery to the Hospital at:

> Director of Managed Care
> Office of Planning and Business Development
> Children's Hospital National Medical Center
> 8737 Colesville Rd., Suite 400
> Silver Spring, Maryland  20910

with a copy to General Counsel,

and to Health Plan at:

> President
> M.D. Individual Practice Association, Inc.
> 451 Hungerford Drive, Suite 700
> Rockville, Maryland  20850-4168

E.  This Agreement constitutes the entire understanding of the parties hereto, and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties.

F.  This Agreement shall not be assigned, delegated or transferred by Hospital or Health Plan without the written consent of the other party. Consent shall not be unreasonably withheld by either party.

G.  The invalidity or unenforceability of any terms or provisions of this Agreement shall in no way affect the validity or enforceability of any other terms or provisions.

H.  None of the provisions of this Agreement is intended to create nor shall it be deemed or construed to create any relationship between the parties hereto other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto, nor any of their respective employees or contractors, shall be construed to be the agent, the employer or the representative of the other.

13

BRSI 000206

[] CONFIDENTIAL

I.  This Agreement shall be governed by the laws of the District of Columbia.

J.  The obligations of each party to this Agreement shall inure solely to the benefit of the other party, and, except as explicitly provided herein, no person or entity shall be a third party beneficiary of this Agreement.

K.  In the event of a conflict among the provisions of this Agreement and any documents referenced herein or attached hereto, the terms and conditions of this Agreement shall take precedence.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____    Type Name: Eric Baugh, M.D.

Title: V.P. Medical Affairs    Address: 451 Hungerford Drive
                                         Suite 700
Telephone: (301) 294-5040                Rockville, MD  20850


CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER

By: _____    Type Name: Ron Sloan

Title: Exec. V.P./COO    Address: 111 Michigan Ave.
                                  Washington, D.C.  20010
Telephone: (202) 745-2001


14

BRSI 000207

ATTACHMENT B                    CONFIDENTIAL

## UTILIZATION REVIEW PROCEDURES

### PRE-AUTHORIZATION PROCESS:

All elective procedures including obstetrical must be pre-authorized. In the HMO setting, the admitting physician is required to notify the Utilization Review Department. We have an answering machine dedicated to pre-authorizations with a taped instruction message. The information is retrieved from the machine, a hospital authorization form is completed and the information is entered into the computer with the length of stay included. If requested, the admitting physician is called back with an authorization number and duration of inital length of stay. The hospital authorization forms are filed by date to await hospital notification.

### PRE-AUTHORIZED/EMERGENCY/DIRECT HOSPITAL ADMISSIONS

Participating hospitals are required to notify the Utilization Review Department of emergency and direct admissions at time of admission. There is a dedicated answering machine for hospital notification available 24 hours per day with a taped instruction message. During regular business hours, information is retrieved from the machine frequently at intervals not to exceed 2 hours. After the information is retrieved, a hospital authorization form is completed, the admission is entered into the computer and the hospital is notified of the benefit/coverage information and the initial length of stay, if requested.

Non participating hospital calls are forwarded directly to the Census Coordinator who takes the information on the admission as well as name and phone number of contact person at the admitting hospital. The same procedure is then followed to process the admission as with the participating hospitals.

The Concurrent Review Coordinators are assigned to specific hospitals and are responsible for determining the initial length of stay which is entered into the computer with the other hospital admisson information. Each day the Census Coordinator calls the hospitals to check on discharges of those members whose initial length of stay is due to expire in 24 to 48 hours. The hospital authorization forms of those members who remain hospitalized are distributed to the appropriate Coordinators who then conduct an onsite chart review or a telephone review to determine the medical necessity of continuing the hospitalization. If it is determined that the member requires additional acute care, the length of stay is extended based on documented medical necessity. If the determination is that an acute care setting is no longer necessary, the physician is notified by phone that coverage will terminate within 24 hours unless there is documented medical necessity.

BRSI 000208

 **CONFIDENTIAL**

Page 2

If it is determined after talking with the physician that the member no longer medically requires an acute level of care but for some reason elects to stay hospitalized the case is referred to the Medical Director for review. If the decision is made to deny further coverage, the hospital and physician are notified by phone with a follow-up letter and the member is notified by hand delivered letter that hospital coverage will cease in 24 hours.

Retro hospital chart reviews are done in the hospital medical records department to determine medical necessity. An example of a case requiring a Retro review would be a weekend discharge of a member who overstayed the assigned number of days.

Case management of complex or chronic patients is done when the Utilization Review Coordinator identifies that the patient has met the established criteria. On lengthy and more complex cases, the department Discharge Planner becomes involved to aid in determining how and when we can safely move the member to another level of care. Other levels of care could include extended care facility, rehabilitation center or skilled care in the home. There is a Home Care Coordinator who is responsible for setting up skilled care in the home when appropriate.

BRSI 000209

[] CONFIDENTIAL

11.    Utilization Review and Case Management - (describe
utilization review process; indicate extent of such activities as
pre-admission certification, concurrent review, retrospective
review, second opinion surgery, and discharge plan screening.  Is
a contract in place for external peer review?)

The Utilization Review department is notified of all hospital
admissions, either prior to, as in pre-authorization by the
admitting physician, or in the case of an urgent or an emergency
situation at the actual time of admission.

The physicians are required to pre-authorize all elective
admissions with the Utilization Review department.  When the
department receives the information it is reviewed for compliance
with the approved procedures.  An initial length of stay is then
determined using the professional activity study criteria and the
ICD-9-CM books published by CPHA.  The physician is then notified
of the decision.  A similar process is followed when the
department is notified of an urgent or emergency admission.  A
length of stay is determined using the above mentioned reference
books.

The concurrent review process is implemented if the member is
still an inpatient on the projected discharge date.  The member's
record is reviewed onsite or the admitting physician is consulted
by phone.  Additional inpatient days are authorized if medically
indicated.

In the event that a member is discharged from a hospital beyond
the assigned length of stay but before a review can be done, a
Coordinator will review the chart in the hospital medical records
department.

A second opinion screening program for selected surgical
procedures will become effective December 1, 1987.

All of the Utilization Review Coordinators are involved in
discharge planning.  The more difficult cases such as premature
infants, terminal patients and those requiring extended physical
rehabilitation are referred to our Coordinator of Discharge
Planning, who works closely with social workers and our Home
Health Coordinator.

The Peer Review committee meets every other month with the
Medical Director to review and give guidance on selected or
difficult cases.

The Concurrent Review Coordinators, Discharge Planner, Medical
Director, and the Manager and Supervisor of the Utilization
Review department meet weekly to discuss case management of
cases with Senior management.

*Complex*

BRS1 000210

# ℧ CONFIDENTIAL

Page 2

12.   Utilization Experience - (indicate your actual experience
      for the following:-

   a.  Physician outpatient visits per 1000 enrolees
       3000 PCP visits/1000
   ..  2000 Specialist visits/1000

   b.  Average cost per outpatient visit
       $43.22 per PCP visit

   c.  Inpatient days per thousand - 307

   d.  Average length of stay for:
       1.  Surgical  3.9
       2.  Medical   4.7
       3.  Maternity  2.5
       4.  Mental Health  10.7
           (Includes substance above as of 5/1)
       5.  Substance Abuse  21 (prior to 5/1)

BRSI 000211

[] CONFIDENTIAL

*Attachment B*
*Children's Hospital*
*Hospital Services Listing*
*AS OF: December 1, 1998*

**Inpatient Specialty Services**

Medical Services

| | | | |
|---|---|---|---|
| _____ | Cardiology | _____ Adult | ✓ Pediatric |
| _____ | Cardiac Care Unit | _____ Adult | ✓ Pediatric |
| _____ | Cardiology | _____ Adult | ✓ Pediatric |
| _____ | Endocrinology | _____ Adult | ✓ Pediatric |
| _____ | Gastroentrology | _____ Adult | ✓ Pediatric |
| _____ | Gerontology | _____ Adult | _____ Pediatric |
| _____ | Hematology/Oncology | _____ Adult | ✓ Pediatric |
| _____ | Infectious Disease | _____ Adult | ✓ Pediatric |
| _____ | Intensive Care Unit | _____ Adult | ✓ Pediatric |
| _____ | Neonatology, Level II Unit | _____ Adult | ✓ Pediatric |
| _____ | Neonatology, Level III Unit | _____ Adult | ✓ Pediatric |
| _____ | Nephrology | _____ Adult | ✓ Pediatric |
| _____ | Neurology | _____ Adult | ✓ Pediatric |
| _____ | Nursery | | ✓ Pediatric |
| _____ | Rehabilitation, Physical | _____ Adult | _____ Pediatric |
| _____ | Rheumatology | _____ Adult | ✓ Pediatric |

Surgical Services

| | | | |
|---|---|---|---|
| _____ | Burns | _____ Adult | ✓ Pediatric |
| _____ | Cardiovascular Surgery | _____ Adult | ✓ Pediatric |
| _____ | General Surgery | _____ Adult | ✓ Pediatric |
| _____ | Gynecology | _____ Adult | ✓ Pediatric |
| _____ | Hand Surgery | _____ Adult | ✓ Pediatric |
| _____ | Neurosurgery | _____ Adult | ✓ Pediatric |
| _____ | Obstetrics | _____ Adult | _____ Pediatric |
| _____ | Orthopedics | _____ Adult | ✓ Pediatric |
| _____ | Opthalmology | _____ Adult | ✓ Pediatric |
| _____ | Oral Surgery | _____ Adult | ✓ Pediatric |
| _____ | Otolaryngology | _____ Adult | ✓ Pediatric |
| _____ | Plastic Surgery | _____ Adult | ✓ Pediatric |
| _____ | ~~Pediatry~~ Foot surgery | _____ Adult | ✓ Pediatric |
| _____ | Proctology/Colon Rectal | _____ Adult | ✓ Pediatric |
| _____ | Thoracic | _____ Adult | ✓ Pediatric |
| _____ | Urology | _____ Adult | ✓ Pediatric |
| _____ | Vascular | _____ Adult | ✓ Pediatric |
| _____ | Trauma | _____ Adult | ✓ Pediatric |

Psychiatry/Behavioral/Mental Health

| | | | |
|---|---|---|---|
| _____ | Inpatient | _____ Adult | ✓ Adolescent |
| _____ | Partial Hospitalization (Day Treatment) | _____ Adult | ✓ Adolescent |
| _____ | Rehabilitation, Behavioral | _____ Adult | _____ Adolescent |

BRSI 000212

[] CONFIDENTIAL

*Attachment B (Continued)*
*Children's Hospital*
*Hospital Service Listing (Continued)*
*AS OF: December 1, 1998*

Tertiary Services - Referral Center Designation Requires Separate Attachment

*Cardiac Surgery*

| | | | | |
|---|---|---|---|---|
| _____ | Catheterization | _____ Adult | ✓ | Pediatric |
| _____ | Angioplasty | _____ Adult | ✓ | Pediatric |
| _____ | Coronary Artery Bypass | _____ Adult | _____ | Pediatric |

*Transplants*

| | | | | |
|---|---|---|---|---|
| _____ | Bone Marrow - Autologus | _____ Adult | ✓ | Pediatric |
| _____ | Bone Marrow - Allogenic, Related | _____ Adult | ✓ | Pediatric |
| _____ | Bone Marrow - Allogenic, Unrelated | _____ Adult | ✓ | Pediatric |
| _____ | Heart | _____ Adult | ✓ | Pediatric |
| _____ | Kidney | _____ Adult | ✓ | Pediatric |
| _____ | Kidney/Pancreas | _____ Adult | _____ | Pediatric |
| _____ | Liver | _____ Adult | _____ | Pediatric |
| _____ | Lung | _____ Adult | _____ | Pediatric |

## Facility/Outpatient Clinical Services

| | |
|---|---|
| ✓ | Ambulatory Surgery - Referral Center Designation Requires Separate Attachment |
| ✓ | Blood Bank |
| ✓ | Cardiac Catheterization - Referral Center Designation Requires Separate Attachment |
| ✓ | Cardio Diagnostic Testing |
| ✓ | Comprehensive Geriatric Assessment |
| ✓ | CT Scanner - Referral Center Designation Requires Separate Attachment |
| ✓ | Day Treatment/Partial Hospitalization |
| ✓ | Diagnostic Radioisotope |
| ✓ | Emergency Department |
| ✓ | Extracorporeal Shock Wave Lithotripter - Referral Center Designation Requires Separate Attachment |
| ✓ | Family Planning Services |
| ✓ | Genetic Counseling/Screening Services |
| ✓ | Health Promotion Services |
| ✓ | Hemodialysis - Referral Center Designation Requires Separate Attachment |
| ✓ | Home Health Services - Referral Center Designation Requires Separate Attachment |
| ✓ | Hospice - Referral Center Designation Requires Separate Attachment |
| ✓ | Infusion/Chemo Therapy - Referral Center Designation Requires Separate Attachment |
| ✓ | Magnetic Resonance Imaging - Referral Center Designation Requires Separate Attachment |
| ✓ | Megavoltage Radiation Therapy - Referral Center Designation Requires Separate Attachment |
| ✓ | Occupational Therapy - Referral Center Designation Requires Separate Attachment |
| ✓ | Pain Management - Referral Center Designation Requires Separate Attachment |
| ✓ | Physical Therapy - Referral Center Designation Requires Separate Attachment |
| ✓ | Skilled Nursing/Long Term Care - Referral Center Designation Requires Separate Attachment |
| ✓ | Speech Therapy - Referral Center Designation Requires Separate Attachment |

BRSI 000213

⬚ **CONFIDENTIAL**

*Attachment B (Continued)*
*Children's Hospital*
*Hospital Service Listing (Continued)*
*AS OF: December 1, 1998*

Radiology - Referral Center Designation Requires Separate Attachment
Substance Abuse/Chemical Dependency - Referral Center Designation Requires Separate Attachment

Other Facility/Outpatient Clinical Services Not Addressed in this Agreement Require Separate Attachment

*Physician Services*

Hospital Based Radiology: Group's Name *Children's Hospital Physicians*
Hospital Based Anesthesia: Group's Name *Children's Hospital Physicians*
    Certified Nurse Anesthetist Employed By: (Circle One)    Hospital Group
Hospital Based Pathology: Group's Name *Children's Hospital Physicians*
Hospital Based Emergency Services: Group's Name *Children's Hospital Physicians*
Hospital Based Neonatology: Group's Name *Children's Hospital Physicians*
Hospital Based Intensivist: Group's Name *Children's Hospital Physicians*
Other:

BRSI 000214

CONFIDENTIAL

**FILE COPY**

### FIFTH ADDENDUM TO AGREEMENT
### BETWEEN
### MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
### AND
### CHILDREN'S NATIONAL MEDICAL CENTER

THIS FIFTH ADDENDUM, effective April 1, 1995, is made part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc. (hereinafter "Health Plan") and CHILDREN'S NATIONAL MEDICAL CENTER (hereinafter "Hospital"), as amended on July 1, 1990, April 1, 1991, September 1, 1992 and July 1, 1992.

