# EXHIBIT 2

**⨆ CONFIDENTIAL**

7/1/88

M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC.

HOSPITAL SERVICES AGREEMENT

THIS AGREEMENT, effective July 1, 1988, by and between the M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC., a Maryland corporation (hereinafter "Health Plan") and CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER, a private, not-for-profit corporation organized under the laws of the District of Columbia (hereinafter "Hospital").

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, the parties agree as follows:

## I.  DEFINITIONS

A.  "Covered Services" means those health services which are covered by Health Plan in accordance with the applicable Evidence of Coverage issued by Health Plan.

B.  "Emergency" means a physical or mental condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that, in the opinion of the physician or other professional treating the person in need of care, the absence of immediate medical attention could reasonably be expected to result in (1) placing the patient's health in serious jeopardy, (2) serious impairment to bodily functions, (3) serious dysfunction of any bodily organ or part, or (4) unduly prolonging suffering.  The Hospital will use reasonable efforts to contact the Health Plan within twenty-four (24) hours after treatment or admission of a Member for an Emergency to the Hospital, but in no event, later than the next business day following a weekend or holiday.

C.  "Evidence of Coverage" means the agreement(s) between Health Plan and employer groups or individuals specifying the terms and conditions of Health Plan's coverage by which Health Plan is obligated to provide certain medical and hospital services to Members (and which include any copayment and/or deductible amounts to be paid by Members), which agreement(s) may be modified by Health Plan from time to time and copies of which will be made available to Hospital upon the signing of this Agreement; provided, however, Health Plan will provide Hospital with at least thirty (30) days written notice of any material change in Health Plan's coverage which would impact Hospital directly.

BRSI 000194

CONFIDENTIAL

D.  "Hospital-based Physicians" means those physicians who practice at Hospital in the specialty areas including, but not limited to, Radiology, Pathology, Anesthesiology and Emergency Medicine; and who have satisfied the credentialling requirements of Hospital and its medical staff.

E.  "Hospital Services" means all inpatient services, emergency room, and outpatient hospital services that are ordinarily and customarily provided by Hospital; provided, however, that Hospital Services do not include the services of any Hospital-based Physicians.

F.  "Inpatient Day" means the day or days a Member is a registered bed patient at Hospital in accordance with Health Plan certification procedures.  Only those Inpatient Days described in the applicable Member Evidence of Coverage will be covered by Health Plan.

G.  "Member" means any person who is enrolled in the M.D. IPA Health Plan as defined by the Health Plan or validly eligible for Health Plan coverage or who has been admitted to Hospital or retained as an inpatient in Hospital following an admission based upon pre-admission authorization by Health Plan.  Status as a Member resulting from pre-admission authorization by Health Plan, authorization by Health Plan following Emergency admission, or Health Plan authorization of persons not otherwise qualified as a Member shall continue until notified otherwise by Health Plan, and until such time as the individual can be discharged or a transfer can be arranged.  Similarly, individuals receiving outpatient services from Hospital pursuant to authorization by Health Plan shall be deemed to be Members until Hospital is notified otherwise by Health Plan.

H.  "Plan Provider" means a physician or other appropriately licensed provider of health services with whom the Physicians Health Plan of Maryland, Inc. or Health Plan has entered into a contractual agreement for the provision of certain Covered Services to Members.

## II.  HEALTH SERVICES

The Hospital agrees to provide to Members those Hospital Services normally provided by Hospital to the general community; provided, however, the Hospital's obligation to provide such services is subject to the availability of beds, staff and other facilities and services.  If the operation of Hospital's facilities is interrupted by war, fire, insurrection, labor dispute, riot, the elements, act of God or, without limiting the foregoing, any other cause beyond the control of Hospital, Hospital shall be relieved of its obligations as to all services

2

BRSI 000195

## ⟦Ⅱ⟧ CONFIDENTIAL

affected for the duration of such interruption. In the event this occurs, Hospital will cooperate with Health Plan in its attempts to refer Members to appropriate treatment settings within Health Plan's delivery network. Hospital will notify Health Plan in the event Hospital is unable to provide services under this Agreement.

Hospital further agrees to arrange for the provision of Covered Services by Hospital-based Physicians to support the provision of Hospital Services. Hospital will provide Health Plan with evidence that Hospital's obligations with respect to qualifications of, and provision of Covered Services by, Hospital-based Physicians will be performed in accordance with Hospital's standard procedures.

The Hospital and Hospital-based Physicians, in accordance with the provisions, spirit and intent of this Agreement, shall not differentiate or discriminate in the treatment of or in the quality of services rendered to Members on the basis of race, sex, age, religion, place of residence, health status or source of payment, and shall observe, protect and promote the rights of Members as patients.

The Health Plan shall allow Plan Providers to refer Members to Hospital for specialty services including secondary care. The Health Plan administrative policies and procedures shall not limit referrals to Hospital to only tertiary care services.

III. <u>HOSPITAL ADMISSIONS, OUTPATIENT SERVICES AND EMERGENCIES</u>

A.    General

Health Plan will establish a procedure reasonably acceptable to Hospital by which Hospital may, at its option, confirm, by telephone (1) that a particular person is a Member and (2) that the services rendered or to be rendered to a particular Member are Covered Services. If Hospital obtains oral confirmation from Health Plan through such procedure that a particular person is a Member and/or that particular services are Covered Services, Health Plan shall not subsequently deny payment on the grounds that such information was incorrect, provided, Hospital uses reasonable efforts to obtain payment from the person before collecting from Health Plan. Notwithstanding the preceding sentence, Hospital shall not be obligated to attempt to collect from persons covered under state-sponsored assistance programs prior to collecting from Health Plan. Verification of Hospital Services pursuant to this paragraph shall also be deemed to be verification for the admitting CHFA Specialist's services. The Hospital shall identify an individual who, along with his designees, shall serve as coordinator for the Hospital in cooperating with Health Plan's authorization process (such person is hereinafter referred to as the "Coordinator").

BRSI 000196

!!/ CONFIDENTIAL

If it should be necessary for Hospital to transfer a Member to another facility, all costs of transferring the Member from Hospital to such other facility shall be borne by Health Plan.

B.   Hospital Admissions

Except in Emergencies, the Hospital agrees to admit Members to the Hospital subject to bed and staff availability only upon (1) the order of a Plan Provider who is also a member of the Hospital medical staff with admission privileges and who is in compliance with Hospital's policies and procedures and medical staff bylaws and (2) oral notification by the Health Plan of a pre-admission authorization certifying the coverage, services and the number of Inpatient Days authorized.   In the event a Plan Provider admits a Member for other than an Emergency and the Hospital has not been notified of a pre-admission authorization, the Hospital shall make reasonable efforts to contact the Health Plan within twenty-four (24) hours, but in no event later than the next business day following a weekend or holiday after admission of a Member to the Hospital.   Notwithstanding the outcome of the post-admission certification, the Hospital will be paid by the Health Plan for the period from date of admission to the date notice is given by Health Plan certifying length of stay, which length of stay period shall in no event be for a period shorter than the period between date of admission and receipt by Hospital of the post-admission certification determination.   However, except in Emergencies, if the Hospital fails to notify Health Plan within the required time frame set forth above, and if services are retrospectively denied by Health Plan, Hospital shall not be entitled to any compensation hereunder for services rendered after the expiration of the certified length of stay.

C.   Outpatient Services

Except in Emergencies, the Hospital agrees to treat Members on an outpatient basis subject to staff and facilities availability only upon the order of a Plan Provider.

D.   Emergencies

In Emergencies, the Hospital will use reasonable efforts to contact the Health Plan within twenty-four (24) hours after treatment or admission of a Member to the Hospital, but in no event later than the next business day following a weekend or holiday.   The Coordinator shall provide the Health Plan such information as Health Plan may reasonably request on the number and type of Emergency admissions of Members at the Hospital.   The Hospital shall permit review of such admissions by a Plan Provider or his or her designated representative for certification of the number of Inpatient Days authorized by the Health Plan.   Such certification shall in no event be for a

4

BRSI 000197

## ⁅ CONFIDENTIAL

period shorter than the period between date of admission and receipt by the Hospital of notice of certification, except that if Hospital fails to notify Health Plan within the required time frame set forth in this paragraph, and if services are retrospectively denied by Health Plan, Hospital shall not be entitled to any compensation hereunder for services rendered after the expiration of the certified length of stay.