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

The Diabetes Program of Children's National Medical Center as described in attachment A of this addendum and dated February 1995 is incorporated into the existing contract between the Health Plan and the Hospital in its entirety.

All other pricing, terms and conditions, except as previously modified, remain in effect.

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____    Typed Name:    J. Stevens Dufresne

Title:    Executive Vice President, Provider Networks

CHILDREN'S NATIONAL MEDICAL CENTER

By: _____    Typed Name: _____

Title: _____    Address: _____

_____

BRSI 000215

[|] CONFIDENTIAL

## ~~FIFTH~~ ADDENDUM TO AGREEMENT
### BETWEEN
### MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
### AND
### CHILDREN'S HOSPITAL

FIPA

THIS ~~FOURTH~~ ADDENDUM, effective September 15, 1993, is made part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc., (hereinafter "Health Plan") and CHILDREN'S HOSPITAL (hereinafter "Hospital"), as amended on July 1, 1990, April 1, 1991, September 1, 1992, and July 1, 1992.

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

I.    Attachment A of the Agreement is deleted and replaced with the new Attachment A which is incorporated herein by reference effective September 15, 1993. This in no way effects rates for reimbursement to PPO members, which are previously incorporated by reference in Attachment A-1.

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____    Typed name: _J. Stevens Dufresne_____

Title: _Executive Vice President_____    Address: _4 Taft Court_____
                                                      _Rockville, MD  20850_

CHILDREN'S HOSPITAL

By: _____    Typed name: _Michelle K. Mahan_____
        10.17.94

Title: _Vice President, Finance_____    Address: _111 Michigan Avenue, N.W._
                                                     _Washington, D.C. 20010_

BRSI 000216

FOURTH ADDENDUM TO **CONFIDENTIAL**
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

THIS FOURTH ADDENDUM, effective July, 1, 1992, is made part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc., (hereinafter "Health Plan") and CHILDREN'S HOSPITAL (hereinafter "Hospital"), as amended on July 1, 1990, April 1, 1991, and September 1, 1992.

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

I. <u>Article II</u> - Health Services
Insert the following after the fourth paragraph:

"Throughout the term of this agreement, Health Plan will continue to identify Hospital and members of Children's Faculty Associates, Inc. as "community hospital" and "community participating providers" and will not limit the authorization of services rendered at Hospital by members of Children's Faculty Associates, Inc. any more than for other community-based physicians."

II. <u>Article V</u> - Compensation
Insert the following after fourth paragraph:

"Hospital and Health Plan acknowledge that there may be outliers identified by Hospital during the contract year which were not defined at the time of this agreement. Hospitals and Health Plan agree to negotiate in good faith on such outlier claims to ensure that Children's receives fair and adequate payment."

III. <u>Article VI, Section A</u> - Billings
Insert the following after the last sentence of the sixth paragraph:

"Hospital reserves the right to interim bill Health Plan for members continuously hospitalized for 30 days or more."

BRSI 000217

Fourth Addendum to Hospital Service **CONFIDENTIAL**
Effective July 1, 1992
Page Two of Two

"Notwithstanding the preceding paragraph, both Hospital and
Health Plan recognize the outlier reimbursement structure is
complex and sometimes difficult to administer. Hospital will
make every effort to ensure the coding is accurate and submit
any adjustments and/or corrections in a timely manner. Until
improved software is available, Hospital will make best
efforts to notify Health Plan of outlier cases as they are
identified during the concurrent review process with the
utilization management worksheet. Health Plan will make every
effort to pay claims, including the additional outlier
payments, on a timely basis the first time the claim is
received. Health Plan will not deny outlier payments for up
to twelve months following the submission of a final claim
solely due to the lack of correct coding on the UB-82 or its
successor. Health Plan will make requested corrections in
outlier payments within the payment timeframe specified in
Article V."

IV.  Attachment A of the Agreement is deleted and replaced with the
     new Attachment A which is incorporated herein by reference
     effective July 1, 1992. This in no way effects rates for
     reimbursement to PPO members, which are previously
     incorporated by reference in Attachment A-1.

V.   Except as expressly provided herein, the Agreement shall
     remain unmodified and in full force and effect.


     IN WITNESS THEREOF, the parties hereto have caused this
Agreement to be executed by their duly authorized representatives.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____    Typed name:_____

Title: _MAMSI_____   Address:_____

                                _____


CHILDREN'S HOSPITAL

By: _____    Typed name:_Michelle K. Mahan_

Title:_Vice President, Finance_  Address:_____

                                _____


BRSI 000218

¶ CONFIDENTIAL

THIRD ADDENDUM TO AGREEMENT
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

THIS THIRD ADDENDUM, effective September 1, 1992, is made a part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc. (hereinafter "Health Plan") and Children's Hospital (hereinafter "Hospital") as amended on July 1, 1990, and April 1, 1991.

WHEREAS, Health Plan is associated with various Preferred Provider Arrangements to deliver or arrange for the delivery of health services;

WHEREAS, the parties wish to renegotiate reimbursement rates for Preferred Provider Arrangements and other terms effective September 1, 1992;

NOW THEREFORE, in consideration of the mutual premises herein stated, it is agreed by and between the parties hereto as follows:

1.  <u>Article I</u>

    Amend Definitions as follows:

    a.  Delete the last sentence in the definition of "Member", Section G, and replace with the following. "Member" also means enrolled persons in the Mid-Atlantic Psychiatric Services, Inc.

    b.  Replace section J with the following: "Health Plan" or "Health Maintenance Organization" means MD-Individual Practice Association, Inc., Mid-Atlantic Psychiatric Services, Inc.

    c.  Create new section K to read as follows: "PPO Member" means any person who is enrolled in an organization conducting a Preferred Provider Arrangement (such as Alliance PPO) under which Health Plan has contracted with an employer, insurance company, or other third party. For all purposes other than reimbursement, "Member" includes "PPO Member".

BRSI 000219

**[] CONFIDENTIAL**

CH and MD-IPA
Third Addendum
Page Two

2.   <u>Reimbursement Rates:</u> Article V - Compensation, add the following paragraphs
               between paragraph two and three:



  Attachment A of the Agreement (Reimbursement) applies to
  all services rendered to members other than PPO members.

  Attachment A-I is added to this agreement to reflect a
  rate for services rendered to PPO members, incorporated
  herein by reference.

3.   <u>Confidentiality of Contractual Provision</u>

  Article XV - Miscellaneous, add a new paragraph L as follows:

  "The rates of this Agreement shall remain confidential and
  each party shall take precautions and make best efforts to
  prevent any disclosure except to duly authorized
  representatives, employees, and members of either party as is
  required by law."

4.   <u>Full Force and Effect.</u>

  Except as expressly provided herein, the Agreement, as
  amended, shall remain unmodified and in full force and effect.

BRSI 000220

[]] **CONFIDENTIAL**

CH and MD-IPA
Third ~~Fourth~~ Addendum
Page Three

    IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed by their duly authorized representatives.

MD INDIVIDUAL PRACTICE ASSOCIATION, INC.

_____
                (Signature)

_____
                (Typewritten Name)
J. STEVENS DuFresne

_____
                (Title)
Executive Vice President

_____
                (Date)


CHILDREN'S HOSPITAL

_____
                (Signature)

        Ron J. Sloan
_____
                (Typewritten Name)          Michelle K. Mahan

    EXECUTIVE VICE PRESIDENT/CCO
_____
                (Title)                     VP Finance

        October 12, 1992
_____
                (Date)


BRSI 000221

[] CONFIDENTIAL

SECOND ADDENDUM TO AGREEMENT
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

THIS SECOND ADDENDUM, effective April 1, 1991, is made a part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July, 1988 between MD-Individual Practice Association, Inc. (hereinafter "Health Plan") and Children's Hospital (previously referred to as Children's Hospital National Medical Center; hereinafter "Hospital"). Furthermore, the Second Addendum surpasses the First Addendum as of April 1, 1991.

WHEREAS, Health Plan and Hospital desire to preserve and enhance delivery of health services; and

WHEREAS, Health Plan is associated with various preferred provider arrangements to deliver or arrange for the delivery of health services;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

1.  Article I - Definitions, shall be amended as follows:

    a.  The definition of "Member" at Section G will remain as written, and the following language will be added at the end of the current definition. "Member" also means enrolled persons in the Mid-Atlantic Psychiatric Services, Inc. or organizations conducting a preferred provider arrangement in association with Alliance PPO, Inc. (hereinafter referred to as "Health Plan" or "Health Maintenance Organization")."

    b.  Add a new definition as Section I as follows: "Preferred Provider Arrangement" means a written arrangement (Purchaser Service Agreement) under which Health Plan has contracted with an employer, insurance company, or other third party (hereinafter referred to as the "Payor") under which Payor or contract beneficiary of the Payor has access to Health Plan providers, including Hospital, and receives services from Hospital under the terms of this Hospital Service Agreement. Hospital will look solely to Payor for payment of services provided to employees or contract beneficiary of Payor and shall not in any event look to Health Plan for such payment. For purposes of this definition, Payor is exactly the same as the Purchaser and will be used interchangeably to define the same entity. Health Plan will provide Hospital with updated lists of Payors or Purchasers from time to time upon request of Hospital.

BRSI 000222

M.D. IPA and CH
Second Addendum
Page 2

**① CONFIDENTIAL**

c.   Add a new definition as Section J as follows:  "Health Plan"
     or "Health Maintenance Organization" means MD-Individual
     Practice Association, Inc., Mid-Atlantic Psychiatric
     Services, Inc. or Alliance PPO, Inc.

2.   <u>Article II</u> -   Replace the last paragraph of this article in its
     entirety with the following:

          The Health Plan shall allow Plan Providers to refer
     Members to Hospital for all services which are approved by a
     Member's primary care physician.  Health Plan's
     administrative manuals, provider directories, and all other
     internal and provider reference materials will indicate
     Hospital is a full-service facility with "community
     hospital;" status at each document's next printing.  Until
     such printing, Health Plan shall ensure its staff use their
     best efforts to inform inquiring members and Participating
     Providers of the Hospital's full-service status.  Health
     Plan will use best efforts to list each Children's Faculty
     Associates member by name, individually, indicating their
     specialty and their service locations, in the Provider
     Directory.  Prior to directory publication, Health Plan will
     provide Hospital with two working days to review and proof
     listing of Children's Faculty Associates' member
     information.  In the event that Hospital fails to provide
     necessary corrections to Health Plan by the end of the
     second working day, Health Plan reserves the right to
     publish the directory without delay.

3.   <u>Article V</u> - Compensation, shall be amended as follows:

     In Paragraph three, lines three and seven, reduce the forty-five
     (45) day payment timeframe to forty (40) days.

     Add a new fifth paragraph to the existing language as follows:

          Notwithstanding the above, Health Plan is not
     responsible for payments for Services rendered to Members
     who are participants under a preferred provider arrangement.
     Health Plan will assist Hospital to resolve reimbursement
     issues with Payors or Purchasers.

          If Hospital notifies Health Plan that a Purchaser has
     failed to (1) comply with the identification and
     verification of coverage requirements of the Agreement or
     (2) pay a claim within the timeframe set forth in the
     Purchaser Service Agreement, then Health Plan shall have ten
     (10) days to correct such breach.  If Health Plan is unable
     to cure within ten (10) days, Health Plan's rights under the
     applicable Purchaser Service Agreement, including the

BRSI 000223

M.D. IPA and CH
Second Addendum
Page 3

[] CONFIDENTIAL

arbitration remedy, if any, shall be automatically assigned
to Hospital to enforce performance of Purchaser's
obligations.  Until Purchaser corrects such breach, Hospital
shall have no obligation to render services to the
Purchaser's Members.

4.   Article VI - Billings, shall be replaced in its entirety, as
follows,

        The Hospital shall bill the Health Plan for all
     Hospital Services rendered to Members.  Billings shall
     include identifying patient information and an itemized
     record of services and charges in customary bill form (UB-
     82).  All bills shall be sent to:

               MD-Individual Practice Association, Inc.
               4 Taft Court
               Rockville, Maryland  20850

     (A)  With respect to services provided to Members in the Health
     Maintenance Organization:

        Hospital hereby agrees that in no event, including, but
     not limited to, non-payment by the Health Maintenance
     Organization, Health Maintenance Organization insolvency or
     breach of this Agreement, shall Hospital bill, charge,
     collect a deposit from, seek compensation, remuneration or
     reimbursement from, or have any recourse against
     subscribers, Members or persons other than the Health
     Maintenance Organization for services provided pursuant to
     this Agreement.  This provision shall not prohibit
     collection of any applicable copayments,  deductibles billed
     in accordance with the terms of the Health Maintenance
     Organization's subscriber agreement, or fees for non-covered
     services.