### IV.  DISCHARGE PLANNING

The Health Plan, through Plan Providers, utilizes a system for the coordinated discharge planning of Members.  The Hospital shall cooperate in the implementation and operation of such a discharge planning system.

Hospital recognizes that Health Plan utilizes an extensive network of Plan Providers in order to provide cost efficient and appropriate health services to its Members.  Unless otherwise directed by Health Plan, or unless no Plan Provider is available to meet the Member's health need, all discharges and referrals by Hospital shall be to a Plan Provider provided Hospital, in its sole discretion, believes such Plan Provider is qualified and competent.

Health Plan shall notify Hospital in writing in those situations where discharges are to other than a Plan Provider. There shall be no penalty for the first and second transfer to other than a Plan Provider.  However, in the event Hospital receives written notification of Hospital's failure to comply with this provision a third time, Hospital shall reimburse Health Plan for the difference, if any, in costs incurred by Health Plan between compensation it pays to the non-Plan Provider and the payment that would otherwise have been made to the Plan Provider designated by Health Plan and such reimbursement will apply to all subsequent non-compliance with this provision; provided this non-compliance penalty shall not apply where the Hospital refused to transfer to a Plan Provider because of questions of the Plan Provider's qualifications or competency.

### V.  COMPENSATION

Health Plan agrees to pay Hospital for Covered Services it renders to Members, provided that such Covered Services are provided in accordance with the procedures provided herein. Hospital shall collect Health Plan authorized copayments and deductibles from the Members and the Members shall be solely responsible for the payment of such copayments and deductibles.

The Health Plan agrees to pay the Hospital for services provided to Members in accordance with the compensation schedule

5

BRSI 000198

CONFIDENTIAL

annexed to this Agreement as Attachment A and incorporated by reference herein.

Subject to Section VI below, for all bills received by Health Plan in substantially complete form that are not paid within forty-five (45) days, Health Plan shall pay Hospital the amount due in accordance with the compensation schedule plus interest in the amount of one and a quarter (1.25) percent per month on the balance owed; provided, however, this provision shall not entitle the Health Plan to delay payment beyond the 45 day period. Time is of the essence with respect to the payment period. Notwithstanding this provision, in the event Health Plan does not receive a bill from Hospital within ninety (90) days of the date of discharge of the Member or the date of Service(s), as applicable, Health Plan shall pay Hospital the amount due in accordance with the compensation schedule within ninety (90) days from the date the bill is received and, if Health Plan fails to pay within this period, Health Plan shall pay an interest rate of one and a quarter (1.25) percent per month.

Hospital shall submit bills to Health Plan in batches by certified mail. In an effort to ensure verification of Health Plan's receipt of all bills, Health Plan shall provide Hospital with written verification of each bill in batches received from Hospital within seven working days of receipt of such bills. Such verification shall take the form of an itemized list of each bill received including the following items from the UB-82 billing form:

> Patient name,
> Patient control number,
> Total charges, and
> Date(s) of service.

All verification lists shall be sent by certified mail to:

> HMO Billing Manager
> Children's Hospital National Medical Center
> 8737 Colesville Road, 6th Floor
> Silver Spring, Maryland  20910

## VI.  BILLINGS

The Hospital shall bill the Health Plan for all Hospital Services rendered to Members. Billings shall include identifying patient information and an itemized record of services and charges in customary bill form (UB-82). All bills shall be sent to:

> M.D. Individual Practice Association, Inc.
> 451 Hungerford Drive, Suite 700
> Rockville, Maryland  20850-4168

6

BRSI 000199

## [1] CONFIDENTIAL

Hospital agrees and warrants that in no event, including, but not limited to, non-payment by Health Plan, Health Plan insolvency or breach of this Agreement, shall Hospital bill, charge, or collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or subscriber for Covered Services provided under this Agreement. This provision shall not prohibit Hospital from billing and collecting from the Member or subscriber for applicable copayments and deductibles and non-Covered Services. Hospital further agrees that this provision and warranty herein shall survive termination of this Agreement, regardless of the cause giving rise to termination, shall be construed to be for the benefit of the Member or subscriber, and shall supersede any oral or written contrary agreement now existing or hereafter entered into between Hospital and any Member or subscriber or any person acting on a Member's or subscriber's behalf. Any modification, addition, or deletion to this paragraph shall become effective on a date no earlier than fifteen (15) days after the Virginia State Corporation Commission or appropriate state regulatory agencies have received written notice of such proposed change.

Except for circumstances which are beyond the control of Hospital, Hospital shall make reasonable efforts to submit all bills within ninety (90) days of the date of discharge of the Member or date of Service(s), as applicable. No payment shall be made unless the bill for Hospital Services is received within one (1) calender year after the date of discharge of the Member or date of Service(s), as applicable; provided, however, for a Member who is hospitalized continuously, Hospital may, at its option, submit a bill every thirty (30) days. Hospital shall appeal all Health Plan denials of payment within one hundred and fifty (150) days from the date Hospital receives written notice of a denied claim. All billings by Hospital may be considered final by Health Plan unless adjustments are requested in writing by Hospital within sixty (60) days after receipt of such billing by Health Plan.

Health Plan shall pay the Hospital 90% of the amount due as set forth in this Agreement on all disputed claims pending resolution of the dispute; provided, Hospital responds in writing within 30 days to written inquiries received from Health Plan regarding disputed amounts. If Health Plan disagrees with the charges on any bill, it shall notify Hospital in writing of the disputed charges within thirty (30) days after receipt of the bill. The above provision for 90% payment on disputed claims does not apply to claims which have been denied for reasons other than disputes related to the amount of charges for services rendered by Hospital.

7

BRSI 000200

CONFIDENTIAL

## VII.  TESTS AND PROCEDURES

Hospital agrees to accept the results of qualified and timely laboratory and radiological tests or other procedures which may have been performed on a Member prior to admission or outpatient treatment at Hospital; provided, (1) in the sole judgment of the Hospital, such tests or procedures are performed in accordance with accepted medical practice and (2) the tests or procedures are submitted at the time of admission or performance of outpatient services; and provided further, that this shall not be deemed to prevent such tests and/or procedures from being reperformed or repeated if the Hospital, in its sole judgement, determines that it is medically necessary.

## VIII.  COOPERATION

Hospital shall permit Health Plan to implement and operate Health Plan's own prospective, concurrent and retrospective quality assurance and utilization review programs through Health Plan employees and/or agents within the Hospital, attached hereto as Attachment B and incorporated by reference.  The Health Plan shall notify the Hospital at least thirty (30) days in advance of any material changes in such programs.  Material changes are defined as changes which are implemented to directly impact Hospital in a manner that Hospital determines it cannot abide by the provisions of this Agreement.  Hospital shall, upon 24 hours advance notice, make available for the Health Plan's inspection such pertinent sections of a Member's hospital medical record as may be required by Health Plan in keeping with the rules of confidentiality of Member records as set forth in Section XI of this Agreement.  Copies of such information will be provided to Health Plan or its agent at a cost of 15 cents per page.