        Copayments are the responsibility of the subscriber or
     Member to pay at the time of services and Hospital agrees to
     use best efforts to collect such fees from subscriber/Member
     at the time services are rendered.

        Hospital further agrees that (1) this provision shall
     survive the termination of this Agreement regardless of the
     cause giving rise to such termination and shall be construed
     to be for the benefit of the Health Maintenance
     Organization's subscribers or Members and that (2) this
     provision supersedes any oral or written agreement to the
     contrary now existing or hereafter entered into between

M.D. IPA and CH
Second Addendum
Page 4

[] CONFIDENTIAL

Hospital and the subscriber, Member or persons acting on the subscriber's behalf.

Any modifications, additions, or deletions to the provisions of this hold harmless clause shall become effective on a date no earlier than fifteen (15) days after the State Corporation Commission and thirty (30) days after the appropriate regulating entity have received written notice of such proposed changes.

In the event that revenues of the Health Plan are insufficient to pay Hospital the compensation due, Hospital agrees to furnish to Members services specified in the Section(s) that describe health and or Hospital services to be provided a Member for a period of thirty (30) days from the day that revenue insufficiency occurs.

Except for circumstances which are beyond the control of Hospital, no payment shall be made unless the bill for services is received within one hundred twenty (120) days after the most recent date of discharge of the Member or date of service, whichever occurs later; provided, however, for a Member who is hospitalized continuously, Hospital may, at its option, submit a bill every thirty (30) days. Hospital shall appeal all Health Plan denials of payment within ninety (90) days from the date Hospital receives written notice of a denied claim. All billings by Hospital may be considered final by Health Plan unless adjustments are requested in writing by Hospital within sixty (60) days after receipt of such billing by Health Plan.

Health Plan shall pay the Hospital 90% of the amount due as set forth in this Agreement on all disputed claims pending resolution of the dispute; provided, Hospital responds in writing within thirty (30) days to written inquiries received from Health Plan regarding disputed amounts. If Health Plan disagrees with the charges on any bill, it shall notify Hospital in writing of the disputed charges within thirty (30) days after receipt of the bill. The above provision for 90% payment on disputed claims does not apply to claims which have been denied for reasons other than disputed related to the amount of charges for services rendered by Hospital.

(B)  With respect to individuals who participate in a Preferred Provider Arrangement:

Hospital hereby agrees that in no event, including, but

BRSI 000225

M.D. IPA and CH
Second Addendum                    ‖ CONFIDENTIAL
Page 5

not limited to, non-payment by any employer, insurance
company or other third party contracting with Health Plan
for provision of services under a preferred provider
arrangement, the insolvency of the previously enumerated
Payors or breach of this Hospital Service Agreement, shall
Hospital bill, charge, collect a deposit from, seek
compensation, remuneration or reimbursement from, or have
any recourse against subscribers, Members or persons other
than the ultimate Payor of services provided pursuant to
this Hospital Service Agreement.  This provision shall not
prohibit collection of any applicable copayment, deductibles
billed in accordance with the terms of the subscriber's
agreement, or fees for non-covered services.

Copayments are the responsibility of the subscriber or
Member to pay at the time of services, and Hospital agrees
to use its best efforts to collect such fees from
subscriber/Member at the time services are rendered.

Hospital further agrees that (1) this provision shall
survive the termination of this Hospital Service Agreement,
regardless of the cause given rise to such termination and
shall be construed to be for the benefit of the
subscriber/Member, and that (2) this provision supersedes
any oral or written agreement to the contrary now existing
or hereinafter entered into between Hospital and the
subscriber, Member or persons acting on the subscriber's
behalf.

Any modifications, additions, or deletions to the
provision of this hold harmless clause shall become
effective on a date no earlier than fifteen (15) days after
the State Corporation Commission and thirty (30) days after
the appropriate regulating entity have received written
notice of such proposed changes.

Except for circumstances which are beyond the control
of Hospital, no payment shall be made unless the bill for
services is received within one hundred twenty (120) days
after the date of discharge of the Member or date of
service, whichever occurs later.  All billings by Hospital
may be considered final by Health Plan unless adjustments
are requested in writing by Hospital within sixty (60) days
after receipt of such billing by Health Plan.

5.   Attachment A of the Agreement is deleted and replaced with the
     revised Attachment A, effective April 1, 1991, which is
     incorporated herein by reference.

BRSI 000226

M.D. IPA and CH
Second Addendum
Page 6                         ¦¦ CONFIDENTIAL

6.  <u>Article XIV</u> - Term and Termination, first and second paragraphs
    shall be deleted and replaced by the following:

              This Agreement shall be effective from April 1, 1991,
         until March 31, 1993, whereupon the terms of the Agreement
         will automatically be extended for one year periods unless
         sooner terminated.

              Not withstanding anything herein to the contrary, this
         Agreement may be terminated by Hospital or Health Plan upon
         giving at least sixty (60) days written notice.

7.  <u>Article XV</u> - Miscellaneous, paragraph D will be amended to change
    the Hospital's mailing address to:

                   Director, Managed Care
                   Office of Managed Care
                   Children's Hospital
                   111 Michigan Avenue, N.W.
                   Washington, D.C.   20010-2970

    with a copy to General Counsel at the same address, and the
    Health Plan's mailing address to:

                   Senior Vice President, Provider Networks
                   Mid-Atlantic Medical Services, Inc.
                   4 Taft Court
                   Rockville, Maryland   20850-4168

Except as expressly provided herein, the Agreement shall remain
unmodified and in full force and effect.

BRSI 000227

M.D. IPA and CH ! CONFIDENTIAL
Second Addendum
Page 7

IN WITNESS THEREOF, the undersigned have executed this Second Addendum
to the Agreement as of the date noted below.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.:

By: _____

Title: _Senior Vice President_____

Telephone: _301-251-4096_____

Date: _____


CHILDREN'S HOSPITAL:

By: _____

Title: _____EXECUTIVE VICE PRESIDENT/CCO__

Telephone: _____(202) 745-2001_____

Date: _____October 22, 1991_____

BRSI 000228

⚏ CONFIDENTIAL

FIRST AMENDMENT TO THE HOSPITAL SERVICES AGREEMENT

between

CHILDREN'S HOSPITAL AND M.D.IPA

This First Amendment to the Hospital Services Agreement effective July 1, 1990 is made and entered into by and between the M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC., (hereinafter "Health Plan"), and CHILDREN'S HOSPITAL (previously referred to as Children's Hospital National Medical Center, hereinafter "Hospital").

Whereas, the Health Plan and Hospital mutually desire to amend the Agreement in certain respects.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.  Reimbursement Rates.

Attachment A of the Agreement is deleted and replaced with the new Attachment A which is incorporated herein by reference effective July 1, 1990.

2.  Term and Termination.

The first sentence of Paragraph Two of Section XIV is revised to reflect the State of Virginia's Insurance Code (1989) requirement that providers give health maintenance organizations sixty days notice of termination.  Paragraph Two, Section XIV will therefore be deleted and replaced with the following:

    "Notwithstanding anything herein to the contrary, this Agreement may be terminated by Hospital upon giving at least sixty (60) days written notice to Health Plan.  Health Plan may terminate this Agreement upon giving at least ninety (90) days written notice to Hospital."

3.  Full Force and Effect.

Except as expressly provided herein, the Agreement shall remain unmodified and in full force and effect.

BRSI 000229

[] CONFIDENTIAL

**CONTRACTING ENTITY:**

PRINT HERE

| 1 | | | |

DARKEN HERE

| 0 | 0 | 0 | 0 |
| ■ | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |

**CONTRACT TYPE:**

PRINT HERE

| 9 | 8 | 8 | |

DARKEN HERE

| 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | ■ | ■ | 8 |
| ■ | 9 | 9 | 9 |

**DEPARTMENT/PORTFOLIO:**

PRINT HERE

| 1 | 6 | 1 | 2 |

DARKEN HERE

| 0 | 0 | 0 | 0 |
| ■ | 1 | ■ | 1 |
| 2 | 2 | 2 | ■ |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | ■ | 8 | 8 |
| 9 | 9 | 9 | 9 |

PAGE 1 OF 3

FORM VERSION: | | ■ | | |

BRSI 000230

CONFIDENTIAL

USER NAME, PRIMARY:

PRINT HERE

| 2 | 3 | | |

DARKEN HERE

| 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 |
| ■ | 2 | 2 | 2 |
| 3 | ■ | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |

USER NAME, SECONDARY:

PRINT HERE

| 2 | 0 | | |

DARKEN HERE

| 0 | ■ | 0 | 0 |
| 1 | 1 | 1 | 1 |
| ■ | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |

SITE/BUILDING:

PRINT HERE

| 1 | | | |

DARKEN HERE

| 0 | 0 | 0 | 0 |
| ■ | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |

PAGE 2 OF 3

BRSI 000231

CONFIDENTIAL

SITE/BUILDING: ☐ ☐ ☐ ☐   SITE/BUILDING: ☐ ☐ ☐ ☐   SITE/BUILDING: ☐ ☐ ☐ ☐

| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |

SITE/BUILDING: ☐ ☐ ☐ ☐   SITE/BUILDING: ☐ ☐ ☐ ☐   SITE/BUILDING: ☐ ☐ ☐ ☐

| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |

BRSI 000232

# EXHIBIT B

ALLIANCE PPO, INC.

PURCHASER SERVICE AGREEMENT

FOR SELF INSURED

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND0000001

ALLIANCE PPO, INC.
PURCHASER SERVICE AGREEMENT

## TABLE OF CONTENTS

**PAGE**

**I. SERVICES AND COMPENSATION** ................................. 2
   1.1 Provider Contracting Services. .................................. 2
   1.2 Administrative Services. ...................................... 2
   1.3 Preferred Provider/Utilization Review. ........................... 2
   1.4 Alliance PPO, Inc. Compensation. ............................. 3
   1.5 Preferred Provider Compensation. ............................. 3
   1.6 Payment of Claims and Expenses. ............................. 3
   1.7 Participants. .............................................. 4
   1.8 Promotion of PPA. ......................................... 4
   1.9 Eligibility. ............................................... 4
   1.10 Access to Member Funds Records. ............................ 4
   1.11 Cooperation. ............................................. 5
   1.12 Independent Contractors. ................................... 5
   1.13 Provider-Patient Relationship. ............................... 6
   1.14 Hold Harmless. ........................................... 6
   1.15 Insurance. ............................................... 6
   1.16 Legal Defense. ........................................... 6
   1.17 Standard and Character of Performance. ........................ 6
   1.18 Reliance on Communications. ................................ 7
   1.19 Proprietary Information. .................................... 7

**II. TERM AND TERMINATION OF AGREEMENT** ...................... 7
   2.1 Effective Date. ............................................ 7
   2.2 Termination. .............................................. 7
   2.3 Termination for Cause by Alliance PPO, Inc. ..................... 7
   2.4 Termination for Cause by Purchaser. ........................... 8
   2.5 Contact of Alliance Preferred Providers. ........................ 9
   2.6 Applicable Law. ........................................... 9

**III. MISCELLANEOUS** ......................................... 9
   3.1 Amendments. ............................................. 9
   3.2 Waiver. .................................................. 9
   3.3 References to Purchaser. ..................................... 9
   3.4 Third Party Rights. ........................................ 10
   3.5 Assessments. ............................................. 10
   3.6 Limitations. .............................................. 10
   3.7 Arbitration. .............................................. 10

-i-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

3.8  Duties on Termination. ................................... 10
3.9  Performance by Alliance PPO, Inc. ........................... 10
3.10  Successors and Assigns. ................................... 11
3.11  Assignment. .............................................. 11
3.12  Headings. ................................................ 11
3.13  Notice. .................................................. 11
3.14  Entire Agreement. ......................................... 12
3.15  Applicable Law. ........................................... 12

ATTACHMENT LIST ........................................... 13

ATTACHMENT A

    PARTICIPATION AGREEMENTS................................. 14

ATTACHMENT B

    PREFERRED PROVIDER ARRANGEMENTS ..................... 16

ATTACHMENT C

    ADMINISTRATIVE SERVICES ................................ 17
    1.  Financial Systems and Services. ................................ 17
    2.  Claims Screening. ........................................... 17
    3.  Utilization and Peer Review. .................................. 17
    4.  Excluded Expenses and Services. ............................... 17

ATTACHMENT D
COMPENSATION TO ALLIANCE PPO, INC. ......................... 20

    ALLIANCE PPO/MAPSI - Fee Schedule For Member Funds .......... 20

ATTACHMENT E

    SERVICE AREA MAP ....................................... 21
    ALLIANCE PPO GEOGRAPHIC AREAS .......................... 22

ATTACHMENT F

    ALLIANCE PPO, INC. PROVIDER MANUAL ..................... 23

ATTACHMENT G

    ALLIANCE "PHYSICIAN CLAIM REPORT" ........................ 24

-ii-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

# ALLIANCE PPO, INC.

## PURCHASER SERVICE AGREEMENT

This Agreement, effective the first day of January, 1992, by and between the Health Care Cost Containment Corporation of Mid-Atlantic Region (hereafter referred to as "Purchaser"), and Alliance PPO, Inc. (hereafter "Alliance PPO, Inc."), a corporation organized under the laws of the State of Maryland.