Hospital shall cooperate with Health Plan in the coordination of benefits and other third party claims.  In cases where Health Plan is determined, under applicable industry standards regarding coordination of benefits, to be the primary payor, Hospital shall accept payment as set forth in this Agreement.  Notwithstanding the above, in cases where any third party is liable for payment of any amounts and/or services rendered to a Member, Hospital may bill the third party for the difference between Hospital's full charges and the amount due under this Agreement.  In no event shall Health Plan be responsible for any additional payment to Hospital beyond the amount due under this Agreement according to Attachment A, compensation schedule.  Additionally, Hospital will abide by the hold harmless provision listed in Section VI of this Agreement.  In cases where Health Plan is not the primary payor, Hospital shall seek payment from the primary payor before seeking payment from Health Plan.  Health Plan agrees to pay any balance for Covered Services rendered by Hospital that is not paid by the

8

BRSI 000201

# CONFIDENTIAL

primary payor not to exceed the amounts listed in Attachment A, compensation schedule, within 30 days of Health Plan's receipt of a substantially complete bill from Hospital. Hospital will be responsible for obtaining from Member any necessary assignments of benefits in cases where Health Plan is not the primary payor.

Hospital agrees that Health Plan shall list its name, address, and telephone number in Health Plan's roster of participating hospitals; provided, however, that any descriptive statements other than such a listing shall be approved in advance by Hospital.

Hospital and Health Plan shall cooperate through their respective programs and procedures in the expeditious resolution of any Member grievances or complaints. In this regard, Health Plan shall bring to the attention of appropriate Hospital officials all member complaints involving Hospital or any Hospital-based Physician, and Hospital shall, in accordance with its regular procedure, investigate such complaints and use its best efforts to resolve them in a fair and equitable manner. Hospital agrees to notify Health Plan promptly of any action taken or proposed with respect to the resolution of such complaints and the avoidance of similar complaints in the future.

Both Health Plan and Hospital shall give Hospital reasonable access and opportunity to inspect and examine each others' records related to this Agreement.

At least 90 days prior to any renewal date of this Agreement (as specified in Section XIV hereof), Health Plan shall provide Hospital with a list of health care providers (hospitals, physicians and others) that have executed participation agreements with Health Plan, and such other information as may be reasonably requested by Hospital.

## IX.  INSURANCE

Health Plan and Hospital, at each organization's sole cost and expense, shall provide and maintain policies of, or provide through an actuarially determined self-funded insurance plan, general liability and professional liability insurance and other necessary insurance for claims for damage arising by reason of personal injuries or death occasioned directly or indirectly in connection with the operation of each organization. Certificates of proof of insurance in force shall be made available upon request to each party to this Agreement. Any material change in either party's coverage shall be communicated to the other party in writing at least thirty (30) days prior to such change. The party receiving such notice of change in coverage may thereafter terminate this Agreement upon ten (10) days written notice, notwithstanding anything to the contrary herein. Minimum limits

9

BRSI 000202

⬚ CONFIDENTIAL

of professional liability coverage shall be $5,000,000 per
occurrence and $5,000,000 aggregate.   Minimum limits of general
liability coverage shall be $3,000,000 per occurrence and
$3,000,000 aggregate.   If Health Plan changes insurance carriers
it shall endeavor to purchase a tail to cover occurrences back to
the effective date of Hospital's 1986 Agreement with Health Plan.
If a self-funded insurance plan is used by Health Plan, the
financial stability of the reserves shall be opined upon by the
Hospital's actuary on an annual basis.

## X.   INSPECTION OF RECORDS

Subject to the provisions of Section XI of this Agreement,
Health Plan shall have the right, upon request during normal
business hours, to inspect, and obtain copies of, at reasonable
times all books and records including business, administrative
and medical records maintained by Hospital or Hospital-based
Physicians pertaining to Covered Services rendered to Members;
provided, however, Health Plan is responsible for keeping on file
written authorization for release of such records from Member.
The Health Plan agrees to contact the Hospital's Medical Records
Department at least twenty-four (24) hours in advance to schedule
an appointment to inspect records during a Member's hospital
stay.   Copies of the record during such inspection by the Health
Plan or its agent shall be at a cost of 15 cents per page.   The
termination of this Agreement shall have no effect upon such
obligations.

## XI.   CONFIDENTIALITY

Health Plan, Hospital and Hospital-based Physicians shall
treat all Member medical records as confidential to comply with
all local, state and federal laws and regulations, as well as any
licensure and certification requirements, regarding the
confidentiality of Member medical records.

## XII.   REQUIRED CERTIFICATIONS

Hospital warrants that it is duly licensed by the
appropriate governmental agency of the District of Columbia to
operate a hospital and is accredited by the Joint Commission on
Accreditation of Healthcare Organizations (JCAHO).   Hospital
further warrants that it is currently certified as a hospital
provider under Title XVIII (Medicare) of the Social Security Act
and that it shall maintain such certification during the term of
this Agreement.

Hospital shall maintain in good standing such license and
accreditation and shall notify Health Plan immediately should any

10

BRSI 000203

## CONFIDENTIAL

action of any kind be initiated against Hospital which results in (i) the suspension or loss of such license; or (ii) the suspension or loss of such accreditation; or (iii) the imposition of any sanctions against Hospital under the Medicare program. Hospital shall furnish to Health Plan such evidence of licensure and accreditation as Health Plan may reasonably request.

Health Plan warrants that it is duly licensed by the Department of Health and Mental Hygiene of the State of Maryland to operate as a health maintenance organization and that it has been granted a Certificate of Authority to so operate by the State of Maryland.

The Health Plan further warrants and represents that it shall maintain in good standing its (1) Certificate of Authority to operate in the State of Maryland and (2) its federal qualification and that it will notify the Hospital immediately of any action of any kind initiated against it which could result in the suspension or loss of such certification or qualification or imposition of any sanctions against it by the State or Federal government.

## XIII.   MEDICAL STAFF MEMBERSHIP

Notwithstanding any provision contained in this Agreement, a Plan Provider may not admit or treat a Member in the Hospital unless he is a member in good standing of Hospital's organized medical staff with appropriate clinical privileges to admit and treat such Member and is in compliance with Hospital's policies and procedures and medical staff bylaws.

## XIV.   TERM AND TERMINATION

This Agreement shall be effective from July 1, 1988 until June 30, 1989, whereupon the terms of this Agreement will automatically be extended for one year periods unless sooner terminated.

Notwithstanding anything herein to the contrary, this Agreement may be terminated by Hospital upon giving at least thirty (30) days written notice to Health Plan. Health Plan may terminate this Agreement upon giving at least ninety (90) days written notice to Hospital.

effective     In the event that a Member is an admitted inpatient as of the date of termination of this Agreement, Health Plan shall pay for Covered Services at the rate specified in Attachment A, compensation schedule, provided Hospital continues to honor the terms of this Agreement, through such Member's discharge. Except as modified herein, termination shall have no effect upon the

11

BRSI 000204

⬚ CONFIDENTIAL

rights and obligations of the parties arising out of any transactions occurring prior to the effective date of such termination.

Notwithstanding anything herein to the contrary, Health Plan shall have the right to terminate this Agreement immediately by notice to Hospital upon the occurrence of (i) the suspension or revocation of Hospital's license; or (ii) the suspension, revocation or loss of Hospital's JCAHO accreditation; or (iii) the imposition of any sanction against Hospital under the Medicare or Medicaid program. Notwithstanding anything herein to the contrary, Hospital may terminate this Agreement immediately upon written notice to Health Plan in the event of a loss by Health Plan of any license or regulatory approval as set forth in Section XII.

Either party may terminate this Agreement for any material breach by the other of its obligations under this Agreement, provided that written notice of such breach and the intent to terminate this Agreement has been given to the breaching party and such breach has not been remedied to the satisfaction of the non-breaching party within thirty (30) days of such notice. For purposes of this Agreement, "material" breach shall include but shall not be limited to (1) Hospital's or Health Plan's failure to obtain and maintain the insurance required under Section IX and (2) Health Plan's failure to pay Hospital invoices within the times specified in Section V.

## XV. MISCELLANEOUS

A. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

B. Upon termination or expiration of this Agreement certain obligations shall survive, including but not limited to, all confidentiality rights and Health Plan's payment obligations as set forth in Section V.