WHEREAS, Purchaser is a non-profit corporation consisting of member Health and Welfare Trust Funds, established to undertake health care cost containment efforts on behalf of its member funds;

WHEREAS, certain member Health and Welfare Trust Funds (hereafter referred to collectively as "Member Funds") have elected to participate through the Purchaser in obtaining cost containment services hereafter described in this Agreement;

WHEREAS, Participation Agreements of Member Funds, which may · be supplemented or diminished from time to time, are attached hereto as Attachment A;

WHEREAS, Member Funds have adopted health care plans for their eligible participants and the eligible dependents thereof under which such persons are entitled to certain health service benefits (hereafter "Covered Benefits"); (Hereafter the term "Participants" shall mean eligible participants of Member Funds, and where applicable, their dependents.)

WHEREAS, Purchaser desires to offer to its Member Funds a preferred provider arrangement (hereafter "PPA");

WHEREAS, on behalf of its Member Funds, Purchaser desires to purchase certain administrative and provider contracting services for operation of their health care plans from Alliance PPO, Inc.; and

WHEREAS, Alliance PPO, Inc. desires to provide administrative and provider contracting services for Purchaser's Member Funds health care plans, including a PPA;

NOW THEREFORE, in consideration of the promises and mutual covenants contained herein, it is hereby agreed as follows:

-1-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND0000004

# I. SERVICES AND COMPENSATION

1.1  _Provider Contracting Services._  Alliance PPO, Inc. shall arrange, through contracts with physicians, hospitals and other health care providers or entities contracting on behalf of such providers (hereafter "Preferred Providers"), for the reasonable availability of Covered Benefits from health care providers to Participants (hereafter "Provider Contracting Services"), on the preferred provider arrangement rates and terms described in Attachment B hereto. Alliance PPO, Inc. shall provide Purchaser with a list of Preferred Providers (including names, addresses, telephone numbers and, when applicable, respective specialties), which list may be revised by Alliance PPO, Inc. from time to time. Purchaser may include the names, addresses, telephone numbers and the specialties of Preferred Providers in any roster it prepares for distribution to Participants and in connection with Purchaser's marketing and administration of the Plan. Any such written materials to be distributed by Purchaser must be approved by Alliance PPO, Inc., in advance of distribution. Alliance warrants that its initial and ongoing service provider credentialing process shall be in accordance with the terms and conditions set forth in Alliance's proposal dated July 17, 1991, submitted to purchaser, which is incorporated herein and made a part hereof.

Purchaser agrees that Purchaser will not contract with any other organization to provide services similar to those provided by Alliance PPO, Inc. for Participants who live or work in the State of Maryland, District of Columbia, or Commonwealth of Virginia during the term of this contract. It is recognized by the parties that Member Funds may utilize services similar to those provided by Alliance, by separate arrangements.

1.2  _Administrative Services._  Alliance PPO, Inc. shall perform the administrative services set forth in Attachment C hereto (hereafter "Administrative Services") for the operation of the Member Funds. Purchaser and the Member Funds shall cooperate with Alliance PPO, Inc.'s performance of these administrative services in the manner set forth in Attachment C. Alliance PPO, Inc. shall perform these services in accordance with the reasonable exercise of its business judgment on behalf of the Member Funds and all applicable statutory and regulatory requirements. Member Funds shall at all times retain ultimate control over the assets and operations of their plans and final responsibility for the obligations of the plans imposed by law. Alliance PPO, Inc. shall be responsible to perform only the functions described in this Agreement in accordance with policies, directives, and controlling documents of the Member Funds.

1.3  _Preferred Provider/Utilization Review._  This Agreement constitutes a master agreement through which Member Funds may elect to participate. This Agreement covers both the Preferred Provider Organization services to be administered by Alliance and the Utilization Review Services to be administered by Alliance. It is agreed that these services are separate and distinct, and that Member Funds may elect to participate in either the Preferred Provider Arrangement or the Utilization Review or both. The charges to be assessed under this agreement, and the amounts to be paid by Alliance to Purchaser shall be separately calculated for each Member Fund based upon the rates applicable to the

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND0000005

service(s) elected by the Member Fund.  The separate Alliance/MAPSI Participation Agreement to be executed by each Member Fund shall set forth which service(s) each Member Fund shall elect.

1.4  Alliance PPO, Inc. Compensation.  As a fee for the Administrative Services and for its arrangement for Provider Contracting Services, Member Funds shall pay Alliance PPO, Inc. by the fifth of each month the amount specified in Attachment D hereof.  It is understood that a portion of each fee paid by Member Funds to Alliance constitutes an administrative charge due to Purchaser for its services to Member Funds in administering its cost containment programs.  Alliance shall pay to Purchaser by the 15th of each month the amount due to Purchaser as its administrative charge based upon payments made by the Member Funds to Alliance, as set forth in Attachment D.

1.5  Preferred Provider Compensation.  Member Funds and their participants shall be solely responsible for compensating Preferred Providers for Covered Benefits according to the rates and terms provided previously by Alliance PPO, Inc. as may be amended time to time by Alliance PPO, Inc. provided, however, that nothing in this agreement shall be construed to require the Member Funds to modify their existing schedule of benefits. Current rates and terms are described in Attachment B hereof.  Payment by Member Funds and their participants to Preferred Providers in accordance with the terms of this Agreement shall constitute full payment for the provision of Covered Benefits to Participants except that Preferred Providers shall have the right to collect from the Participant any applicable copayment or deductible which when added to payment received from Member Funds will equal the allowed Alliance Fee Maximum for covered services rendered the Participant by Preferred Providers.  Payment for non-covered services rendered the Participant by Preferred Providers, is the responsibility of the Participant.  Member Funds agree to compensate Preferred Provider within twenty seven (27) days after date of mailing of repriced statements to the Member Funds by Alliance PPO, unless Alliance PPO, Inc. or Purchaser notifies Preferred Provider that the statement was deficient or denied payment based upon the determination that services were outside the scope of the Plan.  Member Funds are aware that the contractual relationship between preferred providers and Alliance guarantee acceptance of repriced fees if paid within thirty (30) days, and that failure by a Member Fund to process a claim within twenty seven (27) days might risk loss of the benefit of the repriced savings.  Alliance guarantees that it will forward to the Member Funds its repriced claim within three (3) days from the date received from the preferred provider.  The requirement that Alliance reprice claims within three days shall not apply to those claims which Alliance deems deficient or refers for cost containment analysis.

1.6  Payment of Claims and Expenses.  Member Funds and their Participants shall be solely liable for the provision and payment of benefits provided their Participants and dependents pursuant to their plans and Alliance PPO, Inc. will not be considered the insurer, guarantor or underwriter of the liability of the Member Funds to pay or provide such benefits to the Member Funds' Participants.  Member Funds will be responsible for

all expenses incident to the operation of their plans and the PPA, except as may be specifically assumed by Alliance PPO, Inc. under this Agreement.

1.7 Participants. Purchaser will provide Alliance PPO, Inc., upon reasonable written request, with a list of Participants of the Member Funds who are qualified to receive Covered Benefits under the plans, including names, addresses and identification numbers. Alliance PPO, Inc. may inspect and review Purchaser's or Member Funds eligibility records upon reasonable written request to determine the accuracy of said list, and to determine the accuracy of compensation paid to Alliance PPO, Inc.

The parties recognize that the geographical boundaries within which Alliance PPO, Inc. provides its services are limited, and it is specifically agreed and understood that the obligation of the Purchaser and its Member Funds to compensate Alliance PPO, Inc. for Participants is limited to those Participants who reside, work in or seek services within the Geographical boundaries within which services are provided, which is described in Attachment E hereto; it is agreed that no payments are due with respect to Participants residing and obtaining medical treatment outside of these geographical boundaries.

Purchaser or its Member Funds shall provide each Participant with an identification card similar to the sample card included as Attachment F, and when such card is provided, it shall include the logo and name of Alliance PPO, Inc.  The Member Funds are responsible for Covered Benefits provided to their eligible Participants who present an identification card to a Preferred Provider to the extent of the schedule of benefits under the Member Funds plan.

1.8 Promotion of PPA. Purchaser agrees to be responsible for the marketing in good faith of the PPA to Participants of its Member Funds, and to use its best efforts to encourage participation of Participants in the PPA. Neither Purchaser nor Member Funds shall be required to adopt or implement incentives to utilize Preferred Providers, as it is expressly understood that each Member Fund shall have the unrestricted right to adopt and maintain its own schedule of benefits. Alliance PPO, Inc., may suggest to Member Funds such incentives as it shall deem in the interests of the plans to consider as cost containment measures, and Member Funds may consider such incentives, but are not required to adopt them.

1.9 Eligibility. Member Funds have established the eligibility requirements for participation of Participants in the plans which are described in the plan documents of each Member Fund. Alliance PPO, Inc. shall have the right to obtain all written eligibility requirements of Member Funds. Any changes in such eligibility requirements of Member Funds is reserved solely to the discretion of the Member Fund, provided, however that Member Funds shall promptly notify Alliance of any change in eligibility requirements.

1.10 Access to Member Funds Records. All records relating to the operation of the Member Funds, including but not limited to, all books of medical account, enrollment

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

-4-

records, general administrative records and patient records, shall be and remain the sole property of the Member Funds. In addition, all information systems pertaining to and developed by the plans shall also be and remain the property of the Member Funds. To the extent that Alliance PPO, Inc. shall establish, maintain and carry out procedures for the keeping and preservation of the Member Funds' books and records, including providing for the manner and time of their preservation in accordance with all applicable laws, Alliance PPO, Inc. shall use reasonable efforts to protect the confidentiality of the records of the Member Funds during the term of the contract and thereafter. In this connection, medical records and other privileged information regarding Participants will not be disclosed to anyone other than Member Funds by Alliance PPO, Inc. or Purchaser except (i) with the written consent of the Participants as applicable only for their own medical records, (ii) pursuant to a court order through a court of competent jurisdiction, (iii) if allowed by applicable law, as necessary for the efficient operation of the Plan, or (iv) when required by applicable law.

Upon termination of this Agreement for any reason, Alliance PPO, Inc. shall (i) as soon as practicable deliver in usable form all records, in Alliance PPO, Inc.'s possession, concerning or relating to the Member Fund to the Member Fund or its designee, and (ii) as soon as practicable deliver to the Member Fund or its designee all data in its possession that are necessary to the plans' operations. Alliance PPO, Inc. may retain copies of information reasonably necessary for its operations, provided it gives advance written notice to the Member Funds of which records it copied for its operations.

1.11   Cooperation.   Purchaser shall cooperate with Alliance PPO, Inc. in the performance of its services hereunder and Alliance PPO, Inc. shall not be liable for any breach of obligations of this Agreement caused, in whole or in part, by the lack of cooperation or breach of obligations by Purchaser, by Member Funds or by Participants.

1.12   Independent Contractors.   The relationship between Alliance PPO, Inc. and Preferred Providers is an independent contractor relationship. Preferred Providers and their employees and agents are not employees or agents of Alliance PPO, Inc. and neither Alliance PPO, Inc. nor any employee of Alliance PPO, Inc. is an employee or agent of Preferred Providers. Alliance PPO, Inc. is not responsible and shall not be liable for any claims which may arise from the provision of medical and/or hospital services to Participants by Preferred Providers.

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between Alliance PPO, Inc. and Purchaser or Member Funds other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of the Agreement. Neither of the parties hereto, nor any of their respective employees or Member Funds shall be construed to be the agent, employer, or representative of the other, except to the extent otherwise explicitly provided for herein.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND0000008

1.13 <u>Provider-Patient Relationship</u>. Preferred Providers maintain the physician/ hospital-patient relationship with Participants and are solely responsible to Participants for all services they provide.

1.14 <u>Hold Harmless</u>. In the event Alliance PPO, Inc., its officers, directors, employees or agents are made parties to any judicial, administrative or other proceeding arising in whole or in part out of any function performed by one or more of them under this Agreement, Purchaser shall hold them harmless for all judgments, awards, settlements and costs (including attorneys' fees) which they incur or pay in connection therewith to the extent that the court rendering the judgment or the agency making the award determines that the liability underlying the judgment or award (or attorneys' fees with respect thereto) was caused by the gross negligence, fraud or criminal conduct of Purchaser, its agents, employees, officers or directors.

In the event Purchaser, its Member Funds, its officers, directors, employees or agents are made parties to any judicial, administrative or other proceeding arising in whole or in part out of any function performed by one or more of them under this Agreement, Alliance PPO, Inc. shall hold them harmless for all judgments, awards, settlements and costs (including attorneys' fees) which they incur or pay in connection therewith to the extent that the court rendering the judgment or the agency making the award determines that the liability underlying the judgment or award (or attorneys' fees with respect thereto) was caused by the gross negligence, fraud or criminal conduct of Alliance PPO, Inc., its agents, employees, officers or directors.

1.15 <u>Insurance</u>. Alliance shall maintain liability insurance in the amount of $1 million per incident, $1 million in aggregate claims plus an additional $4 million excess to cover any claims arising out of negligence, malpractice (not to include medical malpractice coverage of providers) or other similar tort, and shall provide proof of same to Purchaser.

1.16 <u>Legal Defense</u>. The defense, including legal fees and costs, together with the amount of any judgment, of any legal action against Purchaser or Member Funds arising out of a claim for benefits under the plans shall be the responsibility of the Member Funds, and shall not be an obligation of Alliance PPO, Inc. unless such litigation shall arise in connection with the omission or commission of action by Alliance. Alliance PPO, Inc. shall, however, cooperate with Purchaser and Member Funds by furnishing such material or information as it has available in connection with the defense of any such action.

1.17 <u>Standard and Character of Performance</u>. Alliance PPO, Inc. shall use customary and reasonable care and proper diligence in the performance of its services under this Agreement. It is understood and agreed by the parties that the terms "customary and reasonable care and proper diligence" and "negligence" do not make Alliance PPO, Inc. a guarantor of the correctness of all claims payments and other services performed under this Agreement, but refer to the usual business practice standards and conduct in such business.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND0000009

For the purposes of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et seq. (hereafter "ERISA"). The "Administrator" and "Named Fiduciary" of the Member Funds, are as set forth in the plan documents. Alliance shall not perform services as a fiduciary. If Alliance PPO, Inc. shall perform any service which would make it a fiduciary within the meaning of ERISA, Alliance PPO, Inc. shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such methods would use in conducting his business or providing services to the Member Funds.