C. In the event any dispute shall arise with respect to the performance or interpretation of any of the terms of this Agreement (other than terminations made pursuant to Section XIV), the signatories of this Agreement, or their designees, shall communicate, in writing, the dispute. Such communication shall be reviewed by the other party and a response in writing shall be made within fifteen (15) days. Should such correspondence fail to resolve the dispute, both parties agree to meet within ten (10) days of the date that the correspondence was sent in order to resolve the dispute. In the event such dispute cannot be satisfactorily resolved by the above process, the dispute, at the request of either party, shall be submitted to a Board of

12

BRSI 000205

CONFIDENTIAL

Arbitrators, so constituted, and shall proceed under the rules and regulations of the American Arbitration Association. Each party shall select one arbitrator and a third shall be selected by the two chosen arbitrators. Both parties expressly covenant and agree to be bound by the decision of the arbitrators as a final determination of the matter in dispute. This provision shall not require either party to pursue arbitration prior to, or in lieu of, exercise of termination rights under Section XIV above. Each party to this Agreement agrees to pay half the arbitration costs.

D. Any notice required to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, or by personal hand delivery to the Hospital at:

> Director of Managed Care
> Office of Planning and Business Development
> Children's Hospital National Medical Center
> 8737 Colesville Rd., Suite 400
> Silver Spring, Maryland  20910

with a copy to General Counsel,

and to Health Plan at:

> President
> M.D. Individual Practice Association, Inc.
> 451 Hungerford Drive, Suite 700
> Rockville, Maryland  20850-4168

E. This Agreement constitutes the entire understanding of the parties hereto, and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties.

F. This Agreement shall not be assigned, delegated or transferred by Hospital or Health Plan without the written consent of the other party. Consent shall not be unreasonably withheld by either party.

G. The invalidity or unenforceability of any terms or provisions of this Agreement shall in no way affect the validity or enforceability of any other terms or provisions.

H. None of the provisions of this Agreement is intended to create nor shall it be deemed or construed to create any relationship between the parties hereto other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto, nor any of their respective employees or contractors, shall be construed to be the agent, the employer or the representative of the other.

13

BRSI 000206

# ⟦⟧ CONFIDENTIAL

    I. This Agreement shall be governed by the laws of the District of Columbia.

    J. The obligations of each party to this Agreement shall inure solely to the benefit of the other party, and, except as explicitly provided herein, no person or entity shall be a third party beneficiary of this Agreement.

    K. In the event of a conflict among the provisions of this Agreement and any documents referenced herein or attached hereto, the terms and conditions of this Agreement shall take precedence.

    IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____   Type Name: Eric Baugh, M.D.

Title: V.P. Medical Affairs .   Address: 451 Hungerford Drive
                                         Suite 700
Telephone: (301) 294-5040               Rockville, MD 20850

CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER

By: _____   Type Name: Ron Sloan

Title: Exec. V.P./COO           Address: 111 Michigan Ave.
                                         Washington, D.C. 20010
Telephone: (202) 745-2001               _____

14

BRSI 000207

 CONFIDENTIAL

## UTILIZATION REVIEW PROCEDURES

### PRE-AUTHORIZATION PROCESS:

All elective procedures including obstetrical must be pre-
authorized.  In the HMO setting, the admitting physician is
required to notify the Utilization Review Department.  We have
an answering machine dedicated to pre-authorizations with a taped
instruction message.  The information is retrieved from the
machine, a hospital authorization form is completed and the
information is entered into the computer with the length of stay
included.  If requested, the admitting physician is called back
with an authorization number and duration of inital length of
stay.  The  hospital authorization forms are filed by date to
await hospital notification.

### PRE-AUTHORIZED/EMERGENCY/DIRECT HOSPITAL ADMISSIONS

Participating hospitals are required to notify the Utilization
Review Department of emergency and direct admissions at time of
admission.  There is a dedicated answering machine for hospital
notification available 24 hours per day with a taped instruction
message.  During regular business hours, information is retrieved
from the machine frequently at intervals not to exceed 2 hours.
After the information is retrieved, a hospital authorization form
is completed, the admission is entered into the computer and the
hospital is notified of the benefit/coverage information and the
initial length of stay, if requested.

Non participating hospital calls are forwarded directly to the
Census Coordinator who takes the information on the admission as
well as name and phone number of contact person at the admitting
hospital.  The same procedure is then followed to process the
admission as with the participating hospitals.

The Concurrent Review Coordinators are assigned to specific
hospitals and are responsible for determining the initial length
of stay which is entered into the computer with the other
hospital admisson information. Each day the Census Coordinator
calls the hospitals to check on discharges of those members whose
initial length of stay is due to expire in 24 to 48 hours.  The
hospital authorization forms of those members who remain
hospitalized are distributed to the appropriate Coordinators who
then conduct an onsite chart review or a telephone review to
determine the medical necessity of continuing the
hospitalization.  If it is determined that the member requires
additional acute care, the length of stay is extended based on
documented medical necessity.  If the determination is that an
acute care setting is no longer necessary, the physician is
notified by phone that coverage will terminate within 24 hours
unless there is documented medical necessity.

BRSI 000208

⚏ CONFIDENTIAL

Page 2

If it is determined after talking with the physician that the member no longer medically requires an acute level of care but for some reason elects to stay hospitalized the case is referred to the Medical Director for review. If the decision is made to deny further coverage, the hospital and physician are notified by phone with a follow-up letter and the member is notified by hand delivered letter that hospital coverage will cease in 24 hours.

Retro hospital chart reviews are done in the hospital medical records department to determine medical necessity. An example of a case requiring a Retro review would be a weekend discharge of a member who overstayed the assigned number of days.

Case management of complex or chronic patients is done when the Utilization Review Coordinator identifies that the patient has met the established criteria. On lengthy and more complex cases, the department Discharge Planner becomes involved to aid in determining how and when we can safely move the member to another level of care. Other levels of care could include extended care facility, rehabilitation center or skilled care in the home. There is a Home Care Coordinator who is responsible for setting up skilled care in the home when appropriate.

BRSI 000209

[] CONFIDENTIAL

11.    Utilization Review and Case Management - (describe
utilization review process; indicate extent of such activities as
pre-admission certification, concurrent review, retrospective
review, second opinion surgery, and discharge plan screening.   Is
a contract in place for external peer review?)

The Utilization Review department is notified of all hospital
admissions, either prior to, as in pre-authorization by the
admitting physician, or in the case of an urgent or an emergency
situation at the actual time of admission.

The physicians are required to pre-authorize all elective
admissions with the Utilization Review department.   When the
department receives the information it is reviewed for compliance
with the approved procedures.   An initial length of stay is then
determined using the professional activity study criteria and the
ICD-9-CM books published by CPHA.   The physician is then notified
of the decision.   A similar process is followed when the
department is notified of an urgent or emergency admission.   A
length of stay is determined using the above mentioned reference
books.

The concurrent review process is implemented if the member is
still an inpatient on the projected discharge date.   The member's
record is reviewed onsite or the admitting physician is consulted
by phone.   Additional impatient days are authorized if medically
indicated.

In the event that a member is discharged from a hospital beyond
the assigned length of stay but before a review can be done, a
Coordinator will review the chart in the hospital medical records
department.

A second opinion screening program for selected surgical
procedures will become effective December 1, 1987.

All of the Utilization Review Coordinators are involved in
discharge planning.   The more difficult cases such as premature
infants, terminal patients and those requiring extended physical
rehabilitation are referred to our Coordinator of Discharge
Planning, who works closely with social workers and our Home
Health Coordinator.

The Peer Review committee meets every other month with the
Medical Director to review and give guidance on selected or
difficult cases.

The Concurrent Review Coordinators, Discharge Planner, Medical
Director, and the Manager and Supervisor of the Utilization
Review department meet weekly to discuss case management of
*Complex* cases with Senior management.