1.18 <u>Reliance on Communications.</u> In all matters pertaining to the performance of services under this Agreement, Alliance PPO, Inc. when it acts in good faith, may rely upon any notice, resolution, instruction, direction, order, certificate, opinion, letter, telegram or other document believed by it to be genuine and authorized by Purchaser or its designee. If any Member Fund plan is amended, Alliance PPO, Inc. shall not be required to act in accordance with any amendment until it receives written notice thereof.

1.19 <u>Proprietary Information.</u> Purchaser acknowledges that Alliance PPO, Inc., in providing services under this Agreement, will of necessity divulge to and provide Purchaser with confidential proprietary plans, programs, formulae, methods and other products and information (hereafter "Proprietary Material") relating to the business services and activities of Alliance PPO, Inc. or its contractors, including Proprietary Material developed in the course of providing services hereunder. Purchaser agrees that, during the term of the Agreement and thereafter, Proprietary Material shall remain the Property of Alliance PPO, Inc. or its contractors and Purchaser shall maintain the confidentiality of such Proprietary Material and shall not use, divulge, furnish or make accessible such Proprietary Material to anyone other than is necessary for the plans' operations except (i) with the consent of the Participants, in regard only to their individual records, (ii) pursuant to a court order through a court of competent jurisdiction, (iii) if allowed by applicable law, as necessary for the efficient operation of the Plan, or (iv) when required by applicable law.

## II. TERM AND TERMINATION OF AGREEMENT

2.1 <u>Effective Date.</u> The effective date of this Agreement shall be the date first written above and it shall continue in effect thereafter for an initial term of two years and from year to year thereafter, subject to the termination provisions set forth below.

2.2 <u>Termination.</u> Either party may terminate this Agreement without cause by written notice at least sixty (60) days prior to the effective date of termination. Any Member Fund may terminate its participation by providing at least 60 days written notice to Purchaser and to Alliance PPO, Inc.

2.3 <u>Termination for Cause by Alliance PPO, Inc.</u> By adopting this master agreement, each Member Fund warrants that its current financial status is sound and that it has no knowledge of any event or transaction which would impair its ability to meet the

financial obligations identified hereunder. Upon reasonable written request, the Member Fund shall make a copy of its most recent financial statements available to Alliance PPO. Alliance PPO, Inc. shall have the option to immediately terminate this Agreement upon the occurrence of any of the following:

(i) Purchaser shall violate any material covenant of this Agreement and/or any other material agreement that is mentioned herein and shall fail to cure such violation within thirty (30) days after written notice thereof; or

(ii) Purchaser shall make an assignment for the benefit of creditors or apply to any tribunal for the appointment of a trustee or receiver for any substantial part of its assets, or cause to be commenced any proceeding relating to it under any bankruptcy, reorganization, arrangement, insolvency, readjustment or debt, dissolution, or liquidation laws or any jurisdiction; or

(iii) If any such application shall be filed or any such proceedings shall be commenced against Purchaser or an order shall be entered appointing any such trustee or receiver, or adjudicating Purchaser a bankrupt or insolvent, or approving a petition in any such proceedings, and such application, proceedings, or order shall remain in effect for sixty (60) days; or

(iv) There exists the issuance of an attachment, garnishment or similar process against any substantial part of the property of Purchaser and such attachment, garnishment or other similar process is not dismissed within sixty (60) days unless Alliance PPO, Inc. is contesting the validity of such action by appropriate proceedings taken in good faith within the sixty (60) day period; or

(v) Purchaser shall admit in writing that it is unable to meet its current financial obligations.

2.4 <u>Termination for Cause by Purchaser</u>. Alliance PPO, Inc. warrants that its current financial status is sound and that it has no knowledge of any event of transaction which would impair its ability to meet any obligations identified hereunder. Purchaser shall have the option to immediately terminate this Agreement upon the occurrence of any of the following:

(i) Alliance PPO, Inc. shall violate any material covenant of this Agreement and/or any other material agreement that is mentioned herein and shall fail to cure such violation within thirty (30) days after written notice thereof; or

(ii) Alliance PPO, Inc. shall make an assignment for the benefit of creditors or apply to any tribunal for the appointment of a trustee or receiver for any substantial part of its assets, or cause to be commenced any proceeding relating to it under any bankruptcy,

-8-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000011

reorganization, arrangement, insolvency, readjustment or debt, dissolution, or liquidation laws or any jurisdiction; or

(iii) If any such application shall be filed or any such proceedings commenced against Alliance PPO, Inc. or an order shall be entered appointing any such trustee or receiver, or adjudicating Alliance PPO, Inc. a bankrupt or insolvent, or approving a petition in any such proceedings, and such application, proceedings, or order shall remain in effect for sixty (60) days; or

(iv) There exists the issuance of an attachment, garnishment or similar process against any substantial part or the property of Alliance PPO, Inc. and such attachment, garnishment or other similar process is not dismissed within sixty (60) days unless Alliance PPO, Inc. is contesting the validity of such action by appropriate proceedings taken in good faith within the sixty (60) day period; or

(v) Alliance PPO, Inc. shall admit in writing that it is unable to meet its current obligations.

2.5    Contact of Alliance Preferred Providers.  Purchaser agrees that Purchaser will not contact any Alliance Preferred Providers during the term of this Agreement, or for a period of three months after termination of this Agreement, for the purpose of establishing, directly or indirectly, a comparable network of providers.

2.6    Applicable Law.  In the event that any governmental agency determines that Alliance PPO, Inc. is operating in violation of any law or regulation and requests that Alliance PPO, Inc. cease operations, then this Agreement may be terminated by Alliance PPO, Inc. immediately or as soon as practicable as determined by Alliance PPO, Inc. and any unearned fees paid in advance shall be reimbursed to the Member Funds.

## III.  MISCELLANEOUS

3.1    Amendments.  Except as provided herein, this Agreement or any part hereof may be amended at any time by written consent of both parties, without notice to or consent of any Participant.

3.2    Waiver.  No covenant, condition, duty, obligation, or undertaking contained in or made a part of this Agreement shall be waived except by the express written consent of the party giving such waiver granted in accordance with the provisions hereof, and forbearance or indulgence in any form or manner by either party in any regard whatsoever shall not constitute a waiver of the covenant, condition, duty, obligation, or undertaking to be kept, performed, or discharged by the other party to which the same may apply.

3.3    References to Purchaser.  Purchaser agrees that Alliance PPO, Inc. may refer to and identify Purchaser in informing Preferred Providers and other prospective purchasers

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000012

and health providers about the organizations, funds, and employers participating in Alliance PPO, Inc.'s PPA or employing its services.

3.4 <u>Third Party Rights</u>. This Agreement is entered into by and between the parties hereto and for their benefit. There is no intent by either party to create or establish third party beneficiary status or rights in any Participant, subcontractor, or other third party to this Agreement except Member Funds, and no such third party shall have any right to enforce any right or enjoy any benefit created or established under this Agreement, except Member Funds.

3.5 <u>Assessments</u>. The Purchaser will pay Alliance PPO, Inc. within a reasonable time after assessment any tax or charge assessed against Alliance PPO, Inc. which may be incurred by reason of a change in or imposition of any charges imposed on Alliance PPO, Inc. by any public body, exclusive of Federal or State Income Taxes, which affect this Agreement to the extent based upon services provided under this Agreement.

3.6 <u>Limitations</u>. In the event the operations of Alliance PPO, Inc.'s facilities or any substantial portion thereof are interrupted by war, fire, insurrection, labor/provider contract troubles, riots, the elements, earthquakes or acts of God, the provisions of this Agreement (or such portions hereof as Alliance PPO, Inc. is thereby rendered incapable of performing) shall be suspended for the duration of such interruption, and Member Funds shall receive refund for any unearned fees paid in advance.

3.7 <u>Arbitration</u>. Any controversy arising out of or relating to this contract, or the breach thereof, may be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

3.8 <u>Duties on Termination</u>. As of the effective date of termination of this Agreement pursuant to any provision of this Agreement, the Agreement shall be considered of no further force or effect, provided, however, that each party shall remain liable for any obligations or liabilities arising from activities carried on by such party or its agents, servants, or employees during the period this Agreement shall have been in effect. In the event a Participant is being treated by a Preferred Provider as of the date of termination of this Agreement, Preferred Provider shall, to the extent it may be deemed medically appropriate, continue to render Covered Benefits to Participant until alternate treatment of Participant's condition can be arranged. In such event, Member Funds shall continue to compensate Preferred Provider for such services in accordance with the terms and conditions of this Agreement (including Alliance's maximum pricing schedule).

3.9 <u>Performance by Alliance PPO, Inc.</u> At its discretion, Alliance PPO, Inc. may perform its obligations under this Agreement through employees or arrangements with agents or independent contractors.

-10-

3.10 <u>Successors and Assigns</u>. The provisions of this Agreement and obligations arising hereunder shall extend to, be binding upon, and inure to the benefit of the executors, administrators, successors, and assigns of the parties hereto.

3.11 <u>Assignment</u>. Purchaser shall not assign its right and obligations under this Agreement without the prior written consent of Alliance PPO, Inc. Alliance PPO, Inc. may assign its respective rights and responsibilities under this Agreement to any entity which owns or controls Alliance PPO, Inc., to any entity which is currently owned or controlled by Alliance PPO, Inc., or to any entity which is currently under common ownership or control with Alliance PPO, Inc. with prior written notice to Purchaser.

3.12 <u>Headings</u>. The headings of the various sections of the Agreement are inserted merely for the purpose of convenience and do not, expressly or by implication, limit, define or extend the specific terms of the section so designated.

3.13 <u>Notice</u>. Any notice required to be given pursuant to the terms and provisions of this Agreement shall be in writing and may either be personally delivered or sent by registered or certified mail by United States Postal Service, return receipt requested, postage prepaid, addressed to each party at the addresses which follow:

    i) Purchaser:

        Charles Mankin, Jr., President
        Health Care Cost Containment Corp.
        4725 Silver Hill Road
        Suitland, MD  20746

    ii) Alliance PPO, Inc.:

        Mark D. Groban, President
        Alliance, PPO, Inc.
        4 Taft Court
        Rockville, MD  20850

    iii) for purposes of notice and monitoring only:

        L.E. Laurion, Jr.
        The Segal Company
        1920 N Street, NW
        Washington, DC  20036

-11-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000014

3.14   Entire Agreement.   This Agreement (together with all attachments and documents incorporated herein) contains the entire agreement between the parties relating to the rights granted and the obligations assumed by this Agreement. Any prior agreements, promises, negotiations, or representations relating to the subject matter of this Agreement not expressly set forth in this Agreement are of no force or effect.

3.15   Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, this _17_ day of __July__, 1992


PURCHASER                                                    Alliance PPO, Inc.

By: _Charles Mankin, Jr.___                By: _Mark D Groban MD___

Title: _President___                                   Title: _President___

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000015

# ATTACHMENT LIST

| | |
|---|---|
| Attachment A | Participation Agreements |
| Attachment B | Preferred Provider Arrangements |
| Attachment C | Administrative Services |
| Attachment D | Compensation to Alliance PPO, Inc. |
| Attachment E | Geographical Boundaries |
| Attachment F | Sample Identification Card |

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000016

## ATTACHMENT A

### ALLIANCE/MAPSI
### Participation Agreement

This Participation Agreement is entered into this _____ day of _____, 199__, between the Health Care Cost Containment Corporation of Mid-Atlantic Region, Inc. ("HCCCC"), the_____ _____ ("the Fund"), and Alliance PPO, Inc. and MAPSI (collectively referred to as "Alliance").

WHEREAS, the Health Care Cost Containment Corporation of Mid-Atlantic Region, Inc. has entered into two Purchaser Service Agreements dated, January 1, 1992, one with Alliance PPO Inc., and the other with MAPSI ("the Agreements"), a copy of which is attached and incorporated herein, which permit those Health and Welfare Trust Funds which are members of the HCCCC to become Member Funds in the Alliance PPO network, utilization review services and MAPSI mental health and substance abuse services; and

WHEREAS, the Fund has elected to become a Member Fund pursuant to one or both of the Agreements.

NOW THEREFORE, in consideration of the mutual covenants contained herein, it is hereby agreed as follows:

1.      The Fund shall be a Member Fund pursuant to one or both of the Agreements, and be entitled to all the rights, privileges and obligations of Member Funds in accordance with the terms of such Agreements and such terms as incorporated herein by reference until such time as the Agreements shall terminate in accordance with its terms, or until such time as the Fund may earlier elect to terminate its participation under the terms of this agreement.

2.      The Fund hereby elects to participate in the following portions of the Agreements:

> ☐      PPO      ☐      UR      ☐      MAPSI

3.      Alliance agrees to provide to the Fund such services and obligations as are established for Member Funds under the Agreements, with respect to the services elected hereunder.

4.      The Fund agrees to pay to Alliance on or before the fifth day of each month a monthly contribution obligation in accordance with the schedule set forth in the Agreements.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000017

The Fund agrees to pay Health Care Cost Containment Corporation of Mid-Atlantic Region, Inc. an administrative fee per participant per month in accordance with the fee schedule attached to the Agreements for tasks performed by "HCCCC" in behalf of and as agreed to by the Fund and HCCCC. The Fund recognizes that the monthly payment hereunder includes this administrative charge which will be paid from Alliance to HCCCC only after receipt by Alliance.

5.    The Fund agrees to provide to Alliance its Summary Plan Description and any modifications to its plan of benefits which shall occur from time to time.