BRSI 000210

## CONFIDENTIAL

Page 2

12.    Utilization Experience - (indicate your actual experience
       for the following:-

    a.  Physician outpatient visits per 1000 enrolees
        3000 PCP visits/1000
        2000 Specialist visits/1000

    b.  Average cost per outpatient visit
        $43.22 per PCP visit

    c.  Inpatient days per thousand - 307

    d.  Average length of stay for:
        1.  Surgical  3.9
        2.  Medical  4.7
        3.  Maternity  2.5
        4.  Mental Health  10.7
            (includes substance above as of 5/1)
        5.  Substance Abuse  21 (prior to 5/1)

BRSI 000211

⨉ CONFIDENTIAL

*Attachment B*
*Children's Hospital*
*Hospital Services Listing*
*AS OF: December 1, 1998*

**Inpatient Specialty Services**

Medical Services

| | | | |
|---|---|---|---|
| _____ | Cardiology | _____ Adult | ✓ Pediatric |
| _____ | Cardiac Care Unit | _____ Adult | ✓ Pediatric |
| _____ | Cardiology | _____ Adult | ✓ Pediatric |
| _____ | Endocrinology | _____ Adult | ✓ Pediatric |
| _____ | Gastroenterology | _____ Adult | ✓ Pediatric |
| _____ | Gerontology | _____ Adult | _____ Pediatric |
| _____ | Hematology/Oncology | _____ Adult | ✓ Pediatric |
| _____ | Infectious Disease | _____ Adult | ✓ Pediatric |
| _____ | Intensive Care Unit | _____ Adult | ✓ Pediatric |
| _____ | Neonatology, Level II Unit | _____ Adult | ✓ Pediatric |
| _____ | Neonatology, Level III Unit | _____ Adult | ✓ Pediatric |
| _____ | Nephrology | _____ Adult | ✓ Pediatric |
| _____ | Neurology | _____ Adult | ✓ Pediatric |
| _____ | Nursery | | ✓ Pediatric |
| _____ | Rehabilitation, Physical | _____ Adult | _____ Pediatric |
| _____ | Rheumatology | _____ Adult | ✓ Pediatric |

Surgical Services

| | | | |
|---|---|---|---|
| _____ | Burns | _____ Adult | ✓ Pediatric |
| _____ | Cardiovascular Surgery | _____ Adult | ✓ Pediatric |
| _____ | General Surgery | _____ Adult | ✓ Pediatric |
| _____ | Gynecology | _____ Adult | ✓ Pediatric |
| _____ | Hand Surgery | _____ Adult | ✓ Pediatric |
| _____ | Neurosurgery | _____ Adult | ✓ Pediatric |
| _____ | Obstetrics | _____ Adult | _____ Pediatric |
| _____ | Orthopedics | _____ Adult | ✓ Pediatric |
| _____ | Opthalmology | _____ Adult | ✓ Pediatric |
| _____ | Oral Surgery | _____ Adult | ✓ Pediatric |
| _____ | Otolaryngology | _____ Adult | ✓ Pediatric |
| _____ | Plastic Surgery | _____ Adult | ✓ Pediatric |
| _____ | ~~Podiatry~~ *Foot surgery* | _____ Adult | ✓ Pediatric |
| _____ | Proctology/Colon Rectal | _____ Adult | ✓ Pediatric |
| _____ | Thoracic | _____ Adult | ✓ Pediatric |
| _____ | Urology | _____ Adult | ✓ Pediatric |
| _____ | Vascular | _____ Adult | ✓ Pediatric |
| _____ | Trauma | _____ Adult | ✓ Pediatric |

Psychiatry/Behavioral/Mental Health

| | | | |
|---|---|---|---|
| _____ | Inpatient | _____ Adult | ✓ Adolescent |
| _____ | Partial Hospitalization (Day Treatment) | _____ Adult | ✓ Adolescent |
| _____ | Rehabilitation, Behavioral | _____ Adult | _____ Adolescent |

BRSI 000212

CONFIDENTIAL

*Attachment B (Continued)*
*Children's Hospital*
*Hospital Service Listing (Continued)*
*AS OF: December 1, 1998*

Tertiary Services - Referral Center Designation Requires Separate Attachment

*Cardiac Surgery*

| | | |
|---|---|---|
| _____ Catheterization | _____ Adult | ✓ Pediatric |
| _____ Angioplasty | _____ Adult | ✓ Pediatric |
| _____ Coronary Artery Bypass | _____ Adult | _____ Pediatric |

*Transplants*

| | | |
|---|---|---|
| _____ Bone Marrow – Autologus | _____ Adult | ✓ Pediatric |
| _____ Bone Marrow – Allogenic, Related | _____ Adult | ✓ Pediatric |
| _____ Bone Marrow – Allogenic, Unrelated | _____ Adult | ✓ Pediatric |
| _____ Heart | _____ Adult | ✓ Pediatric |
| _____ Kidney | _____ Adult | ✓ Pediatric |
| _____ Kidney/Pancreas | _____ Adult | _____ Pediatric |
| _____ Liver | _____ Adult | _____ Pediatric |
| _____ Lung | _____ Adult | _____ Pediatric |

## Facility/Outpatient Clinical Services

- ✓ Ambulatory Surgery - Referral Center Designation Requires Separate Attachment
- ✓ Blood Bank
- ✓ Cardiac Catheterization – Referral Center Designation Requires Separate Attachment
- ✓ Cardio Diagnostic Testing
- _____ Comprehensive Geriatric Assessment
- ✓ CT Scanner - Referral Center Designation Requires Separate Attachment
- ✓ Day Treatment/Partial Hospitalization
- ✓ Diagnostic Radioisotope
- ✓ Emergency Department
- _____ Extracorporeal Shock Wave Lithotripter - Referral Center Designation Requires Separate Attachment
- ✓ Family Planning Services
- ✓ Genetic Counseling/Screening Services
- ✓ Health Promotion Services
- ✓ Hemodialysis - Referral Center Designation Requires Separate Attachment
- ✓ Home Health Services – Referral Center Designation Requires Separate Attachment
- _____ Hospice - Referral Center Designation Requires Separate Attachment
- ✓ Infusion/Chemo Therapy - Referral Center Designation Requires Separate Attachment
- ✓ Magnetic Resonance Imaging - Referral Center Designation Requires Separate Attachment
- ✓ Megavoltage Radiation Therapy - Referral Center Designation Requires Separate Attachment
- ✓ Occupational Therapy - Referral Center Designation Requires Separate Attachment
- ✓ Pain Management - Referral Center Designation Requires Separate Attachment
- ✓ Physical Therapy - Referral Center Designation Requires Separate Attachment
- ✓ Skilled Nursing/Long Term Care - Referral Center Designation Requires Separate Attachment
- ✓ Speech Therapy - Referral Center Designation Requires Separate Attachment

BRSI 000213

**⚓ CONFIDENTIAL**

*Attachment B (Continued)*
*Children's Hospital*
*Hospital Service Listing (Continued)*
*AS OF: December 1, 1998*

Radiology - Referral Center Designation Requires Separate Attachment
Substance Abuse/Chemical Dependency - Referral Center Designation Requires Separate Attachment

Other Facility/Outpatient Clinical Services Not Addressed in this Agreement Require Separate Attachment

*Physician Services*

Hospital Based Radiology: Group's Name _Children's Hospital Physicians_
Hospital Based Anesthesia: Group's Name _Children's Hospital Physicians_
    Certified Nurse Anesthetist Employed By: (Circle One)    Hospital Group
Hospital Based Pathology: Group's Name _Children's Hospital Physicians_
Hospital Based Emergency Services: Group's Name _Children's Hospital Physicians_
Hospital Based Neonatology: Group's Name _Children's Hospital Physicians_
Hospital Based Intensivist: Group's Name _Children's Hospital Physicians_
Other: _____

_____
_____
_____
_____

BRSI 000214

**☐ CONFIDENTIAL**

**FILE COPY**

## FIFTH ADDENDUM TO AGREEMENT
### BETWEEN
### MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
### AND
### CHILDREN'S NATIONAL MEDICAL CENTER

THIS FIFTH ADDENDUM, effective April 1, 1995, is made part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc. (hereinafter "Health Plan") and CHILDREN'S NATIONAL MEDICAL CENTER (hereinafter "Hospital"), as amended on July 1, 1990, April 1, 1991, September 1, 1992 and July 1, 1992.