6.    This Participation Agreement shall continue in full force and effect until the earlier of a) the termination of the Agreements, or b) the date upon which the Fund shall set to terminate its participation, provided, however that the Fund shall have provided no less than 60 days written notice to HCCCC and Alliance that it will terminate its participation, or c) at the option of Alliance, if the fund fails materially to pay, or provide sufficient funds to pay, claims for Covered Services and for other expenses of the Fund in accordance with the terms of this Participation Agreement and pursuant to the schedule of benefits of the Fund, or shall fail to pay to Alliance the compensation due hereunder.

_____  
Alliance

_____  
HCCCC

_____  
Union Trustee

_____  
Employer Trustee

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000018

# ATTACHMENT B

## PREFERRED PROVIDER ARRANGEMENTS

The Preferred Providers who will provide Covered Benefits, will be paid at a rate which is generally a ten percent (10%) to twenty percent (20%) discount from usual and customary fees which prevail in the community. Fee maximums are to be set and monitored by Alliance PPO, Inc., and those maximums will be adjusted from time to time at the sole discretion of Alliance PPO, Inc. Alliance PPO, Inc. has negotiated per diem rates with several District of Columbia hospitals. These rates are subject to renegotiation from time to time. In a manner consistent with its business practice, Alliance PPO, Inc., in its sole discretion, will negotiate rates it believes are appropriate and reasonable within the community. In the event Alliance shall enter into negotiations in which a general increase in fee maximums are anticipated, Alliance will give advance written notice to Purchaser and give Purchaser the opportunity to make recommendations to Alliance.

Under Maryland law, Maryland hospitals charge all payors a rate which has been approved by Maryland regulatory authorities. Therefore, no discounts are available under the PPA from Maryland hospitals.

Alliance PPO, Inc.'s PPA includes ancillary services such as: laboratory, durable medical equipment, home health care and other services. Because of Alliance PPO, Inc.'s purchasing power, these services are generally provided on a discounted basis from usual and customary community charges. In a manner consistent with its business practice, Alliance PPO, Inc. at its sole discretion, will negotiate rates from time to time, which Alliance PPO, Inc. believes are reasonable and appropriate within the community. In the event Alliance shall enter into negotiations in which a general increase in fee maximums are anticipated, Alliance will give advance written notice to Purchaser and give Purchaser the opportunity to make recommendations to Alliance.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000019

ATTACHMENT C

ADMINISTRATIVE SERVICES

Alliance PPO, Inc. shall perform the following administration:

1. **Financial Systems and Services.** Alliance PPO, Inc. shall establish and administer procedures and systems for the preparation of financial reports for the efficient management and planning of the Plan. Alliance PPO, Inc. shall provide Purchaser and Member Funds no less frequently then quarterly with a summary of financial and statistical reports on utilization of medical services by Participant (see Exhibit 1 attached).

2. **Claims Screening.** All Preferred Providers will submit payment requests to Alliance PPO, Inc. Alliance PPO, Inc. will:

a). Determine that Provider is a member PPA.

b) Determine fee maximum amount for service billed by Preferred Provider.

c) Prepare payment advice for Purchaser or Purchaser's designee and forward a payment advice to Purchaser, or Purchaser designee for payment.

Member Funds or Member Funds designee shall pay all such claims within twenty seven (27) days of mailing of repriced provider claim by Alliance PPO, Inc..

3. **Utilization and Peer Review.** Alliance PPO, Inc. shall maintain systems and procedures necessary or appropriate for the operation of reasonable and appropriate utilization review, quality assurance and peer review programs. The services covered by utilization review include those services described in the proposal of July 17, 1991 submitted to the Purchaser, which are incorporated herein and made a part hereof. With respect to the quarterly Reports described in the proposal, Alliance agrees to refund 5% of its Utilization Review fee for the quarter to each Member Fund in the event such Member Fund's Quarterly Reports are not submitted within forty five (45) days of the end of each calendar quarter.

4. **Excluded Expenses and Services.** Expenses incurred by Purchaser or Member Funds for the following services shall not be the responsibility of Alliance:

(a) All direct and indirect costs for providers and suppliers in connection with the delivery of covered health care services and supplies to Participants, including all compensation and reimbursement paid to medical and paramedical personnel and health care facilities;

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000020

(b)   Expenses associated with meetings, communications and mailings to Purchaser, including its management, or Board of Directors or committees;

(c)   All insurance costs, including professional liability/malpractice, general liability and all reinsurance and stop-loss, which may be purchased for Purchaser or their Member Funds with the written approval of Purchaser;

(d)   Taxes or other governmental obligations of the Plan or Purchaser;

(e)   Purchaser's annual corporate financial audit, and such other audits and financial statements required by state or federal law and costs associated with preparation of Purchaser's corporate tax returns or other returns or reports for Plan or Purchaser;

(f)   Costs of legal services for the Plan which arise in the normal course of the Plan's operations;

(g)   License and filing fees and penalties and other fees associated with annual and other reports required to be filed by Purchaser or Member Funds by federal and state statutes and regulations; and

(h)   Expenses for independent legal, independent accounting, and independent actuarial services of Purchaser.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000021

## EXHIBIT 1

### ALLIANCE PPO/MAPSI*
### Fee Schedule For Member Funds

(Per eligible fund participant per month - $/p/mo.)

| | Up to 20,000** | 20,000 - 50,000** | 50,000 + ** |
|---|---|---|---|
| Alliance Hospital and Physician Network Only | $2.15/p/mo. | $1.90/p/mo. | $1.85/p/mo. |
| Alliance Utilization Review Services Only | $1.45/p/mo. | $1.40/p/mo. | $1.40/p/mo. |
| Alliance Network and UR | $3.00/p/mo. | $2.80/p/mo. | $2.75/p/mo. |
| MAPSI (Network & UR) Only*** | $0.55/p/mo. | $0.50/p/mo. | $0.50/p/mo. |
| Alliance Network, UR as well as MAPSI Network & UR*** | $3.50/p/mo. | $3.25/p/mo. | $3.20/p/mo. |

Administrative charge due to HCCCC (included in above rates):

| | | | |
|---|---|---|---|
| Alliance Hospital and Physician Network | | | .15/p/mo. |
| Alliance Utilization Review | | | .05/p/mo. |
| MAPSI Network & UR | | | .05/p/mo. |

*    Includes fee to HCCCC

-19-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000022

## ATTACHMENT D

## COMPENSATION TO ALLIANCE PPO, INC.

Member Funds shall pay Alliance PPO, Inc. the fees outlined below per month for each eligible participant within the geographical jurisdiction of this agreement (as defined in the agreement) of each Member Fund who is eligible to access Covered Benefits through Preferred Providers, whether or not such Participants, or their dependents actually use any Preferred Providers. A determination of the number of Participants will be made on the first of each month. Alliance PPO, Inc. has the right to review Member Funds' eligibility records in order to determine if the information on the number of eligible Participants is accurate. Member Funds shall pay Alliance PPO, Inc. on the fifth day of each month for each month Alliance PPO, Inc. is to provide services under this Agreement. Alliance PPO, Inc. is not required to invoice Purchaser for payment.

It is recognized that due to delinquent employer contributions or for other reasons, the exact number of eligible participants may not be known to the Member Fund by the fifth day of the month. If additional information pertaining to eligibility shall become known to the Member Fund following the date upon which the monthly payment is made, the Member Fund will make corrective adjustment of the number of eligible participants at the time of the next monthly payment.

Alliance shall pay to Purchaser by the 15th of each month the Administrative Charge collected from the Member Funds as set forth below.

Each plan will recognize savings in payments to Preferred Providers in an amount at least equal to Alliance PPO, Inc.'s compensation calculated above during the first twelve months of operation of this Agreement exclusive of the portion of the Administrative fee, which is remitted to the Purchaser by Alliance PPO, on behalf of each Member Fund. Savings will be determined by calculating the difference between the charges for Covered Benefits at the Preferred provider's requested payment amounts, and the authorized adjusted fee as repriced by Alliance PPO, Inc. By way of example, the calculation of savings for a repriced claim is set forth on the Claims cover sheet as the difference between requested fee and the repriced adjusted amount of fee (Example attached as Exhibit G). If any Member Fund has not recognized savings during the first twelve months of operation of this Agreement equal to Alliance PPO, Inc.'s, compensation (exclusive of the portion of the fee paid to purchaser) for the first twelve months of operation of this Agreement, Alliance PPO, Inc. will refund each Member Fund the difference between the savings and its compensation relating to such Member Fund.

-20-

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000023

The fee due by Member Funds shall be calculated based upon the total number of eligible participants for all Member Funds participating through this Master Agreement in accordance with the following schedule.

In determining the number of participants each month, there shall be a separate calculation for the Alliance PPO under this contract and a separate calculation under the MAPSI contract. A rate change which shall occur as a result of an increase (or decrease) in the total number of participants in all Member Funds shall be effective on the first day of the month for which the larger (or smaller) number of participants crosses the threshold for change of fee. The fee shall be such that all Member Funds participating in similar programs shall pay at the same rate. The HCCCC shall notify Alliance PPO and Member Funds as to any change in rates due to change in number of participants.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000024

## ATTACHMENT E

Service Area Map



CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

Alliance PPO Geographic Areas

Harford/Baltimore County/Baltimore City

Howard/Carroll Counties

Western Maryland
    *Allegany, Washington and Garrett Counties*

Frederick County

Montgomery County

Prince Georges County

Anne Arundel County

Southern Maryland
    *Calvert, Charles and St. Mary's Counties*

Eastern Shore
    *Cecil, Kent, Queen Anne's, Talbot, Caroline, Dorchester, Wicomico, Somerset, Worcester, Accomack and Northampton Counties*

Washington, DC

Northern Virginia
    *Loudoun, Fairfax and Prince William Counties.  Cities of Alexandria, Arlington and Falls Church*

North Central Virginia
    *Stafford, King George, Spottsylvania, Fauquier Counties*

South Central Virginia
    *Richmond*

Tidewater
    *Cities of Virginia Beach, Chesapeake, Portsmouth, Norfolk*

Pennsylvania

Delaware

Shenandoah
    *Frederick, Shenandoah counties of Virginia*

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

-23-

HWFUND00000026

ATTACHMENT F



ALLIANCE PPO, INC. PROVIDER MANUAL

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

–24–

HWFUND00000027

# AMENDMENT TO

# ALLIANCE PPO, INC.

# PURCHASER SERVICE AGREEMENT

This Amendment to the Alliance PPO, Inc. Purchaser Service Agreement, is effective the first day of January, 1994, by and between the Health Care Cost Containment Corporation of the Mid-Atlantic Region (hereafter referred to as "Purchaser"), and Alliance PPO, Inc. (hereafter "Alliance PPO, Inc."), a corporation organized under the laws of the State of Maryland.

WHEREAS, Purchaser is a non-profit corporation consisting of member Health and Welfare Trust Funds, established to undertake health care cost containment efforts on behalf of its member funds;

WHEREAS, certain member Health and Welfare Trust Funds (hereafter referred to collectively as "Member Funds") have elected to participate through the Purchaser in obtaining cost containment services hereafter described in this Agreement;

WHEREAS, Participation Agreements of Member Funds, which may be supplemented or diminished from time to time, have previously been executed;

WHEREAS, Member Funds have adopted health care plans for their eligible participants and the eligible dependents thereof under which such persons are entitled to certain health service benefits;

WHEREAS, Purchaser desires to offer to its Member Funds a preferred provider arrangement (hereafter "PPA");

WHEREAS, on behalf of its Member Funds, Purchaser desires to purchase certain administrative and provider contracting services for operation of their health care plans from Alliance PPO, Inc.;

WHEREAS, Alliance PPO, Inc. desires to provide administrative and provider contracting services for Purchaser's Member Funds health care plans, including a PPA; and

WHEREAS, the parties hereto entered into a Purchaser Service Agreement effective January 1, 1992,

NOW THEREFORE, in consideration of the promises and mutual covenants contained herein, it is hereby agreed as follows:

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000028

1.    The terms and conditions of the Purchaser Service Agreement entered into January 1, 1992 shall continue in full force and effect except as modified herein or as modified within an Alliance/MAPSI Participation Agreement between Alliance/MAPSI, HCCCC and a Member Fund.

2.    This Amendment shall continue in effect for an initial period of two years, and shall continue from year to year thereafter, subject to the termination provisions set forth in the Purchaser Service Agreement.

3.    The fees set forth in paragraph 1.4 of the Purchaser Service Agreement and Attachment D are hereby modified and amended effective April 1, 1994 as follows. With respect to any Member Fund who shall have begun participation with the HCCCC prior to April 1, 1994, the fees shall be as set forth in Attachment D-1. With respect to Member Funds who shall first begin participation with the HCCCC on or after April 1, 1994, the fees shall be as set forth in Attachment D-2.

4.    In the event a Member Fund shall elect to have Alliance perform repricing services with respect to claims which are non-Alliance provider claims as well as claims which are Alliance provider claims, the Member Fund shall provide written request for this additional service by Alliance, and the Member Fund shall pay to Alliance/MAPSI the sum of ten cents ($.10) per member per month for these services in addition to any other fees provided under this Agreement.

    IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, this 28 day of April, 1994.


PURCHASER                                        Alliance PPO, Inc.

By: _____          By: _____

Title: _____          Title: _____

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000029

ATTACHMENT LIST

Attachment D-1 and D-2          Compensation to Alliance PPO, Inc.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000030

ATTACHMENT D-1

COMPENSATION TO ALLIANCE PPO, INC.