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

The Diabetes Program of Children's National Medical Center as described in attachment A of this addendum and dated February 1995 is incorporated into the existing contract between the Health Plan and the Hospital in its entirety.

All other pricing, terms and conditions, except as previously modified, remain in effect.

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____ Typed Name:    J. Stevens Dufresne

Title:    Executive Vice President, Provider Networks

CHILDREN'S NATIONAL MEDICAL CENTER

By: _____    Typed Name: _____

Title: _____    Address: _____

_____

BRSI 000215

[I] CONFIDENTIAL

FIFTH ADDENDUM TO AGREEMENT
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

FIFTH

THIS FOURTH ADDENDUM, effective September 15, 1993, is made part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc., (hereinafter "Health Plan") and CHILDREN'S HOSPITAL (hereinafter "Hospital"), as amended on July 1, 1990, April 1, 1991, September 1, 1992, and July 1, 1992.

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

I.     Attachment A of the Agreement is deleted and replaced with the new Attachment A which is incorporated herein by reference effective September 15, 1993. This in no way effects rates for reimbursement to PPO members, which are previously incorporated by reference in Attachment A-1.

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____     Typed name: _J. Stevens Dufresne_____

Title: _Executive Vice President_____     Address: _4 Taft Court_____
                                                       _Rockville, MD  20850_

CHILDREN'S HOSPITAL

By: _____     Typed name: _Michelle K. Mahan_____
        10 . 17 . 94

Title: _Vice President, Finance_____     Address: 111 Michigan Avenue, N.W.
                                                       Washington, D.C. 20010

BRSI 000216

CONFIDENTIAL

FOURTH ADDENDUM TO AGREEMENT
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

THIS FOURTH ADDENDUM, effective July, 1, 1992, is made part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc., (hereinafter "Health Plan") and CHILDREN'S HOSPITAL (hereinafter "Hospital"), as amended on July 1, 1990, April 1, 1991, and September 1, 1992.

WHEREAS, the Health Plan and the Hospital mutually desire to provide hospital care services and to serve and enhance patient dignity;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

I.    Article II - Health Services
      Insert the following after the fourth paragraph:

      "Throughout the term of this agreement, Health Plan will continue to identify Hospital and members of Children's Faculty Associates, Inc. as "community hospital" and "community participating providers" and will not limit the authorization of services rendered at Hospital by members of Children's Faculty Associates, Inc. any more than for other community-based physicians."

II.   Article V - Compensation
      Insert the following after fourth paragraph:

      "Hospital and Health Plan acknowledge that there may be outliers identified by Hospital during the contract year which were not defined at the time of this agreement. Hospitals and Health Plan agree to negotiate in good faith on such outlier claims to ensure that Children's receives fair and adequate payment."

III.  Article VI, Section A - Billings
      Insert the following after the last sentence of the sixth paragraph:

      "Hospital reserves the right to interim bill Health Plan for members continuously hospitalized for 30 days or more."

BRSI 000217

Fourth Addendum to Hospital Services Agreement **CONFIDENTIAL**
Effective July 1, 1992
Page Two of Two

"Notwithstanding the preceding paragraph, both Hospital and
Health Plan recognize the outlier reimbursement structure is
complex and sometimes difficult to administer. Hospital will
make every effort to ensure the coding is accurate and submit
any adjustments and/or corrections in a timely manner. Until
improved software is available, Hospital will make best
efforts to notify Health Plan of outlier cases as they are
identified during the concurrent review process with the
utilization management worksheet. Health Plan will make every
effort to pay claims, including the additional outlier
payments, on a timely basis the first time the claim is
received. Health Plan will not deny outlier payments for up
to twelve months following the submission of a final claim
solely due to the lack of correct coding on the UB-82 or its
successor. Health Plan will make requested corrections in
outlier payments within the payment timeframe specified in
Article V."

IV.  Attachment A of the Agreement is deleted and replaced with the
     new Attachment A which is incorporated herein by reference
     effective July 1, 1992. This in no way effects rates for
     reimbursement to PPO members, which are previously
     incorporated by reference in Attachment A-1.

V.   Except as expressly provided herein, the Agreement shall
     remain unmodified and in full force and effect.


     IN WITNESS THEREOF, the parties hereto have caused this
Agreement to be executed by their duly authorized representatives.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.

By: _____    Typed name:_____

Title: _MANSI_____   Address:_____

                                 _____


CHILDREN'S HOSPITAL

By: _____    Typed name:_Michelle K. Mahan_

Title:_Vice President, Finance__ Address:_____

                                 _____

BRSI 000218

¶ CONFIDENTIAL

THIRD ADDENDUM TO AGREEMENT
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

THIS THIRD ADDENDUM, effective September 1, 1992, is made a part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July 1988 between MD-Individual Practice Association, Inc. (hereinafter "Health Plan") and Children's Hospital (hereinafter "Hospital") as amended on July 1, 1990, and April 1, 1991.

WHEREAS, Health Plan is associated with various Preferred Provider Arrangements to deliver or arrange for the delivery of health services;

WHEREAS, the parties wish to renegotiate reimbursement rates for Preferred Provider Arrangements and other terms effective September 1, 1992;

NOW THEREFORE, in consideration of the mutual premises herein stated, it is agreed by and between the parties hereto as follows:

1.    Article I

      Amend Definitions as follows:

      a.    Delete the last sentence in the definition of "Member", Section G, and replace with the following. "Member" also means enrolled persons in the Mid-Atlantic Psychiatric Services, Inc.

      b.    Replace section J with the following: "Health Plan" or "Health Maintenance Organization" means MD-Individual Practice Association, Inc., Mid-Atlantic Psychiatric Services, Inc.

      a.k.    Create new section K to read as follows: "PPO Member" means any person who is enrolled in an organization conducting a Preferred Provider Arrangement (such as Alliance PPO) under which Health Plan has contracted with an employer, insurance company, or other third party. For all purposes other than reimbursement, "Member" includes "PPO Member".

BRSI 000219

## ⬚ CONFIDENTIAL

CH and MD-IPA
Third Addendum
Page Two

2.  <u>Reimbursement Rates:</u>  Article V – Compensation, add the following paragraphs
    between paragraph two and three:

    Attachment A of the Agreement (Reimbursement) applies to
    all services rendered to members other than PPO members.

    Attachment A-I is added to this agreement to reflect a
    rate for services rendered to PPO members, incorporated
    herein by reference.

3.  <u>Confidentiality of Contractual Provision</u>

    Article XV – Miscellaneous, add a new paragraph L as follows:

    "The rates of this Agreement shall remain confidential and
    each party shall take precautions and make best efforts to
    prevent any disclosure except to duly authorized
    representatives, employees, and members of either party as is
    required by law."

4.  <u>Full Force and Effect.</u>

    Except as expressly provided herein, the Agreement, as
    amended, shall remain unmodified and in full force and effect.

BRSI 000220

## ¶ CONFIDENTIAL

CH and MD-IPA
~~Third~~ Fourth Addendum
Page Three

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed by their duly authorized representatives.

MD INDIVIDUAL PRACTICE ASSOCIATION, INC.

_____
(Signature)

J. STEVENS DuFRESNE
_____
(Typewritten Name)

Executive Vice President
_____
(Title)

_____
(Date)


CHILDREN'S HOSPITAL

_____          Michelle L Mahan
(Signature)

Ron J. Sloan                              Michelle K. Mahan
_____
(Typewritten Name)

EXECUTIVE VICE PRESIDENT/CCO              VP Finance
_____
(Title)

October 12, 1992
_____
(Date)

BRSI 000221

[1] CONFIDENTIAL

SECOND ADDENDUM TO AGREEMENT
BETWEEN
MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.
AND
CHILDREN'S HOSPITAL

THIS SECOND ADDENDUM, effective April 1, 1991, is made a part of, and incorporated by reference in, the provisions of the Agreement made the 1st day of July, 1988 between MD-Individual Practice Association, Inc. (hereinafter "Health Plan") and Children's Hospital (previously referred to as Children's Hospital National Medical Center; hereinafter "Hospital"). Furthermore, the Second Addendum surpasses the First Addendum as of April 1, 1991.