Such Member Funds as shall have begun participation prior to April 1, 1994, shall pay Alliance PPO, Inc. the fees outlined below per month for each eligible participant within the geographical jurisdiction of this agreement (as defined in the agreement) of each Member Fund who is eligible to access Covered Benefits through Preferred Providers, whether or not such Participants, or their dependents actually use any Preferred Providers. A determination of the number of Participants will be made on the first of each month. Alliance PPO, Inc. has the right to review Member Funds' eligibility records in order to determine if the information on the number of eligible Participants is accurate. Member Funds shall pay Alliance PPO, Inc. on the fifth day of each month for each month Alliance PPO, Inc. is to provide services under this Agreement. Alliance PPO, Inc. is not required to invoice Purchaser for payment.

It is recognized that due to delinquent employer contributions or for other reasons, the exact number of eligible participants may not be known to the Member Fund by the fifth day of the month. If additional information pertaining to eligibility shall become known to the Member Fund following the date upon which the monthly payment is made, the Member Fund will make corrective adjustment of the number of eligible participants at the time of the next monthly payment.

Alliance shall pay to Purchaser by the 15th of each month the Administrative Charge collected from the Member Funds as set forth below.

Each plan will recognize savings in payments to Preferred Providers in an amount at least equal to Alliance PPO, Inc.'s compensation calculated above during the first twelve months of operation of this Agreement exclusive of the portion of the Administrative fee, which is remitted to the Purchaser by Alliance PPO, on behalf of each Member Fund. Savings will be determined by calculating the difference between the charges for Covered Benefits at the Preferred provider's requested payment amounts, and the authorized adjusted fee as repriced by Alliance PPO, Inc. By way of example, the calculation of savings for a repriced claim is set forth on the Claims cover sheet as the difference between requested fee and the repriced adjusted amount of fee (Example attached as Exhibit G to original Agreement). If any Member Fund has not recognized savings during the first twelve months of operation of this Agreement equal to Alliance PPO, Inc.'s, compensation (exclusive of the portion of the fee paid to purchaser) for the first twelve months of operation of this Agreement, Alliance PPO, Inc. will refund each Member Fund the difference between the savings and its compensation relating to such Member Fund.

The fee due by Member Funds shall be calculated based upon the total number of eligible participants for all Member Funds participating through this Master Agreement in accordance with the following schedule.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER                    HWFUND00000031

In determining the number of participants each month, there shall be a separate calculation for the Alliance PPO under this contract and a separate calculation under the MAPSI contract.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000032

D-1

## ALLIANCE PPO/MAPSI*

Fee Schedule For Member Funds Who Have Begun Participation in HCCCC Prior to April 1, 1994

(Per eligible fund participant per month - $/p/mo.)

|  | 1/1/94-12/31/94 | 1/1/95-12/31/95 | 1996 |
|---|---|---|---|
| Alliance Hospital and Physician Network Only | $2.05/p/mo. | $2.20/p/mo. | |
| Alliance Utilization Review Services Only | $1.50/p/mo. | $1.60/p/mo. | |
| Alliance Network and UR | $2.95/p/mo. | $3.16/p/mo. | |
| MAPSI (Network & UR) Only*** | $0.50/p/mo. | $0.54/p/mo. | |
| Alliance Network, UR as well as MAPSI Network & UR*** | $3.35/p/mo. | $3.58/p/mo. | $3.69 |

Administrative charge due to HCCCC (not included in above rates):

| | |
|---|---|
| Alliance Hospital and Physician Network | .15/p/mo. |
| Alliance Utilization Review | .05/p/mo. |
| MAPSI Network & UR | .05/p/mo. |

---

\*    Does not include fee to HCCCC.
\*\*\*   The MAPSI component is covered by separate contract which is coordinated with this contract.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000033

ATTACHMENT D-2

## COMPENSATION TO ALLIANCE PPO, INC.

Such Member Funds as shall have begun participation on or after April 1, 1994, shall pay Alliance PPO, Inc. the fees outlined below per month for each eligible participant within the geographical jurisdiction of this agreement (as defined in the agreement) of each Member Fund who is eligible to access Covered Benefits through Preferred Providers, whether or not such Participants, or their dependents actually use any Preferred Providers. A determination of the number of Participants will be made on the first of each month. Alliance PPO, Inc. has the right to review Member Funds' eligibility records in order to determine if the information on the number of eligible Participants is accurate. Member Funds shall pay Alliance PPO, Inc. on the fifth day of each month for each month Alliance PPO, Inc. is to provide services under this Agreement. Alliance PPO, Inc. is not required to invoice Purchaser for payment.

It is recognized that due to delinquent employer contributions or for other reasons, the exact number of eligible participants may not be known to the Member Fund by the fifth day of the month. If additional information pertaining to eligibility shall become known to the Member Fund following the date upon which the monthly payment is made, the Member Fund will make corrective adjustment of the number of eligible participants at the time of the next monthly payment.

Alliance shall pay to Purchaser by the 15th of each month the Administrative Charge collected from the Member Funds as set forth below.

Each plan will recognize savings in payments to Preferred Providers in an amount at least equal to Alliance PPO, Inc.'s compensation calculated above during the first twelve months of operation of this Agreement exclusive of the portion of the Administrative fee, which is remitted to the Purchaser by Alliance PPO, on behalf of each Member Fund. Savings will be determined by calculating the difference between the charges for Covered Benefits at the Preferred provider's requested payment amounts, and the authorized adjusted fee as repriced by Alliance PPO, Inc. By way of example, the calculation of savings for a repriced claim is set forth on the Claims cover sheet as the difference between requested fee and the repriced adjusted amount of fee (Example attached as Exhibit G to Original Agreement). If any Member Fund has not recognized savings during the first twelve months of operation of this Agreement equal to Alliance PPO, Inc.'s, compensation (exclusive of the portion of the fee paid to purchaser) for the first twelve months of operation of this Agreement, Alliance PPO, Inc. will refund each Member Fund the difference between the savings and its compensation relating to such Member Fund.

The fee due by Member Funds shall be calculated based upon the total number of eligible participants for all Member Funds participating through this Master Agreement in accordance with the following schedule.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000034

In determining the number of participants each month, there shall be a separate calculation for the Alliance PPO under this contract and a separate calculation under the MAPSI contract.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000035

D-2

ALLIANCE PPO/MAPSI*

Fee Schedule For Member Funds Who Have Begun Participation in HCCC on or after April 1, 1994

(Per eligible fund participant per month - $/p/mo.)

| | 1/1/94-12/31/94 | 1/1/95-1/2/31/95 |
|---|---|---|
| Alliance Hospital and Physician Network Only | $2.15/p/mo. | $2.30/p/mo. |
| Alliance Utilization Review Services Only | $1.60/p/mo. | $1.71/p/mo. |
| Alliance Network and UR | $3.05/p/mo. | $3.26/p/mo. |
| MAPSI (Network & UR) Only*** | $0.60/p/mo. | $0.64/p/mo. |
| Alliance Network, UR as well as MAPSI Network & UR*** | $3.45/p/mo. | $3.69/p/mo. |

Administrative charge due to HCCCC (not included in above rates):
Alliance Hospital and Physician Network                    .15/p/mo.
Alliance Utilization Review                                       .05/p/mo.
MAPSI Network & UR                                              .05/p/mo.

_____
*       Does not include fee to HCCCC.
***   The MAPSI component is covered by separate contract which is coordinated with this contract.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000036

1996 - 1997

AMENDMENT TO

ALLIANCE PPO, INC.

PURCHASER SERVICE AGREEMENT

This Amendment to the Alliance PPO, Inc. Purchaser Service Agreement, is effective the first day of January, 1996, by and between the Health Care Cost Containment Corporation of the Mid-Atlantic Region (hereafter referred to as "Purchaser"), and Alliance PPO, Inc. (hereafter "Alliance PPO, Inc."), a corporation organized under the laws of the State of Maryland.

**WHEREAS**, Purchaser is a non-profit corporation consisting of member Health and Welfare Trust Funds, established to undertake health care cost containment efforts on behalf of its member Funds;

**WHEREAS**, certain member Health and Welfare Trust Funds (hereafter referred to collectively as "Member Funds") have elected to participate through the Purchaser in obtaining cost containment services hereafter described in this Agreement.

**WHEREAS**, Participation Agreements of Member Funds, which may be supplemented or diminished from time to time, have previously been executed;

**WHEREAS**, Member Funds have adopted health care plans for their eligible participants and the eligible dependents thereof under which such persons are entitled to certain health service benefits;

**WHEREAS**, Purchaser desires to offer to its Member Funds a preferred provider arrangement (hereafter "PPA");

**WHEREAS**, on behalf of its Member Funds, Purchaser desires to purchase certain administrative and provider contracting services for operation of their health care plans from Alliance PPO, Inc.;

**WHEREAS**, Alliance PPO, Inc. desires to provide administrative and provider contracting services for Purchaser's Member Funds health care plans, including a PPA; and

**WHEREAS**, the parties hereto entered into a Purchaser Service Agreement effective January 1, 1992, which was readopted and amended by Agreement dated April 28, 1994.

**NOW THEREFORE**, in consideration of the promises and mutual covenants contained herein, it is hereby agreed as follows:

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000037

1.    The terms and conditions of the Purchaser Service Agreement entered into January 1, 1992 as readopted and Amended April 28, 1994, shall continue in full force and effect except as modified herein or as modified within an Alliance/MAPSI Participation Agreement between Alliance/MAPSI, HCCCC and a Member Fund.

2.    This Amendment shall continue in effect for an initial period of two years, and shall continue from year to year thereafter, subject to the termination provisions set forth in the Purchaser Service Agreement.

3.    The fees set forth in paragraph 1.4 of the Purchaser Service Agreement and Attachment D are hereby modified and amended effective January 1, 1996, as set forth in Attachment D.

4.    In the event a Member Fund shall elect to have Alliance receive for identification and separation, claims which are non-Alliance provider claims as well as claims which are Alliance provider claims, the Member Fund shall provide written request for this additional service by Alliance, and the Member Fund shall pay to Alliance/MAPSI the sum of ten cents ($.10) per member per month for these services in addition to any other fees provided under this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized officers, this _8th_ day of _August_, 1996.

**PURCHASER**                                **Alliance PPO, Inc.**

By: _John L. McTief_                          By: _Mark C. Davis_

Title: _President_                            Title: _President_

c:\award\hccc\allianc2.agr

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000038

## ATTACHMENT D

## COMPENSATION TO ALLIANCE PPO, INC.

Such Member Funds as shall have elected participation under this Agreement, shall pay Alliance PPO, Inc. the fees outlined below per month for each eligible participant within the geographical jurisdiction of this Agreement (as defined in the Agreement) of each Member Fund who is eligible to access Covered Benefits through Preferred Providers, whether or not such Participants, or their dependents actually use any Preferred Providers. A determination of the number of Participants will be made on the first of each month. Alliance PPO, Inc. has the right to review Member Funds' eligibility records in order to determine if the information on the number of eligible Participants is accurate. Member Funds shall pay Alliance PPO, Inc. on the fifth day of each month for each month Alliance PPO, Inc. is to provide services under this Agreement. Alliance PPO, Inc. is not required to invoice Purchaser for payment.

It is recognized that due to delinquent employer contributions or for other reasons, the exact number of eligible participants may not be known to the Member Fund by the fifth day of the month. If additional information pertaining to eligibility shall become known to the Member Fund following the date upon which the monthly payment is made, the Member Fund will make corrective adjustment of the number of eligible participants at the time of the next monthly payment.

Alliance shall pay to Purchaser by the 15th of each month the Administrative Charge collected from the Member Funds as set forth below.

Each plan will recognize savings in payments to Preferred Providers in an amount at least equal to Alliance PPO, Inc.'s compensation calculated above during the first twelve months of operation of this Agreement exclusive of the portion of the Administrative fee, which is remitted to the Purchaser by Alliance PPO, on behalf of each Member Fund. Savings will be determined by calculating the difference between the charges for Covered Benefits at the Preferred provider's request payment amounts, and the authorized adjusted fee as repriced by Alliance PPO, Inc. By way of example, the calculation of savings for a repriced claims is set forth on the Claims cover sheet as the difference between requested fee and the repriced adjusted amount of fee (Example attached as Exhibit G to original Agreement). If any Member Fund has not recognized savings during the first twelve months of operation of this Agreement equal to Alliance PPO, Inc.'s compensation (exclusive of the portion of the fee paid to purchaser) for the first twelve months of operation of this Agreement, Alliance PPO, Inc. will refund each Member Fund the difference between the savings and its compensation relating to such Member Fund.

The fee due by Member Funds shall be calculated based upon the total number of eligible participants for all Member Funds participating through this Master Agreement in accordance with the following schedule.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000039

**D-1**

### ALLIANCE PPO/MAPSI*

Fee Schedule For Member Funds Of The Health Care Cost Containment Corporation
of the Mid-Atlantic Region

(per eligible fund participant per month - $/p/mo.)

|  | 1/1/96-12/31/96 | 1/1/97-12/31/97 |
|---|---|---|
| Alliance Hospital and Physician Network Only | $2.27/p/mo. | $2.36/p/mo. |
| Alliance Utilization Review Services Only | $1.65/p/mo. | $1.72/p/mo. |
| Alliance Network and UR | $3.25/p/mo. | $3.38/p/mo. |
| MAPSI (Network & UR) Only | $0.56/p/mo. | $0.58/p/mo. |
| Alliance Network, UR as well as MAPSI Network & UR | $3.69/p/mo. | $3.84/p/mo. |

Administrative charge due to HCCCC (not included in above rates):
    Alliance Hospital and Physician Network    .15/p/mo.
    Alliance Utilization Review    .05/p/mo.
    MAPSI Network & UR    .05/p/mo.

---

* Does not include fee to HCCCC.

c  w " p.l here alliance att

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000040

# 1998-2000 AMENDMENT TO
## ALLIANCE PPO, INC. PURCHASER SERVICE AGREEMENT

This Amendment to the Alliance PPO, Inc. Purchaser Service Agreement, is effective the first day of January, 1998, by and between the Health Care Cost Containment Corporation of the Mid-Atlantic Region, Inc., (hereafter referred to as "Purchaser"), and Alliance PPO, Inc. (hereafter "Alliance PPO, Inc."), a corporation organized under the laws of the State of Maryland.