WHEREAS, Health Plan and Hospital desire to preserve and enhance delivery of health services; and

WHEREAS, Health Plan is associated with various preferred provider arrangements to deliver or arrange for the delivery of health services;

NOW THEREFORE, in consideration of the mutual promises herein stated, it is agreed by and between the parties hereto as follows:

1.   Article I - Definitions, shall be amended as follows:

   a.   The definition of "Member" at Section G will remain as written, and the following language will be added at the end of the current definition. "Member" also means enrolled persons in the Mid-Atlantic Psychiatric Services, Inc. or organizations conducting a preferred provider arrangement in association with Alliance PPO, Inc. (hereinafter referred to as "Health Plan" or "Health Maintenance Organization")."

   b.   Add a new definition as Section I as follows:  "Preferred Provider Arrangement" means a written arrangement (Purchaser Service Agreement) under which Health Plan has contracted with an employer, insurance company, or other third party (hereinafter referred to as the "Payor") under which Payor or contract beneficiary of the Payor has access to Health Plan providers, including Hospital, and receives services from Hospital under the terms of this Hospital Service Agreement.  Hospital will look solely to Payor for payment of services provided to employees or contract beneficiary of Payor and shall not in any event look to Health Plan for such payment.  For purposes of this definition, Payor is exactly the same as the Purchaser and will be used interchangeably to define the same entity.  Health Plan will provide Hospital with updated lists of Payors or Purchasers from time to time upon request of Hospital.

BRSI 000222

M.D. IPA and CH
Second Addendum
Page 2

**⊓ CONFIDENTIAL**

    c.   Add a new definition as Section J as follows:  "Health Plan" or "Health Maintenance Organization" means MD-Individual Practice Association, Inc., Mid-Atlantic Psychiatric Services, Inc. or Alliance PPO, Inc.

2.   <u>Article II</u> -  Replace the last paragraph of this article in its entirety with the following:

       The Health Plan shall allow Plan Providers to refer Members to Hospital for all services which are approved by a Member's primary care physician.  Health Plan's administrative manuals, provider directories, and all other internal and provider reference materials will indicate Hospital is a full-service facility with "community hospital;" status at each document's next printing.  Until such printing, Health Plan shall ensure its staff use their best efforts to inform inquiring members and Participating Providers of the Hospital's full-service status.  Health Plan will use best efforts to list each Children's Faculty Associates member by name, individually, indicating their specialty and their service locations, in the Provider Directory.  Prior to directory publication, Health Plan will provide Hospital with two working days to review and proof listing of Children's Faculty Associates' member information.  In the event that Hospital fails to provide necessary corrections to Health Plan by the end of the second working day, Health Plan reserves the right to publish the directory without delay.

3.   <u>Article V</u> - Compensation, shall be amended as follows:

In Paragraph three, lines three and seven, reduce the forty-five (45) day payment timeframe to forty (40) days.

Add a new fifth paragraph to the existing language as follows:

       Notwithstanding the above, Health Plan is not responsible for payments for Services rendered to Members who are participants under a preferred provider arrangement. Health Plan will assist Hospital to resolve reimbursement issues with Payors or Purchasers.

       If Hospital notifies Health Plan that a Purchaser has failed to (1) comply with the identification and verification of coverage requirements of the Agreement or (2) pay a claim within the timeframe set forth in the Purchaser Service Agreement, then Health Plan shall have ten (10) days to correct such breach.  If Health Plan is unable to cure within ten (10) days, Health Plan's rights under the applicable Purchaser Service Agreement, including the

BRSI 000223

M.D. IPA and CH
Second Addendum
Page 3

**☊ CONFIDENTIAL**

        arbitration remedy, if any, shall be automatically assigned
to Hospital to enforce performance of Purchaser's
obligations.  Until Purchaser corrects such breach, Hospital
shall have no obligation to render services to the
Purchaser's Members.

4.   <u>Article VI</u> - Billings, shall be replaced in its entirety, as
follows,

        The Hospital shall bill the Health Plan for all
Hospital Services rendered to Members.  Billings shall
include identifying patient information and an itemized
record of services and charges in customary bill form (UB-
82).  All bills shall be sent to:

               MD-Individual Practice Association, Inc.
               4 Taft Court
               Rockville, Maryland  20850

(A)  With respect to services provided to Members in the Health
Maintenance Organization:

        Hospital hereby agrees that in no event, including, but
not limited to, non-payment by the Health Maintenance
Organization, Health Maintenance Organization insolvency or
breach of this Agreement, shall Hospital bill, charge,
collect a deposit from, seek compensation, remuneration or
reimbursement from, or have any recourse against
subscribers, Members or persons other than the Health
Maintenance Organization for services provided pursuant to
this Agreement.  This provision shall not prohibit
collection of any applicable copayments, deductibles billed
in accordance with the terms of the Health Maintenance
Organization's subscriber agreement, or fees for non-covered
services.

        Copayments are the responsibility of the subscriber or
Member to pay at the time of services and Hospital agrees to
use best efforts to collect such fees from subscriber/Member
at the time services are rendered.

        Hospital further agrees that (1) this provision shall
survive the termination of this Agreement regardless of the
cause giving rise to such termination and shall be construed
to be for the benefit of the Health Maintenance
Organization's subscribers or Members and that (2) this
provision supersedes any oral or written agreement to the
contrary now existing or hereafter entered into between

BRSI 000224

M.D. IPA and CH
Second Addendum
Page 4

**⬚ CONFIDENTIAL**

Hospital and the subscriber, Member or persons acting on the
subscriber's behalf.

Any modifications, additions, or deletions to the
provisions of this hold harmless clause shall become
effective on a date no earlier than fifteen (15) days after
the State Corporation Commission and thirty (30) days after
the appropriate regulating entity have received written
notice of such proposed changes.

In the event that revenues of the Health Plan are
insufficient to pay Hospital the compensation due, Hospital
agrees to furnish to Members services specified in the
Section(s) that describe health and or Hospital services to
be provided a Member for a period of thirty (30) days from
the day that revenue insufficiency occurs.

Except for circumstances which are beyond the control
of Hospital, no payment shall be made unless the bill for
services is received within one hundred twenty (120) days
after the most recent date of discharge of the Member or
date of service, whichever occurs later; provided, however,
for a Member who is hospitalized continuously, Hospital may,
at its option, submit a bill every thirty (30) days.
Hospital shall appeal all Health Plan denials of payment
within ninety (90) days from the date Hospital receives
written notice of a denied claim.  All billings by Hospital
may be considered final by Health Plan unless adjustments
are requested in writing by Hospital within sixty (60) days
after receipt of such billing by Health Plan.

Health Plan shall pay the Hospital 90% of the amount
due as set forth in this Agreement on all disputed claims
pending resolution of the dispute; provided, Hospital
responds in writing within thirty (30) days to written
inquiries received from Health Plan regarding disputed
amounts.  If Health Plan disagrees with the charges on any
bill, it shall notify Hospital in writing of the disputed
charges within thirty (30) days after receipt of the bill.
The above provision for 90% payment on disputed claims does
not apply to claims which have been denied for reasons other
than disputed related to the amount of charges for services
rendered by Hospital.