**WHEREAS,** Purchaser is a non-profit corporation consisting of member Health and Welfare Trust Funds, established to undertake health care cost containment efforts on behalf of its Member Funds;

**WHEREAS,** certain Member Health and Welfare Trust Funds (hereafter referred to collectively as "Member Funds") have elected to participate through the Purchaser in obtaining cost containment services hereafter described in this Agreement.

**WHEREAS,** Participation Agreements of Member Funds, which may be supplemented or diminished from time to time, have previously been executed;

**WHEREAS,** Member Funds have adopted health care plans for their eligible participants and the eligible dependents thereof under which such persons are entitled to certain health service benefits;

**WHEREAS,** Purchaser desires to offer to its Member Funds a preferred provider arrangement (hereafter "PPA");

**WHEREAS,** on behalf of its Member Funds, Purchaser desires to purchase certain administrative and provider contracting services for operation of their health care plans from Alliance PPO, Inc.;

**WHEREAS,** Alliance PPO, Inc. desires to provide administrative and provider contracting services for Purchaser's Member Funds health care plans, including a PPA; and

**WHEREAS,** the parties hereto entered into a Purchaser Service Agreement effective January 1, 1992, which was readopted and amended by Agreement dated April 28, 1994, and further readopted and amended by Agreement dated August 8, 1996, and effective January 1, 1996, it is,

**NOW THEREFORE,** in consideration of the promises and mutual covenants contained herein, it is hereby agreed as follows:

1. The terms and conditions of the Purchaser Service Agreement entered into January 1, 1992 as readopted and Amended April 28, 1994, and as further readopted and Amended August 8, 1996, shall continue in full force and effect except as modified herein or as modified

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000041

within an Alliance/MAPSI Participation Agreement between Alliance/MAPSI, HCCCC and a Member Fund.

2. This Agreement, as Amended, shall continue in effect for an initial period of three years, and shall continue from year to year thereafter, subject to the termination provisions set forth in the Purchaser Service Agreement.

3. The fees set forth in paragraph 1.4 of the Purchaser Service Agreement and Attachment D are hereby modified and amended effective January 1, 1998, as set forth in Attachment D.

4. Services known as Alliance PLUS, consisting of Durable Medical Equipment, Skilled Nursing Facility, Hospice, and Home Care shall be included in the category of service known as Alliance Facility and Physician Network Only, at no extra charge.

5. The parties agree that for so long as this Agreement, as Amended shall remain in effect, and neither party shall have terminated this Agreement as Amended, Purchaser shall not enter into any other Agreement with any third party which is unaffiliated with Alliance PPO, Inc., the terms of which shall constitute a Master Agreement for its Member Funds to participate in a competing Facility and Physician Preferred Provider Network .

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, this _30_ day of _December_ , 1997.

Health Care Cost Containment
Corporation of the Mid-Atlantic
Region, Inc.

By: _____

Alliance PPO, Inc.

By: _____

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

## ATTACHMENT D
## COMPENSATION TO ALLIANCE PPO. INC.

Such Member Funds as shall have elected participation under this Agreement, shall pay Alliance PPO, Inc. the fees outlined below per month for each eligible participant within the geographical jurisdiction of this Agreement (as defined in the Agreement) of each Member Fund who is eligible to access Covered Benefits through Preferred Providers, whether or not such Participants, or their dependents actually use any Preferred Providers. A determination of the number of Participants will be made on the first of each month. Alliance PPO, Inc. has the right to review Member Funds' eligibility records in order to determine if the information on the number of eligible Participants is accurate. Member Funds shall pay Alliance PPO, Inc. on the fifth day of each month for each month Alliance PPO, Inc. is to provide services under this Agreement. Alliance PPO, Inc. is not required to invoice Purchaser for payment.

It is recognized that due to delinquent employer contributions or for other reasons, the exact number of eligible participants may not be known to the Member Fund by the fifth day of the month. If additional information pertaining to eligibility shall become known to the Member Fund following the date upon which the monthly payment is made, the Member Fund will make corrective adjustment of the number of eligible participants at the time of the next monthly payment.

Alliance shall pay to Purchaser by the 15th of each month the Administrative Charge collected from the Member Funds as set forth b low.

Each plan will recognize savings in payments to Preferred Providers in an amount at least equal to Alliance PPO, Inc.'s compensation calculated above during the first twelve months of operation of this Agreement exclusive of the portion of the Administrative fee, which is remitted to the Purchaser by Alliance PPO, on behalf of each Member Fund. Savings will be determined by calculating the difference between the charges for Covered Benefits at the Preferred provider's request payment amounts, and the authorized adjusted fee as repriced by Alliance PPO, Inc. By way of example, the calculation of savings for a repriced claims is set forth on the Claims cover sheet as the difference between requested fee and the repriced adjusted amount of fee (Example attached as Exhibit G to original Agreement). If any Member Fund has not recognized savings during the first twelve months of operation of this Agreement equal to Alliance PPO, Inc.'s, compensation (exclusive of the portion of the fee paid to purchaser) for the first twelve months of operation of this Agreement, Alliance PPO, Inc. will refund each Member Fund the difference between the savings and its compensation relating to such Member Fund.

The fee due by Member Funds shall be calculated based upon the total number of eligible participants for all Member Funds participating through this Master Agreement in accordance with the following schedule.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000043

## D-1

## ALLIANCE PPO/MAPSI

### Fee Schedule For Member Funds Of The Health Care Cost Containment Corporation of the Mid-Atlantic Region, Inc. *

(per eligible fund participant per month - $/p/mo.)

| | 1/1/98-12/31/98 | 1/1/99-12/31/99 | 1/1/00-12/31/00 |
|---|---|---|---|
| Alliance Hospital and Physician Network Only | $2.45 | $2.51 | $2.57 |
| Alliance Utilization Review Services Only | $1.79 | $1.83 | $1.87 |
| Alliance Network and UR | $3.51 | $3.60 | $3.69 |
| MAPSI (Network & UR) Only | $0.60 | $0.61 | $0.62 |
| Alliance Network, UR as well as MAPSI Network & UR | $3.99 | $4.09 | $4.19 |

\*  Does not include fee to HCCCC.
Administrative charge due to HCCCC (not included in above rates):

| | |
|---|---|
| Alliance Hospital and Physician Network | .15/p/mo. |
| Alliance Utilization Review | .05/p/mo. |
| MAPSI only | .05/p/mo. |
| Alliance Network & UR | .20/p/mo. |
| Alliance Network, UR & MAPSI | .25/p/mo. |

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000044

# 2001-2003 AMENDMENT TO
# ALLIANCE PPO, INC. PURCHASER SERVICE AGREEMENT

This Amendment to the Alliance PPO, Inc. Purchaser Service Agreement, which was first effective January 1, 1992, having been amended by amendments effective January 1, 1994, January 2, 1996, and January 1, 1998, is effective the first day of January, 2001, by and between the Health Care Cost Containment Corporation of the Mid-Atlantic Region, Inc., (hereafter referred to as "Purchaser"), and Alliance PPO, Inc. (hereafter "Alliance PPO, Inc."), a corporation organized under the laws of the State of Maryland.

**WHEREAS**, Purchaser is a non-profit corporation consisting of member Health and Welfare Trust Funds, established to undertake health care cost containment efforts on behalf of its Member Funds;

**WHEREAS**, certain Member Health and Welfare Trust Funds (hereafter referred to collectively as "Member Funds") have elected to participate through the Purchaser in obtaining cost containment services hereafter described in this Agreement;

**WHEREAS**, Participation Agreements of Member Funds, which may be supplemented or diminished from time to time, have previously been executed;

**WHEREAS**, Member Funds have adopted health care plans for their eligible participants and the eligible dependents thereof under which such persons are entitled to certain health service benefits;

**WHEREAS**, Purchaser desires to offer to its Member Funds a preferred provider arrangement (hereafter "PPA");

**WHEREAS**, on behalf of its Member Funds, Purchaser desires to purchase certain administrative and provider contracting services for operation of their health care plans from Alliance PPO, Inc.;

**WHEREAS**, Alliance PPO, Inc. desires to provide administrative and provider contracting services for Purchaser's Member Funds health care plans, including a PPA; and

**WHEREAS**, the parties hereto entered into a Purchaser Service Agreement effective January 1, 1992, which was readopted and amended by Agreement dated April 28, 1994, and further readopted and amended by Agreement dated August 8, 1996, and effective January 1, 1996, and further readopted and amended by agreement dated December 30, 1997 and effective January 1, 1998, it is.

**NOW THEREFORE**, in consideration of the promises and mutual covenants contained herein, it is hereby agreed as follows:

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000045

1. The terms and conditions of the Purchaser Service Agreement entered into January 1, 1992 as readopted and Amended April 28, 1994, and as further readopted and Amended August 8, 1996, and as further readopted and amended December 30, 1997, shall continue in full force and effect except as modified herein or as modified within an Alliance/MAPSI Participation Agreement between Alliance/MAPSI, HCCCC and a Member Fund.

2. This Agreement, as Amended, shall continue in effect for an initial period of three years, and shall continue from year to year thereafter, subject to the termination provisions set forth in the Purchaser Service Agreement.

3. The fees set forth in paragraph 1.4 of the Purchaser Service Agreement and Attachment D are hereby modified and amended effective January 1, 2001, as set forth in Attachment D.

4. Services known as Alliance PLUS, consisting of Durable Medical Equipment, Skilled Nursing Facility, Hospice, and Home Care shall be included in the category of service known as Alliance Facility and Physician Network Only, at no extra charge.

5. The parties agree that for so long as this Agreement, as Amended shall remain in effect, and neither party shall have terminated this Agreement as Amended, Purchaser shall not enter into any other Agreement with any third party which is unaffiliated with Alliance PPO, Inc., the terms of which shall constitute a Master Agreement for its Member Funds to participate in a competing Facility and Physician Preferred Provider Network .

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, this _____ day of _____, 2000.

Health Care Cost Containment
Corporation of the Mid-Atlantic
Region, Inc.

By: _____ 10/20/00

Alliance PPO, Inc.

By: _____

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000046

# ATTACHMENT D
## COMPENSATION TO ALLIANCE PPO, INC.

Such Member Funds as shall have elected participation under this Agreement, shall pay Alliance PPO, Inc. the fees outlined below per month for each eligible participant within the geographical jurisdiction of this Agreement (as defined in the Agreement) of each Member Fund who is eligible to access Covered Benefits through Preferred Providers, whether or not such Participants, or their dependents actually use any Preferred Providers. A determination of the number of Participants will be made on the first of each month. Alliance PPO, Inc. has the right to review Member Funds' eligibility records in order to determine if the information on the number of eligible Participants is accurate. Member Funds shall pay Alliance PPO, Inc. on the fifth day of each month for each month Alliance PPO, Inc. is to provide services under this Agreement. Alliance PPO, Inc. is not required to invoice Purchaser for payment.

It is recognized that due to delinquent employer contributions or for other reasons, the exact number of eligible participants may not be known to the Member Fund by the fifth day of the month. If additional information pertaining to eligibility shall become known to the Member Fund following the date upon which the monthly payment is made, the Member Fund will make corrective adjustment of the number of eligible participants at the time of the next monthly payment.

Alliance shall pay to Purchaser by the 15th of each month the Administrative Charge collected from the Member Funds as set forth below.

Each plan will recognize savings in payments to Preferred Providers in an amount at least equal to Alliance PPO, Inc.'s compensation calculated above during the first twelve months of operation of this Agreement exclusive of the portion of the Administrative fee, which is remitted to the Purchaser by Alliance PPO, on behalf of each Member Fund. Savings will be determined by calculating the difference between the charges for Covered Benefits at the Preferred provider's request payment amounts, and the authorized adjusted fee as repriced by Alliance PPO, Inc. By way of example, the calculation of savings for a repriced claims is set forth on the Claims cover sheet as the difference between requested fee and the repriced adjusted amount of fee (Example attached as Exhibit G to original Agreement). If any Member Fund has not recognized savings during the first twelve months of operation of this Agreement equal to Alliance PPO, Inc.'s, compensation (exclusive of the portion of the fee paid to purchaser) for the first twelve months of operation of this Agreement, Alliance PPO, Inc. will refund each Member Fund the difference between the savings and its compensation relating to such Member Fund.

The fee due by Member Funds shall be calculated based upon the total number of eligible participants for all Member Funds participating through this Master Agreement in accordance with the following schedule.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000047

## D-1

### ALLIANCE PPO/MAPSI
### Fee Schedule For Member Funds Of The Health Care Cost Containment Corporation
### of the Mid-Atlantic Region, Inc. *

(per eligible fund participant per month - $/p/mo.)

|  | 01/01/01-12/31/01 | 01/01/02-12/31/02 | 01/01/03-12/31/03 |
|---|---|---|---|
| Alliance Hospital and Physician Network Only | $2.67 | $2.78 | $2.86 |
| Alliance Utilization Review Services Only | $1.94 | $2.02 | $2.08 |
| Alliance Network and UR | $3.84 | $3.99 | $4.11 |
| MAPSI (Network & UR) Only | $0.64 | $0.67 | $0.69 |
| Alliance Network, UR as well as MAPSI Network & UR | $4.36 | $4.53 | $4.66 |

\* Does not include fee to HCCCC.
Administrative charge due to HCCCC (not included in above rates):

      Alliance Hospital and Physician Network    .15/p/mo.
      Alliance Utilization Review    .05/p/mo.
      MAPSI Network & UR    .05/p/mo.

CONFIDENTIAL -
SUBJECT TO
PROTECTIVE ORDER

HWFUND00000048