(B)  With respect to individuals who participate in a Preferred
Provider Arrangement:

Hospital hereby agrees that in no event, including, but

BRSI 000225

‖ CONFIDENTIAL

not limited to, non-payment by any employer, insurance
company or other third party contracting with Health Plan
for provision of services under a preferred provider
arrangement, the insolvency of the previously enumerated
Payors or breach of this Hospital Service Agreement, shall
Hospital bill, charge, collect a deposit from, seek
compensation, remuneration or reimbursement from, or have
any recourse against subscribers, Members or persons other
than the ultimate Payor of services provided pursuant to
this Hospital Service Agreement.  This provision shall not
prohibit collection of any applicable copayment, deductibles
billed in accordance with the terms of the subscriber's
agreement, or fees for non-covered services.

Copayments are the responsibility of the subscriber or
Member to pay at the time of services, and Hospital agrees
to use its best efforts to collect such fees from
subscriber/Member at the time services are rendered.

Hospital further agrees that (1) this provision shall
survive the termination of this Hospital Service Agreement,
regardless of the cause given rise to such termination and
shall be construed to be for the benefit of the
subscriber/Member, and that (2) this provision supersedes
any oral or written agreement to the contrary now existing
or hereinafter entered into between Hospital and the
subscriber, Member or persons acting on the subscriber's
behalf.

Any modifications, additions, or deletions to the
provision of this hold harmless clause shall become
effective on a date no earlier than fifteen (15) days after
the State Corporation Commission and thirty (30) days after
the appropriate regulating entity have received written
notice of such proposed changes.

Except for circumstances which are beyond the control
of Hospital, no payment shall be made unless the bill for
services is received within one hundred twenty (120) days
after the date of discharge of the Member or date of
service, whichever occurs later.  All billings by Hospital
may be considered final by Health Plan unless adjustments
are requested in writing by Hospital within sixty (60) days
after receipt of such billing by Health Plan.

5.   Attachment A of the Agreement is deleted and replaced with the
     revised Attachment A, effective April 1, 1991, which is
     incorporated herein by reference.

BRSI 000226

M.D. IPA and CH
Second Addendum
Page 6                          ⌐⌐CONFIDENTIAL

6.    <u>Article XIV</u> - Term and Termination, first and second paragraphs
      shall be deleted and replaced by the following:

            This Agreement shall be effective from April 1, 1991,
      until March 31, 1993, whereupon the terms of the Agreement
      will automatically be extended for one year periods unless
      sooner terminated.

            Not withstanding anything herein to the contrary, this
      Agreement may be terminated by Hospital or Health Plan upon
      giving at least sixty (60) days written notice.

7.    <u>Article XV</u> - Miscellaneous, paragraph D will be amended to change
      the Hospital's mailing address to:

                  Director, Managed Care
                  Office of Managed Care
                  Children's Hospital
                  111 Michigan Avenue, N.W.
                  Washington, D.C.   20010-2970

      with a copy to General Counsel at the same address, and the
      Health Plan's mailing address to:

                  Senior Vice President, Provider Networks
                  Mid-Atlantic Medical Services, Inc.
                  4 Taft Court
                  Rockville, Maryland   20850-4168

Except as expressly provided herein, the Agreement shall remain
unmodified and in full force and effect.

BRSI 000227

M.D. IPA and CH
Second Addendum
Page 7

! CONFIDENTIAL

IN WITNESS THEREOF, the undersigned have executed this Second Addendum
to the Agreement as of the date noted below.

MD-INDIVIDUAL PRACTICE ASSOCIATION, INC.:

By: _____

Title: _____

Telephone: ___301- 257-4076___

Date: _____


CHILDREN'S HOSPITAL:

By: _____

Title: _____EXECUTIVE VICE PRESIDENT/COO_____

Telephone: _____(202) 745-2001_____

Date: _____October 22, 1991_____


BRSI 000228

:[] **CONFIDENTIAL**

**FIRST AMENDMENT TO THE HOSPITAL SERVICES AGREEMENT**

between

**CHILDREN'S HOSPITAL AND M.D.IPA**

This First Amendment to the Hospital Services Agreement effective July 1, 1990 is made and entered into by and between the M.D. INDIVIDUAL PRACTICE ASSOCIATION, INC., (hereinafter "Health Plan"), and CHILDREN'S HOSPITAL (previously referred to as Children's Hospital National Medical Center, hereinafter "Hospital").

Whereas, the Health Plan and Hospital mutually desire to amend the Agreement in certain respects.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.  Reimbursement Rates.

Attachment A of the Agreement is deleted and replaced with the new Attachment A which is incorporated herein by reference effective July 1, 1990.

2.  Term and Termination.

The first sentence of Paragraph Two of Section XIV is revised to reflect the State of Virginia's Insurance Code (1989) requirement that providers give health maintenance organizations sixty days notice of termination. Paragraph Two, Section XIV will therefore be deleted and replaced with the following:

"Notwithstanding anything herein to the contrary, this Agreement may be terminated by Hospital upon giving at least sixty (60) days written notice to Health Plan. Health Plan may terminate this Agreement upon giving at least ninety (90) days written notice to Hospital."

3.  Full Force and Effect.

Except as expressly provided herein, the Agreement shall remain unmodified and in full force and effect.

BRSI 000229

‖ CONFIDENTIAL

| CONTRACTING ENTITY: | CONTRACT TYPE: | DEPARTMENT/PORTFOLIO: |
|---|---|---|
| PRINT HERE | PRINT HERE | PRINT HERE |

CONTRACTING ENTITY: `1` 
CONTRACT TYPE: `9` `8` `8`
DEPARTMENT/PORTFOLIO: `1` `6` `1` `2`

DARKEN HERE

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| ■ | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | | ■ | 1 | ■ | 1 |
| 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 | | 2 | 2 | 2 | ■ |
| 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 | | 5 | 5 | 5 | 5 | | 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 | | 8 | ■ | ■ | 8 | | 8 | ■ | 8 | 8 |
| 9 | 9 | 9 | 9 | | ■ | 9 | 9 | 9 | | 9 | 9 | 9 | 9 |

PAGE 1 OF 3

FORM VERSION:    ☐ ■ ☐ ☐

BRSI 000230

CONFIDENTIAL

USER NAME, PRIMARY:        USER NAME, SECONDARY:        SITE/BUILDING:

PRINT HERE                 PRINT HERE                   PRINT HERE

[ 2 ] [ 3 ] [   ] [   ]    [ 2 ] [ 0 ] [   ] [   ]      [ 1 ] [   ] [   ] [   ]

DARKEN HERE                DARKEN HERE                  DARKEN HERE

| 0 | 0 | 0 | 0 |   | 0 | ■ | 0 | 0 |   | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 |   | 1 | 1 | 1 | 1 |   | ■ | 1 | 1 | 1 |
| ■ | 2 | 2 | 2 |   | ■ | 2 | 2 | 2 |   | 2 | 2 | 2 | 2 |
| 3 | ■ | 3 | 3 |   | 3 | 3 | 3 | 3 |   | 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |   | 4 | 4 | 4 | 4 |   | 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |   | 5 | 5 | 5 | 5 |   | 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |   | 6 | 6 | 6 | 6 |   | 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |   | 7 | 7 | 7 | 7 |   | 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 |   | 8 | 8 | 8 | 8 |   | 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |   | 9 | 9 | 9 | 9 |   | 9 | 9 | 9 | 9 |

PAGE 2 OF 3

BRSI 000231

CONFIDENTIAL

SITE/BUILDING: [ ] [ ] [ ] [ ]     SITE/BUILDING: [ ] [ ] [ ] [ ]     SITE/BUILDING: [ ] [ ] [ ] [ ]

| 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 | | 5 | 5 | 5 | 5 | | 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 | | 8 | 8 | 8 | 8 | | 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 | | 9 | 9 | 9 | 9 | | 9 | 9 | 9 | 9 |

SITE/BUILDING: [ ] [ ] [ ] [ ]     SITE/BUILDING: [ ] [ ] [ ] [ ]     SITE/BUILDING: [ ] [ ] [ ] [ ]

| 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 | | 5 | 5 | 5 | 5 | | 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 | | 8 | 8 | 8 | 8 | | 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 | | 9 | 9 | 9 | 9 | | 9 | 9 | 9 | 9 |